**ST. LOUIS DEVELOPMENTAL DISA-BILITIES TREATMENT CENTER PARENTS ASSOCIATION, et al.,** Plaintiffs,

v.

**Arthur L. MALLORY, et al.,** Defendants.

**No. 80–4012–CV–C–H.**

United States District Court, W.D. Missouri, C.D.

Aug. 8, 1984.

Stanley J. Eichner, Robert J. Goodwin, Ann B. Lever, Legal Services of Eastern Missouri, David Howard, Adrienne Volenik, National Center for Youth Law, St. Louis, Mo., for plaintiffs.

Michael Boicourt, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## OPINION AND ORDER

ELMO B. HUNTER, Senior District Judge.

This case, tried to the Court without a jury, presents a challenge to a portion of Missouri's system of providing special education to the handicapped. At issue are the special schools and facilities in Missouri that serve the more profoundly and severely handicapped children of the State. These special schools are attended only by handicapped children.[1] The plaintiffs[2] pos-

---

1. The parties relied on a particular terminology in discussing the different schools. The plaintiffs referred to the separate schools attended only by handicapped children as "segregated" schools and local neighborhood schools attended by the nonhandicapped and the less severely handicapped of the community as "integrated" schools. The defendants referred to the same type of schools as "clustered" and "dispersed," respectively.

The Court will use "special" or "separate" schools for the handicapped only schools. It will use "regular," "local," or "neighborhood" for the public schools attended by the nonhandicapped. Also the use of "schools" encompasses the separate facilities also challenged.

2. The plaintiffs consist of five organizations and thirteen individuals. The five organizational plaintiffs are all advocacy groups. They include the St. Louis Developmental Disabilities Treatment Center Parent's Association, the Missouri Association for Retarded Children, the Missouri Association of Autistic Citizens, Concerned Parents of Caruthersville, and the Missouri Developmental Disabilities Protection and Advocacy Services, Inc. All are not-for-profit corporations, organized and existing under Missouri law. The first four organizations are made up of relatives and friends of the handicapped. The latter organization is funded by the Developmental Disabilities Office of the Department of Health and Human Services and charged

it that the separate nature of the schools prevents the handicapped children who attend them from progressing as they would if they attended a typical, local public school. The defendants,[3] on the other hand, view the special schools as a necessary component of a special education system because not all handicapped children can benefit educationally[4] from attending a regular, neighborhood school.

The plaintiffs have advanced six statutory or constitutional bases for challenging the special schools and facilities. They maintain that placing handicapped children in schools attended only by handicapped children violates the Education of All Handicapped Children Act, 20 U.S.C. § 1401 et seq; Section 504 of the Rehabilitation Act of 1973; the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983; and Missouri statutory law. The plaintiffs seek declaratory and injunctive relief. Specifically, they urge the Court to set out a time table for the closing of all special schools and the "integration" of the handicapped children served in them into local schools. As the plaintiffs view the change, no more than three classes of profoundly handicapped children would be placed in any one regular school. The classes and the schools would be age matched so that elementary aged, profoundly handicapped children would attend a special education class in an elementary school and so on.

The plaintiffs, however, do make a few exceptions. One, the plaintiffs do not actually urge that all handicapped children be allowed to attend regular schools. They except the medically fragile, and the physically abusive.[5] The medically fragile are children for whom attending a regular school would pose a potentially life threatening danger. These are children who can not be moved safely. The physically abusive are children who due to their aggressive behavior pose a physical threat to themselves or others. Two, the plaintiffs do not seek the closing of all special schools that serve only the handicapped. They do not challenge the State School for the Blind nor the State School for the Deaf. The plaintiffs' efforts are directed at the

with advocating for the rights of the handicapped in Missouri. Stips. 40–44. See Title 42 U.S.C. § 6000 et seq.

The thirteen individual plaintiffs are all handicapped and had all attended or were attending a special school. As of June, 1983, nine of them attended separate schools maintained by the defendants, one received instruction at home, one attended a regular public school while awaiting the outcome of a challenge to his placement in a special school, and two no longer attended public school because they had surpassed the statutory age for eligibility to receive a public education in Missouri. Each brought suit through their next friend.

3. Defendants include the Missouri Department of Elementary and Secondary Education, Dr. Arthur L. Mallory the Commissioner of Education, Dr. Leonard W. Hall the Assistant Commissioner in charge of Special Education, the Missouri State Board of Education, the Missouri Department of Mental Health, Paul R. Ahr the Director of the Department of Mental Health, the Special School District of St. Louis County, Pemiscot County Special School District, St. Louis City School District, and seven other local school districts.

All of the school districts and the state departments and agencies were organized pursuant to state law. All the school districts and the State receives federal money from the Department of Health and Human Services (HHS) and the Department of Education (DOE). The Missouri Department of Elementary and Secondary Education, the Department of Mental Health, and the two special school districts maintain the separate schools challenged by the plaintiffs.

The State of Missouri represented its departments, agencies, officials, one of the special school districts, and seven of the local districts at trial. The Special School District of St. Louis County and the St. Louis City School District were represented by their own counsel and presented evidence on their own behalf.

4. The term "education" is used in a broader than normal sense when discussing the more profoundly handicapped. Typically, "education" is thought of in terms of academics: math, language, science, etc. Academics are only secondary considerations when planning an educational program for the severely handicapped. The focus is on teaching "everyday" skills that most people take for granted: dressing, eating, toileting, ambulating, speaking, etc. The Court employs the term in its broader sense throughout the opinion.

5. When the Court speaks of the handicapped children the plaintiffs seek to "integrate," it will always be with these exceptions in mind.

State Schools for the Severely Handicapped, the State Schools and Hospitals administered by the Department of Mental Health, and the separate schools maintained by the two special school districts. Again, the Court emphasizes that the issue presented is not whether any of the individual plaintiffs have been mistakenly placed in a special school,[6] but whether the defendants' special education system which utilizes separate schools violates any of the statutory or constitutional provisions al-

6. Although the plaintiffs do not press any individual claims and resolution of the systemic challenges presented does not hinge on the nature of the individual plaintiffs' handicaps, a brief description of their handicaps should serve as a useful backdrop in analyzing the challenges to the defendant's system. The individual plaintiffs have been referred to by their initials throughout the proceedings in order to protect their privacy. Their full names are on file under seal. Discussed, first, are the plaintiffs who have attended or are attending special schools under the direct auspices of the DESE or the St. Louis Co. Special School District (St. Louis Co. SSD). The age of each child is as of June 15, 1983, the date the stipulations were filed. Finally, the plaintiffs are listed in alphabetical order without regard to the relative severity of their conditions.

P.B. is nine years' old and attends a school within the St. Louis Co. SSD. P.B. was voluntarily admitted to the Developmental Disabilities Treatment Center (DDTC) in St. Louis in 1976. She was last diagnosed as (1) profoundly mentally retarded, (2) having a mixed seizure disorder, and (3) a flaccid quadriplegic. She has a mental age of six months, a fine and gross motor age of less than two months, and a language and self-care level of three to five months. If a child is at a three months' level it means that she is performing or doing the things one would expect a typical three months' old baby to be able to do. P.B. is unaware of her environment, unaware of where her body is in space, does not track objects, and does not initiate nor seek interaction with others. She is completely dependent on others for self-care. Stip. 53–54; P. Exh. 198; Friedebach at Vol. 10; Emmons at Vol. 13.

Both James Friedebach and Ellen Emmons testified for the defendants. James Friedebach, a licensed, clinical psychologist and the Supervisor of Pupil Accounting and Contract Services for the Division of Special Education, DESE, reviews the evaluations of the handicapping conditions of students referred to the special schools and has participated on numerous evaluation teams. Ellen Emmons is a teacher in one of St. Louis County's special schools, and testified with regard to her pupils.

C.E., an eleven year old, attends one of the special schools administered by the Department of Elementary and Secondary Education (DESE). She has a mental age of two years ten months, and a social age of four years two months. She can communicate and make simple requests, is toilet trained, and can discern colors and shapes. C.E. exhibits many characteristics of an autistic child. She is disinterested in people, has no interest in seeking approval, resists even minor change in her environment, and is overly responsive to the changes. Because C.E. will not generalize, she must be taught each pattern of behavior. Stip. 46; P.Exh. 193; Friedebach at Vol. 10.

J.H. is currently homebound. He is fourteen, blind in both eyes, cerebral palsied, mixed quadriplegic, and has a history of seizure disorder. Although he can not speak, he does vocalize and does appear to understand some things said to him. He can not feed himself nor is he completely toilet trained. J.H. does at times seem to enjoy interacting with people who are familiar to him, but his response usually depends on his health. He was recommended for homebound care because he has difficulty with infections. J.H. is completely dependent on others for self-care. Stip. 62–63; P.Exh. 187; Friedebach at Vol. 10.

P.P. is twelve and also attends a separate school administered by the DESE. He was voluntarily admitted to the DDTC due to viral encephalitis. The last evaluation put P.P. at a mental age of one month, social age of one month, a motoric age of three months. P.P. relies on others to feed, dress, move, and toilet him. He does vocalize by humming, will often react to his name by turning his head, and can fix on an object although he can not consistently track it. P.P. is diagnosed as profoundly, mentally retarded secondary to viral encephalopathy and as having profound seizure disorders. Stip. 51–52; P.Exh. 189; Friedebach at Vol. 10.

M.R., age twelve, attends a DESE school. She is more advanced than some of the other children. She has a mental age of one year three months, a motoric age of one to two years, and a social age of three years. Although M.R. can move independently she does not run, skip, or hop. She still requires assistance dressing and eating. M.R. does appear curious about her environment and expresses herself by gestures, but her attention span remains only a few minutes' long. P.Exh. 199; Friedebach at Vol. 10.

S.R. is twenty-two years old. He was voluntarily admitted to the DDTC, and while he was school age he attended a DESE school and also received homebound instruction. His last evaluation noted a mental level of two months, a language level of two to six months, and a social level of eight months. Although S.R. appears to be aware of his environment, he does not show any interest in it nor does he track or fixate on objects. He will, however, sometimes respond to his name. S.R. is dependent on others for all his needs. He is diagnosed as being profoundly, mentally retarded and as having a seizure disorder. Stip. 57; P.Exh. 185; Friedebach at Vol. 10.

C.S. is thirteen and attending a separate school administered by the St. Louis Co. SSD. She is profoundly mentally retarded due to an

leged.[7] Before turning to the specific challenges, the Court begins with an overview of the special education system in Missouri.

## SPECIAL EDUCATION IN MISSOURI

### I. *Department of Elementary and Secondary Education*

The public school system of Missouri offers a free education to any child, handicapped or nonhandicapped, who lives in the State and is between the ages of six and twenty. Mo.Rev.Stat. §§ 160.051, 162.670. At the beginning of the 1982–83 school year over 805,000 youngsters, including approximately 116,000 handicapped children were enrolled in Missouri's public schools.[8]

interuterine infection, is a spastic quadraplegia, and has a seizure disorder. C.S. has been evaluated as having a mental age of less than one month, a motoric age of one to two months, and her social and language levels are no more than three to five months. She is nonverbal and nonambulatory; she has no self-help skills. C.S. is alert, but generally unresponsive to stimuli in the environment. She also can not differentiate among people. On occasion, however, she will respond to her name or track an object. Her attention span is poor. Finally, C.S. is defensive toward contact with others. When approached by another person she will move into a fetal position. Stips. 49–50; P.Exh. 191; Friedebach at Vol. 10; Emmons at Vol. 13.

A.D.W. is eight. The DESE referred him to a special school. His parents challenged his placement in a special school under the Education of All Handicapped Children Act. He is presently attending a public school pending the outcome of the challenge. A.D.W. is at a two to three year level in social behavior, two and one-half to four year level in motoric ability, and one and one-half year level in language. He is ambulatory, almost toilet trained, able to partially dress himself, and able to speak in short sentences. He has a good attention span when interested, but he prefers to spend time alone. Stips. 47–48; P.Exh. 200.

James Friedebach did not discuss A.D.W. because of A.D.W.'s pending lawsuit in federal district court in the Eastern District of Missouri. The defendants maintained that a discussion of A.D.W.'s particular condition would be improper. This Court in summarizing A.D.W.'s handicapped condition as described in his student records does not intend to nor does it take a position on the propriety of A.D.W.'s placement.

K.W. is seventeen and attends a separate school maintained by the St. Louis Co. SSD. He was voluntarily admitted to the DDTC. K.W. has been diagnosed as profoundly mentally retarded due to cerebral anoxia. At fourteen his language level was evaluated at six to twelve months, his motoric level at seven to eight months, and his mental level at eight to ten months. K.W. is nonverbal, but does make sounds when he wants something, and can carry out simple commands. He is also nonambulatory, but capable of generally propelling himself in his wheelchair in wide areas and on smooth surfaces. K.W. is alert to his environ-

ment and responsive. Stips. 64–65. P.Exh. 192; Friedebach at Vol. 10.

W.W. is a fifteen year old attending one of the DESE's schools. He has a mental age of from one to four months, a social level of sixteen months, and a motoric level of twenty-two months. W.W. is ambulatory and vocalizes, but can not speak. He has shown no desire to express his needs. He has a short attention span and does not respond to his name or commands on any type of consistent basis. W.W. has a tendency to spend his time rocking or beating his chest. His only interaction is a reaching and grabbing movement. He is viewed as profoundly mentally retarded. Stips. 55–56; P.Exhs. 183, 184A, and 184E; Friedebach at Vol. 10.

The remaining three plaintiffs W.C., fourteen, M.P., sixteen, and A.W., twenty-three, all attend or have attended special education classes in the Pemiscot County Special School District (Pemiscot Co. SSD). Stips. 58–61. They appear to be at a higher functioning level. W.C. tested at a mental age of three years eight months. The reports from 1980–81 indicate that he is working on writing his name, the alphabet, and numbers. He is also learning to tell time, recite his address and phone number, identify emergency or signal words. P.Exh. 196. A.W., had a mental age of four years ten months in 1978. She can do some simple math; she can recognize colors, numbers, and letters; and she can write. A.W. has a poor attention span, however, and tends to go to sleep. P.Exh. 197. The record was not complete enough to describe M.P. P. Exh. 195.

7. Although there are several individual plaintiffs, the plaintiffs have never approached this case as a challenge to the individual educational programs and placements of the individual plaintiffs. The plaintiffs have consistently challenged the system and the concept of educating profoundly handicapped students in separate schools. They even sought class certification, but after a hearing on certification the Court denied their request.

8. These figures do not include children who attend private or parochial schools. The defendants suggest that none of the private schools have programs for the more profoundly handicapped, and many do not serve any handicapped children.

SD Exh. 16; Stip. 1.12.[9] The State Board of Education is charged with carrying out the educational policies of the State and with overseeing the public school system. Mo.Rev.Stat. § 161.092. The responsibility for the actual daily administration of the system falls to the Missouri Department of Elementary and Secondary Education (DESE). The DESE administers a system composed of 547 local school districts, two special school districts, and the special schools for handicapped children. Stip. 1.1. The special schools include the fifty-two State Schools for the Severely Handicapped (State Schools) attended by 2,450 profoundly handicapped youngsters, the State School for the Blind and the State School for the Deaf which together served slightly more than 400 children in 1982–83.[10] *Id.* at 1.14. The special schools all fall within the auspices of the Division of Special Education of the DESE. The Division of Special Education is responsible for the education of all of Missouri's school-age handicapped population, including those children served by local school districts. Also, within the auspices of the Division are 291 children served by private agencies under contract with the State Schools. *Id.* at 1.14. Finally, although not in a public school, 216 additional youngsters are educated at public expense by the Department of Mental Health.[11]

In Missouri, the vast majority of the handicapped school-age population attend regular schools and are the educational responsibility of the local school districts. Missouri, by law, favors placing handicapped children in regular schools. Mo. Rev.Stat. § 162.680(2). Of the 116,000 handicapped children in the State, approximately 111,000 attend their regular, neighborhood school. SD Exh. 16; Stips. 1.14 and 3.5. The remaining children attend separate schools or facilities. The DESE has established a continuum of alternative placements for handicapped children which include a regular classroom in a regular school, a regular classroom with an educational resource teacher, a regular classroom with an itinerant teacher, a regular classroom with a resource classroom available, a self-contained classroom in a regular school, a split time arrangement between a regular and special school, a special school, a public institution or hospital, a private agency, or homebound instruction.[12] Missouri State Plan FY 84–86 at

9. "Stip. 1.12" means part 1, stipulation number twelve. The plaintiffs stipulated with all the defendants except the St. Louis City School District and the Special School District of St. Louis County in part 1. The plaintiffs stipulated with the City School District in part 2, and the Special School District in part 3. "Supp. Stip." means supplemental stipulation.

"SD Exh." means state defendants' exhibit. "SLSD Exh." means St. Louis City School District's exhibit. "SLCSSD" means St. Louis County Special School District's exhibit. "P. Exh." stands for plaintiffs' exhibit.

10. The plaintiffs dropped both the State School for the Blind and the State School for the Deaf as defendants on the eve of trial. Both schools are administered directly by the DESE and neither one educates any nonhandicapped children.

11. The State also provides a free education to school age children in the custody of the Division of Youth Services and the Department of Corrections. Neither educational program is challenged by the plaintiffs. Stip. 1.14.

12. The educational resource teacher, the itinerant teacher, and the resource room are all intended to assist the handicapped child attending a regular classroom to overcome his handicap and participate at a level on par with his non-handicapped classmates. The educational resource teacher is a specialist in developing strategies to help handicapped children overcome learning difficulties. The resource teacher's role is to assist the regular classroom teacher in developing a program and an instructional method tailored to the particular child having difficulty. The itinerant teacher differs from the resource teacher in that the former works directly with a handicapped child in the academic areas where the child needs special attention. The resource teacher does not deal directly with the child. Both of these strategies occur in the regular classroom. The resource room provides a place for a child experiencing greater difficulty to go for more intensive assistance. It provides the child with the opportunity to focus on a particular problem without the distractions present in a regular classroom. State Plan 1984–86 at A30–A32. The self-contained classrooms are classrooms attended only by handicapped students. These are students who even with the use of aids or supplements can not meaningfully participate in a regular classroom on a full time basis. Sometimes they are able to attend a regular class in an academic subject or in physical education, music, etc. The split time

A30–A33; [13] R. Werner at Vol. 13.[14] The focus in this case is on the separate schools, public institutions, and the private agencies that serve only the handicapped. The schools being challenged are the State Schools for the Severely Handicapped, the DMH State Schools and Hospitals, and the separate schools of the special school districts.

In 1958 Missouri created a system of special schools to educate its handicapped youth. These separate schools at that time served the moderately handicapped. In the early 1970's before the passage of the Education for All Handicapped Children Act, the state made an effort to locate all of the school-age handicapped population and place them in a state funded school or institution to receive educational services. Hall at Vol. 17.[15] The State Schools have evolved to where today their mission is solely to serve the "severely handicapped." By statute, Missouri has defined the "severely handicapped" as children who due to their handicapping condition are "unable to benefit from or meaningfully participate in programs in the public schools for handicapped children." Mo.Rev.Stat. § 162.-675(3).

The state school system is administered by the Division of Special Education of the DESE. Dr. Leonard W. Hall is the Assistant Commissioner in charge of the division. Directly underneath him is Dr. John B. Heskett, the Superintendent of the State Schools for the Severely Handicapped.[16] Dr. Heskett and an assistant superintendent oversee twelve supervisors. Seven have responsibility for particular aspects of the system statewide and five are charged with the direct administration and supervision of the State Schools within a particular geographic region of the State.[17] The DESE budgeted $880,000 for the 1982–83 school year to cover the salaries of the administration and their support staff. Heskett at Vol. 6 and 9.

The State Schools had a budget of approximately $14.9 million for the 1982–83 school year. SD Exh. 13. Most of the money, $13.2 million, came from the general revenues of the state.[18] Supp.Stip. 3(a).

arrangement allows a child to spend part of his day in a self-contained class and part in a separate school. The special schools are the State Schools for the Severely Handicapped and the Phase III schools of the St. Louis Co. SSD. The public institutions and private agencies serve children who need a structured environment on a full time basis. Homebound instruction is designed for children who due to a physical defect or health impairment, can not safely travel elsewhere to receive an education.

**13.** Each state is required by federal law to have a state plan in order to be eligible for funds under the Education of All Handicapped Children Act. 20 U.S.C. §§ 1412(2), 1413. The most recent Missouri State Plans are in the record at P.Exh. 59 and 60.

**14.** Dr. Roland Werner, Jr., is the Superintendent of Schools of the St. Louis County SSD. He has been the Superintendent for two years and was the Director of Special Education for the DESE six years prior to taking this position. R. Werner at Vol. 14; SLCSSD Exh. A.

**15.** Dr. Leonard Hall is the Assistant Commissioner of Education for the State of Missouri and is responsible for the Division of Special Education. He began with the DESE in 1972 to assist in the formulation of what became Missouri's present law on the education of the handicapped. He has been the Assistant Commissioner since 1974.

**16.** Dr. Heskett has been the Superintendent for two years. He was Assistant Superintendent for the seven years before that. Dr. Heskett is responsible for the overall administration and supervision of the state schools.

**17.** The statewide supervisors are responsible for programming, pupil placement, staff development, related services, interagency services, pupil accounting and contractual services, media services and audio visual services.

**18.** Missouri's school districts receive state funds in two forms: categorical money and foundation formula money. The Missouri Legislature appropriates a designated amount of money annually for the public schools of the state. Categorical aid, such as for transportation or exceptional student classes, is paid from the appropriation first. What remains is known as the foundation formula, which is paid out on an equalizing basis. The amount of formula money, money which the local school system may use at its discretion, decreases as the categorical aid commitments increase. Moore at Vol. 12.

John Moore is an Assistant Commissioner of Education responsible for overseeing food service, transportation, school building services, and state aid. He has been an Assistant Commissioner for eight years.

The remainder comes primarily from Chapter One of the Education Consolidation and Improvement Act of 1981, P.L. 97–35, 20 U.S.C. § 3801 et seq. (Chap. One). The State Schools received an additional $1.2 million in Chapter One funds,[19] and carried over a little less than $600,000 in Chapter One money from the previous year.[20] Heskett at Vol. 9; Hall at Vol. 17. Another source of federal funds is the Education of All Handicapped Children Act. P.L. 94–142, 20 U.S.C. § 1401 (Education Act).[21] The bulk of these funds, however, are passed on to the local and special school districts that serve handicapped children. In 1982–83, Missouri received $2 million under the Education Act, and the DESE passed between 88% and 89% directly to the local and special districts that serve handicapped children. Supp.Stip. 1(c); John at Vol. 12.[22] The other twelve percent is treated as a discretionary fund which is allocated by the DESE upon application from the individual school districts.[23] In 1982–83, Missouri used its Chapter One funds to pay the salaries of the teacher aides employed in the State Schools. The State Schools also received approximately $30,000 in discretionary funds under the Education Act for in-service training, and another $443,000 for a summer school program. Heskett at Vol. 9. The State Schools used to also use surplus Chapter One funds for occupational and physical therapy services, but in 1983–84, the Legislature had to provide the money because neither discretionary nor Chapter One funds were available. Hall at Vol. 17.[24]

19. Chapter One provides money earmarked for state operated programs for the handicapped. The funds are provided on a per child basis. Congress appropriates a sum certain which is divided by the number of handicapped that are eligible for funding under the Act. In 1983–84 the fund was parceled out at $425 per child.

   The state school system for purposes of Chapter One monies may count any handicapped student that has been served by a state program for at least a year. If the child, however, is no longer being served in a state program then the state must pass on the amount for that child to the education program serving the child. Any youngster who has never been in a state program is not eligible and can not be counted. Also any youngster counted under the Education Act for funding purposes can not be counted under this Act.

   The State Schools received approximately $1.7 million under Chapter One. The remainder of the money goes to the School for the Blind, the School for the Deaf, and the DMH.

20. The Act allows a state to keep money it does not spend one year for use the following year.

21. Education Act funds are allocated on a per child served basis. Each state receives a certain percentage of the nationwide cost to educate a student in a public elementary or secondary school multiplied by the number of handicapped students, ages three to twenty-one, that are served in the state. In 1982–83, Missouri received $205 per child under the Education Act. The Act requires that 75% of these funds be treated as entitlement funds. Entitlement funds are passed on by the state in proportional allocations to the local and regional public schools and state agencies serving the children counted. A state may treat the other 25% as discretionary funds. Five percent or $300,000 may be used for administration expenses; the remainder must be used for support and direct services. 20 U.S.C. § 1411(c) and (d).

22. Delores John is the Director of the DESE section on special education. She is responsible for monitoring compliance with state and federal laws on the education of the handicapped and with administering funds to the local districts for special education. Before assuming the post, she taught two years in a regular classroom and two years in a classroom for children with behavior disorders. She also spent six years in counseling, and in administrating a handicapped program for a local school district. John at Vol. 11.

23. The discretionary grants have been applied to five major areas: (1) deaf-blind programs at the local level, (2) local programs for the more severely handicapped, (3) priority areas identified on a yearly basis, (4) grants to and contracts with universities and colleges for technical assistance and to disseminate information, and (5) grants to local schools for personnel development and unforeseen contingencies. In 1982–83, $2.4 million in discretionary money went to these five categories, with half the money going for grants in the first two categories. Supp. Stip. 2.

24. One other source of revenue often mentioned is the local tax effort. Missouri requires any school district sending a child to a State School or some other state run agency to pay an amount to the state equal to the local tax effort per child. Mo.Rev.Stat. § 162.740. Although the payments are made directly to the DESE and the DMH, neither department has direct access to the funds. Both must remit the money to the State treasury. *Id.* at § 162.745.

The Division of Special Education operates 52 State Schools for the severely handicapped.[25] The system peaked in 1974 with 68 state schools. The state owns 27 of the buildings which house State Schools and rent the other 25 buildings. The value of the 27 buildings is estimated at $28 million. The 27 buildings, all built by the State especially for the education of the more profoundly handicapped serve 85% of the children that attend State Schools. Each classroom contains a lavatory and a wash area. It was felt this would aid the education program. Clean-ups would be quicker and the teacher would remain in closer proximity to the class. The schools also afford the students more space. The classrooms were designed to provide forty square feet per student, which is fifteen more feet per student than in the typical public school classroom. The schools also contain a prevocational training area and a home-living instructional area.[26] Most im-

portantly, the schools were built with the students safety in mind. Each classroom has an outside exit, an audio and visual alarm system, and antipanic doors. Some schools are located on the campuses of local public schools; others are not, depending on the availability of land. The DESE always attempts to place the State School on the campus of a local school. Heskett at Vol. 6 and 8. The State Schools budgeted about $850–900,000 in new money for maintenance and repair of the buildings, $500,000 for utilities, and $270,000 for rent and custodial work. *Id.* at Vol. 9.

The Division of Special Education employs 325 classroom teachers and 129 classroom aides in its State Schools. The teachers must be certified, or at least temporarily certified, to teach the "severely handicapped." Temporary certification means the teacher is within eighteen hours of certification. The Division works closely with state colleges and universities to pro-

---

25. The fifty-two State Schools and the number of children served in each are as follows:

| | |
|---|---|
| Greene Valley State School, Springfield | 180 |
| Mapaville State School, Mapaville | 81 |
| H. Kenneth Kirchner State School, Jefferson City | 32 |
| Shady Grove State School, Poplar Bluff | 37 |
| Lakeview Woods State School, Lee's Summit | 187 |
| Boonslick State School, St. Peters | 89 |
| Delmar A. Cobble State School, Columbia | 39 |
| Maple Valley State School, Kansas City | 113 |
| State School No. 10, Gideon | 28 |
| Parkview State School, Cape Girardeau | 51 |
| B. W. Sheperd State School, Kansas City | 138 |
| Hubert Wheeler State School, St. Louis | 178 |
| State School No. 14, Bowling Green | 25 |
| Special Acres State School, Flat River | 32 |
| State School No. 18, West Plains | 23 |
| Verelle Penniston State School, Chillicothe | 27 |
| E. W. Thompson State School, Sedalia | 51 |
| State School No. 22, Neosho | 17 |
| B. W. Robinson State School, Rolla | 36 |
| Citadel State School, Potosi | 18 |
| State School No. 25, Ste. Genevieve | 13 |
| State School No. 26, Maryville | 18 |
| State School No. 27, Essex | 17 |
| State School No. 30, Mountain Grove | 13 |
| Helen M. Davis State School, St. Joseph | 76 |
| State School No. 33, Richmond | 25 |
| Oakview State School, Monett | 40 |
| State School No. 35, Keytesville | 8 |
| Mississippi Valley State School, Hannibal | 79 |
| State School No. 37, Passaic | 13 |
| Autumn Hill State School, Union | 50 |

| | |
|---|---|
| State School No. 41, Lutesville | 10 |
| Sunrise State School, Marshfield | 13 |
| Briarwood State School, Harrisonville | 15 |
| State School No. 46, Warrensburg | 20 |
| College View State School, Joplin | 74 |
| New Dawn State School, Sikeston | 86 |
| State School No. 53, Boonville | 13 |
| State School No. 55, Eldon | 10 |
| State School No. 56, Marshall | 17 |
| State School No. 59, Waynesville | 12 |
| Current River State School, Doniphan | 21 |
| State School No. 61, Salem | 16 |
| State School No. 63, Anderson | 20 |
| State School No. 65, Owensville | 8 |
| State School No. 66, Nevada | 20 |
| State School No. 67, Arcadia | 9 |
| State School No. 68, Piedmont | 11 |
| Gateway State School, St. Louis | 195 |
| State School No. 73, Mexico | 15 |
| State School No. 74, Dixon | 9 |
| Dale M. Thompson/Trails West State School, Kansas City | 122 |

Stip. 1.16.

26. The prevocational training area is not a typical school shop. The training area is meant to provide a setting to teach the "severely handicapped" job and work related skills they can generalize and apply in a job. Similarly, the home living area is not a typical home economics room. It is designed like an apartment, and used to teach the severely handicapped the skills necessary to live independently or semi-independently.

vide the necessary course work for temporarily certified teachers to obtain full certification. The State Schools also employ 21 physical education teachers and 36 speech therapists. The physical education teachers and the speech therapists are employed full time at the larger schools and on an itinerant basis at the smaller schools. In addition, the State Schools employ 6 itinerant nurses and contract with local nursing personnel and the county health nurse program for additional nurses. The Division employs 40 occupational therapists, (OT's), and 30 physical therapists (PT's). They are hired on a contractual basis because the Division can not offer them a competitive full time, twelve months' per year salary. The salaries of the teachers, therapists, physical education teachers, and nurses are all tied to the same scale. The salaries of the teachers average $14,000, or about $2,000 less than their counterparts in the regular schools. Heskett at Vol. 9.

Missouri has an elaborate procedure to determine whether a child should attend one of the State Schools or some other setting in the continuum. Mo.Rev.Stat. § 162.670 *et seq.;* State Plan 1984–86 at 39–78. The initial step is the identification of a child with a handicapping condition. Mo.Rev.Stat. § 162.695; State Plan 1984–86 at 40–41. Once a child is identified then the local school district is required to put together an interdisciplinary diagnostic team to evaluate the child's mental, physical, and social development before placing him in a special program. *Id.* at § 162.-700(2); State Plan 1984–86 at 88; Friede-

bach at Vol. 10. The purpose of the evaluation is to gain a picture of the child's strengths and weaknesses. The composition of the diagnostic team varies with the handicapping condition(s) exhibited by the child, and may include medical specialists, various therapists, psychologists, social workers, and educators. Friedebach at Vol. 10. If the diagnostic team determines that the child's handicapping condition necessitates a special education program, then the local school district forms a team to develop an individualized educational plan (IEP) for the child. The IEP team is required to meet within thirty days after the child is identified as needing special education. State Plan 1984–86 at 45. The team typically consists of the child's parent(s), if appropriate the child, a member of the diagnostic team, possibly a special educator from one of the State Schools if the child is more profoundly handicapped, a principal or teacher from the child's local school, and any appropriate medical or therapeutic personnel. State Plan 1984–86 at 45–46; Teacher's Guide at 3.1(a); Yard at Vol. 15; Kopp at Vol. 15; Wilkerson at Vol. 16; Gitel at Vol. 17.[27] The intent is for the members of the team to bring their various perspectives to bear on the developmental and educational needs of the child, and hopefully, to reach a consensus on what is best for the child. The DESE provides educators statewide and the other professionals who participate on IEP teams with information on and technical assistance in developing an IEP and determining the appropriate educational setting. State

**27.** George Yard has a Doctorate Degree in special education and currently is an associate professor of Special Education at the University of Missouri, St. Louis. He has worked for the DMH and the St. Louis County SSD, and as a paid consultant for the DESE. SLCSSD Exh. GG; Yard at Vol. 15.

Walter A. Kopp is the Director of Special Education for the St. Louis City Public Schools. He has held the position since 1967. He has a Master's Degree in elementary administration and has done additional advanced work in special education in the areas of mental retardation and learning disabilities. SLSD Exh. 50; Kopp at Vol. 16.

Lois Wilkerson is a Special Education Administrator with the St. Louis City Public Schools. She has a Master's Degree in elementary educa-

tion and thirty additional hours in special education. Ms. Wilkerson taught behavior disordered children for three and a half years, served as a resource teacher for two years, and was an IEP specialist for a year and a half. She is currently responsible for diagnostic services in three regions of the City's school district. She has participated in over 350 IEP conferences in the last two years. SLSD Exh. 52; Wilkerson at Vol. 16.

Jacqueline Gitel is employed in the Office of Special Education of the St. Louis City Public Schools. She has a Master's Degree in education with emphasis on special education. Ms. Gitel's duties include reviewing all diagnostic information and participating in IEP conferences. SLSD Exh. 53; Gitel at Vol. 17.

Plan 1984–86 at 65. Each team is charged with formulating educational goals and objectives for the child, and then with determining the educational services necessary and the appropriate educational setting for fulfilling the goals and objectives. State Plan 1984–86 at 47–48; Teacher's Guide at 3.1(e)–(k); Kopp at Vol. 15; Wilkerson at Vol. 16. This package of decisions is known as the Child's IEP. If the IEP team determines that the child can not be appropriately served in a local public school, then the child's file is forwarded to the Division of Special Education. Mo.Rev.Stat. § 162.-735; Kopp at Vol. 15.

The Supervisor of Pupil Accounting and Contract Services, currently James Friedebach, heads a team that consists of the Assistant Superintendent of the State Schools and the pertinent regional Special Education Consultant. This team reviews the child's file to determine if his handicapping condition is severe enough to warrant placement outside a regular school. Usually a child who is functioning at a level one-half below the expectations for his peers across a number of assessments will be accepted for placement in a State School. The factors considered include the child's cognitive development, physical development, health, fine and gross motor movements, speech development, and achievement levels. The child's I.Q. is typically a good indicator, but it is not a controlling factor in the decision. Friedebach at Vol. 10; Wilkerson at Vol. 16; Gitel at Vol. 17. The state team also considers the capabilities of the child's local school district. Upon review of the file, the team may either accept the child, refer the child back to the local district, or return the file for additional information. Friedebach at Vol. 10. In making their decision, the state team is guided by the requirement that if the child can meaningfully participate or benefit from a special education program in a regular school with the use of aids and services then he must attend a regular school. Mo.Rev.Stat. §§ 162.675(3); 162.-680(2); State Plan 1984–86 at 63–65. If the state team accepts the child, then the child is assigned to the State School nearest the child's home.[28] State Plan 1984–86 at A29.

During the 1982–83 school year the local districts referred 450 children to the DESE upon completion of the IEP process. Friedebach at Vol. 17. The DESE, however, no longer accepts all referrals. In the early and mid-1970's, when Missouri was first attempting to educationally serve all the handicapped children of the State, the Division of Special Education accepted almost every child referred to it. The DESE wanted to prove that the concept of educating the handicapped was viable. By the late 1970's the state school system was refusing to accept students it would have accepted in previous years, due in part to the growing recognition of the desirability of placing handicapped children in regular schools and in part to the increasing ability of local school districts to adequately serve these children. Heskett at Vol. 9; Friedebach at Vol. 10; Hall at Vol. 17. Over the four school years from 1979–1983, the DESE rejected approximately fourteen percent of the children referred. *See* SD Exh. 16. Although, the number of referrals have increased due in part to better and more complete identification of handicapped children, the local districts are referring fewer children who would be inappropriately placed in the State Schools. Friedebach at Vol. 10. Furthermore, even as the number of children in special education programs increases statewide, the number of them served by the DESE in separate settings has decreased.[29] SD

---

**28.** The DESE also has the option of placing the child with a private agency. Mo.Rev.Stat. § 162.735. Children who exhibit severe emotional or behaviorial problems or who have low incidence severe handicaps are more likely to be referred to private agencies. The private agencies are "not-for-profit" and charge the DESE less than cost. Local school districts are charged the actual cost.

**29.**

|  | 1979–80 | 1980–81 | 1981–82 | 1982–83 |
|---|---|---|---|---|
| Total Served by DESE | 3223 | 3161 | 3094 | 2935 |
| 1. State Schools |  |  |  |  |
| 2. Private Agencies |  |  |  |  |
| 3. Homebound |  |  |  |  |
| Special Education Youngsters | 105,426 | 108,026 | 107,528 | 136,996 |

Exh. 41. If the state team refuses the referral, then the Division of Special Education works with the local district to meet the needs of the child. Friedebach at Vol. 10; Kopp at Vol. 15; Wilkerson at Vol. 16; Hall at Vol. 17; Teacher's Guide at 2.1(a). Often the local district is unwilling to serve the child and will threaten suit. The DESE usually resolves the matter by providing the district with funds to serve the child. Heskett at Vol. 9; John at Vol. 11; Hall at Vol. 17.

Several checks exist with regard to the development of an IEP and placement of handicapped children in the public school system of Missouri. The DESE reviews the progress and program of every child assigned to a State School within approximately thirty days after the assignment to determine if the child's IEP and placement are in fact appropriate. Teacher's Guide to Administration and Instruction, Sept. 1982 at 1.5(e) and 2.1(b), SD Exh. 8 (Teacher's Guide); State Plan 1984–86 at B10; Kopp at Vol. 15. Also any child's IEP and placement can be reviewed at any time upon the request of the child's teacher, another member of the professional staff working with the child, or the child's parents. In any event, the district serving the child must form an IEP team annually to review the child's IEP and placement, and to determine any changes based on the child's progress or lack thereof during the preceding year.[30] Teacher's Guide at 1.5(f); Friedebach at Vol. 10; Kopp at Vol. 15. The parents of the child are encouraged to participate in each IEP conference. State Plan 1984–86 at 45; Teacher's Guide at 1.5(e) and 3.1(a). The conferences enable the educators to learn more about the parents and the parents to learn about the child's educational program. Wilkerson at Vol. 16. The responsible school district must also notify the parents when their child has been identified as having a handicapping condition or is going to be diagnosed or evaluated. Furthermore, if the child is currently receiving a special education program and the district has determined that the program or placement should be altered, or the parents have requested a change that the district has decided not to honor, then the district is responsible for notifying the parents of the decision and informing them of their channels of redress. Mo.Rev.Stat. § 162.945. Missouri provides an independent administrative review process wherein a parent can challenge a decision of the responsible school district at three levels within the state educational system and then in state court. Mo.Rev.Stat. §§ 162.950–162.963; State Plan 1984–86 at 53–59. Most parents, however, agree with the placement decision reached by the IEP team. Moreover, when a disagreement arises it is usually resolved at the informal stage of the review process.[31] Heskett at Vol. 9; Kopp at Vol. 15; Wilkerson at Vol. 16; Gitel at Vol. 17.

The State Schools provide a fluent curriculum during a five hour school day. The teachers have at their disposal a variety of materials developed in Missouri and elsewhere upon which they can draw to fashion an instructional program to meet the individual needs of each child. There is no system-wide, uniform, instructional program that each child must receive, but there are set curriculum areas: self-care skills, sensory motor development, functional academics, language development, interpersonal relationships, and prevocational and vocational skills. P.Exhs. 153A,

---

30. Often the parents and/or the local school district are against returning the child from a State School to a regular school. The local district is against the return because it does not believe it can adequately handle the child. The parents want the child to remain in the State School where he has progressed. The DESE spends much time and effort in answering and resolving the concerns of each. If the child is on the borderline, was accepted in the earlier period, and will not be developmentally harmed by remaining in a State School then the child will not be referred back to the local school district. The state school system, however, will not accept any initial referral based on the wishes of the parents. Heskett at Vol. 9; Hall at Vol. 17.

31. Dr. Heskett reported that he is aware of only twenty to thirty challenges involving State School placements in the last two to three years. Only three or four involved the choice between a State School and a regular school. Most involved the choice between a State School and institutional placement, with the parents favoring the latter option.

153B, 153E, and 153G. The teachers strive to fashion each child's program so that he learns the functional skills he lacks, and how to generalize those skills to various settings.[32] In addition, they teach social and job-related skills. The educational program also includes various nonacademic activities. Examples include field trips into the community, recreational activities, and social outings. Heskett depo. The parents are also included in the educational process. Missouri has developed a program to teach parents to use the home environment to supplement and reinforce what their child is being taught in school, Missouri Instructional Guide for Home Training (MIGHT). Heskett at Vol. 9.

## II. *Department of Mental Health*

Although not primarily an educator, the DMH is also responsible for providing educational opportunities to the youngsters it serves. The DMH, among its other duties, administers five Mental Retardational Developmental Disabilities (MR/DD) facilities: Higginsville State School and Hospital, Marshall State School and Hospital, Nevada State School and Hospital, and St. Louis Developmental Disabilities Treatment Center (DDTC). The DDTC actually consists of three facilities: the original facility in St. Louis and two new facilities, one in south St. Louis County and the other in midtown St. Louis. It is the educational programs administered by the DMH in these facilities that are challenged by the plaintiffs.

Last year approximately 298 school-age children resided in the MR/DD facilities.[33] Of these children, 216 received educational services at the facility where they resided. The other 83 attended either a State School, a school within one of the special school districts, or a local public school.[34] Stips. 20–22. Although the DMH and the DESE are separate and independent departments they work together in providing educational opportunities to the school age children that reside at the MR/DD facilities. The DMH is under the same placement, review, and due process procedures as is the state public school system. SD Exh. 14a, Missouri DMH Compliance Policies and Assurances for PL 94–142. In 1980 the departments entered into an agreement to cooperate with each other in providing educational services. P.Exh. 166. The agreement reiterated the responsibility of the DESE to ensure that the requirements of the state and federal special education laws are complied with by special education providers. The two departments agreed that the DESE would see to it that any child residing in an MR/DD facility and able to leave the grounds for educational services would be appropriately placed in a less restrictive setting. If the DESE and the DMH are unable to agree on whether a particular child is capable of leaving the facility to receive an education,

32. Functional skills are the "everyday" skills that most people take for granted: dressing, eating, toileting, etc. They are skills so basic to life that if one can not do them for himself someone else must do them for him.

Generalization refers to the ability to apply what one has learned in one setting to a similar setting calling for that knowledge. The handicapped have difficulty generalizing.

33. A child may be referred to the DMH by his parents or guardian on a voluntary basis, Mo. Rev.Stat. § 632.110; by a juvenile court, Mo. Rev.Stat. §§ 211.201 through 211.203; or by a circuit court, Mo.Rev.Stat. § 552.020. The DMH accepts only a referred child, only if, after evaluation by department personnel placement with and treatment by the DMH is deemed appropriate. Mo.Rev.Stat. § 632.120. The department admits children who suffer from mental disorders, mental illness, mental retardation, developmental disabilities, and alcohol or drug abuse if they are suitable for the residential therapeutic and habilitation program. The relevant statutory chapters also provide procedural safeguards and require periodic reviews of the necessity of a residential placement. *See* SD Exh. 14a.

34. The following is a table of the number of children residing in and being educated in DMH facilities.

| | Reside | Educate |
|---|---|---|
| Higginsville State School and Hospital | 70 | 70 |
| Marshall State School and Hospital | 87 | 87 |
| Nevada State School and Hospital | 31 | 31 |
| St. Louis State School and Hospital | 29 | 1 |
| St. Louis DDTC | 81 | 27 |

The children not educated at the DMH facilities receive educational services at the following locations: Missouri School for the Blind 10; Special School District of St. Louis County 55; St. Louis City School District 3; State Schools for the Severely Handicapped 14.

then the two departments will form a committee to resolve the dispute and develop an IEP for the child.

Consistent with the DESE's concern with assigning children to the least restrictive environment, the DMH has placed the higher functioning children it serves in community settings, group homes, and foster homes. The functioning level of the remaining children is low. For example, approximately 50% of the children that reside at the DDTC have a functioning level too low to register on the A.A.M.D. scale. Also 80% of the same group are nonambulatory and require wheelchairs or bed-carts for mobility. The same trend is occurring at the Higginsville State School and Hospital. Since 1980 the school age population has declined by twenty-five to thirty children. The ones that remain are lower functioning. Similarly at the Marshall State School and Hospital three groups of children are served: those whose medical problems are so severe they require constant medical attention to ensure life, those who are so physically involved that they can be moved only by bed-cart, and those whose behavior poses a danger to themselves and/or others. Crawford at Vol. 11; Stewart at Vol. 11; John at Vol. 12; Stewart depo.[35] Efforts are still made, however, to place the children in outside residential and educational settings. For instance, in 1980, a team of DESE and DMH personnel evaluated the children attending the St. Louis DDTC. They determined that most of the children should not leave the grounds for educational services, and none would benefit from attending a regular school. Friedebach at Vol. 10; McPheron at Vol. 11; Crawford at Vol. 11.[36] Special reference was also made to three referrals from the Marshall State School and Hospital to the Marshall public schools. One had succeeded, but the other two had failed and were returned to the State School and Hospital. Crawford at Vol. 11.

### III. Special School Districts

Besides the DESE and the DMH, Missouri also has two special school districts (SSD) that provide educational services to handicapped children. The voters of local school districts can decide to join together to create an SSD. Mo.Rev.Stat. §§ 162.-815–162.945. The SSD is separate and independent from the local school districts. The latter continue to serve nonhandicapped children, and the SSD is responsible for educating the handicapped children of the local districts. The SSD, however, is subject to DESE monitoring and supervision as are the local districts. Id. at § 162.930. Missouri's two SSDs serve the local school districts in St. Louis County and Pemiscot County.[37]

---

35. Earl W. Crawford has been the Educational Supervisor at the Marshall State School and Hospital for five years.

Gerold W. Stewart is the coordinator of client services for the DMH. He is responsible for monitoring the diagnostic process and IEP development.

36. Wanda McPheron is the supervisor of Programming for the State Schools. Her responsibilities include ensuring that the IEPs comply with state and federal law.

37. Most of the evidence on the SSDs comes from the testimony of witnesses from and exhibits of the St. Louis Co. SSD. The Pemiscot Co. SSD did not represent itself at the trial and no witnesses from the district testified. All the information on the Pemiscot SSD must be garnered from the portions of the depositions of Russell Gilmore, an administrative assistant for the district; Robert Herring, the Superintendent of Schools of the district; and Charles Williams, the Director of Programming for the district,

offered into evidence. Their testimony can be briefly summarized.

The SSD serves the approixmately 850 handicapped children who reside in the seven local school districts of Pemiscot County. Challenged here is the SSD's "Unit II" program which served forty of these children during the 1982–83 school year. The program is located in a school building formerly used by the McCarty School District and located on the campus of McCarty elementary and middle school. Although the Unit II program is technically a separate program, during the 1982–83 school year nine of the children attended at least one nonacademic class in the regular school building. The IEPs of the nine children had called for some interaction.

The plaintiffs challenge the Unit II program on the grounds that it does not go far enough. They maintain that more interactions should occur and that the interactions that occur for the high school age handicapped children are not appropriate because they are not with age

The SSD of St. Louis County serves as an umbrella district for the twenty-three school districts within the county of St. Louis. As a SSD it is responsible for providing direct educational services to any handicapped child that resides in the county and desires a public education. The SSD served approximately 15,620 school age handicapped children in 1982–83. The educational program of the SSD is divided into four phases. Phase I encompasses the handicapped children that can be mainstreamed into regular classrooms in the local schools. The local school has the primary educational responsibility for these mildly handicapped children. The SSD provides the supplementary or special services necessary to allow the child to be mainstreamed and still benefit educationally. It hires the staff to serve the child's special needs. Phase II is designed for the moderately handicapped. These children are served in self-contained classrooms in their local public schools. The SSD is primarily responsible for educating the children in this phase. It leases classroom space from the local districts and staffs the classrooms.[38] Phase III is aimed at "severely handicapped" children. These children receive their educational services in separate buildings owned and operated by the SSD.

Finally, Phase IV includes children who have a low incident handicap. The SSD contracts with private agencies or establishes homebound instruction to meet the needs of this group. In 1982–83, there were 11,740 children in Phase I, 2,128 in Phase II, 2,007 in Phase III, and 46 in Phase IV. R. Werner at Vol. 13; SD Exh. 16; Stip. 3.4 and 3.5.

The district operated on a $63 million budget in 1982–83. Approximately $3 million came from the federal government under the Education Act and Chapter One. The rest came from state and local sources. The budget is divided into three categories: the teacher's fund which is limited to salaries, the incidental fund which covers employee benefits and supplies, and the building fund earmarked for building construction and maintenance. Although each fund had a reserve in 1982–83, a fourteen percent salary increase for the teachers and therapists in 1983–84 was expected to eliminate the reserves in the teachers and incidental funds. Half a million dollars was budgeted for the central administration office of the district, and a million dollars for maintenance of the Phase III buildings. Harmon at Vol. 14; Supp.Stip. 3. The remaining discussion of the SSD will focus on

---

peers. Because of the nature of the Unit II program this Court's findings with reference to the State Schools and the St. Louis County SSD will apply to this special district also.

**38.** The Phase II program has experienced several problems. Securing classroom space is one problem. The SSD relies on the local districts to provide the classrooms for the Phase II program. Declining enrollments in the local districts have caused them to sell school buildings and thus actually diminish the number of available classrooms. The St. Louis desegregation plan is expected to further exacerbate the space problem. The vocational schools have functioned under a similar plan for three years. The ratio of children transferring to the county districts to children transferring to the city district is five to one. The overall ratio is expected to be at least as high. R. Werner at Vol. 13; Harmon at Vol. 14; Gitel at Vol. 17. Since the local districts satisfy their regular class needs first, the SSD is left scrambling for sufficient classroom space or left to settle for unwanted space.

The Phase II staff also has had to cope with the misconceptions of the principals and regular teaching staff of the local public schools. They structure the school setting with the nonhandicapped child in mind and expect the handicapped child to conform. The staff has experienced difficulties in getting the regular teachers to accept mainstreaming because of the differences in the Phase II children. The regular school personnel also do not understand the special needs of the handicapped children. An example is the inflexible lunch period. The handicapped child requires a longer period in order to receive feeding instruction and to interact. Another example is toileting. The children in Phase II have more toileting accidents than do their nonhandicapped peers and need instruction in toileting, but in the regular school the bathroom is not in or adjacent to the classroom. Also the bathroom is shared with nonhandicapped peers making instruction more difficult. Finally, the regular education staff is not very tolerant of toileting accidents. They do not expect school age-children to have such a problem.

Dr. Harmon is the Deputy Superintendent of Schools for the SSD. Harmon at Vol. 14; SLCSSD Exh. DD.

the Phase III portion of the program since that is the portion challenged by the plaintiffs.

The SSD owns fourteen buildings. Eleven are schools serving handicapped children in the Phase III program. The SSD also leases two other buildings that serve as Phase III schools. All the Phase III schools are one level buildings, accessible to the handicapped with larger than usual classroom space and wider hallways. The additional space is intended to minimize the congestion created by wheelchairs and other equipment necessary to serve the severely handicapped. The rooms also contain or share a bathroom to allow the staff to better cope with toileting problems and a sink to aid in the preparation of the food program and the cleanup of the students. Bolazina at Vol. 14; Harmon at Vol. 14.[39]

The record is sparse in regard to general information on the teaching staff. It does indicate that the teachers of the SSD are certified to teach the severely handicapped, they receive more pay than their counterparts in the state school system, and the SSD has no trouble finding applicants for its teaching positions. Last year the district received 200 applications for every opening. The SSD of St. Louis County has twenty-eight occupational therapist positions and fourteen physical therapist positions. The district, however, has a hard time filling the positions. For the 1982–83 school year the SSD placed forty-six newspaper advertisements and contacted 123 placement offices, but was not able to fill all of the positions. The SSD received only seventeen OT and eleven PT applications for the positions open for the 1982–83 school year. The district was able to hire twenty-four OTs and twelve PTs for the year. It also contracted with two hospitals and two private agencies for additional therapy services. The nine month work year and the salary structure hinder efforts to hire a sufficient number of therapists. Each Phase III school, however, does have an OT and a PT on staff, and present at the school on a daily basis, to deal with those children who may pose a physical threat to themselves or others. The OTs and PTs are responsible for assessing the children's progress on an annual basis. They also participate in the IEP process. Also on the staff of each school is a carpenter to adapt occupational and physical therapy equipment, a nurse to handle medical emergencies, and a dietitian to aid in formulating a food program. A counselor, speech therapist, and audiologist are also available to students in Phase III. R. Werner at Vol. 13; Bolazina at Vol. 14; Eldridge at Vol. 15.[40]

The placement process employed by the SSD is similar to the one previously described: diagnosis, evaluation, IEP formulation, placement, periodic review as necessary, and annual review. To aid in placement decisions the district designed a manual for those who participate on the IEP teams. Since potentially any IEP team can draw from about 1300 staff members, the manual was designed with the intent of bringing more consistency to the process, and of providing guidelines for determining the appropriate placements.[41] Most of the children who attend Phase III schools were

---

**39.** Paulette Bolazina is the Principal/Coordinator (teacher-in-charge) at the Sullivan School, a Phase III school. She has a Master's Degree in special education from St. Louis University and thirty hours of postgraduate work. She has been a teacher-in-charge with the SSD since 1976. Bolazina at Vol. 14; SLCSSD Exh. H.

**40.** Doris D. Eldridge is the Assistant Supervisor for Personnel Services for the St. Louis Co. SSD. Her responsibilities entail protecting the rights of students, serving as the Civil Rights compliance officer, developing policies and procedures for dealing with the students, and working with the State on money matters. From 1975–81, she served as the Director of Pupil Personnel for the district, and then was promoted to her present position. She has a Master's Degree in communicative disorders. Eldridge at Vol. 15; SLCSDD Exh. N.

**41.** The SSD developed the manual as a response to an inquiry by the Office of Civil Rights. The manual informs local school districts and the SSD staff that pupil-teacher ratios, classroom space, availability of related services, parental attitudes, and school district attitudes can not control a placement decision. Instead, determinative factors include the functional level, health, and IEP of the child. Eldridge at Vol. 15.

initially assigned to a Phase II program, but were not benefitting from the program or the environment. Furthermore, many of the children placed in Phase III schools are later placed in a less restrictive educational setting. Consistent with the trend statewide, the percentage of handicapped children served by the SSD in Phase III schools has declined since the 1980–81 school year. The decline, here too, is due to an increasing awareness of and emphasis on placing handicapped children in regular schools when they can benefit from the setting. Handicapped children in Phase III can and have transferred to Phase I and Phase II programs during the school year or upon completion of the annual IEP review.[42] Again, as with the statewide program, if the parents disagree with a decision reached by an IEP team they can challenge the decision through an administrative process and then in state court. During the past three years no parents have challenged or sought review of the placement of their child within a Phase III program. P.Exh. 124, St. Louis Co. SSD Compliance Plan for FY 1983 at 27–51; R. Werner at Vol. 13; Hauser at Vol. 14; Eldridge at Vol. 15.[43]

The curriculum in the Phase III schools focuses on four major areas: academics, self-care skills, job-related skills, and communication skills. The instructional materials used and the program provided each child, however, is geared toward the developmental and functional level of the particular child. The lower functioning children may receive instruction, for example, in responding to sounds, tracking an object, or holding their head up, whereas higher functioning children might work on toileting, dressing, or personal hygiene. Less emphasis is placed on the child's chronological age. The curriculum is also designed to enhance the teacher's abilities to recognize even the most subtle of responses from the youngsters. This is important because the responses, or lack thereof, enable a teacher to determine whether a program or strategy is effective. The environment also needs to be distraction free so that the teachers can concentrate on watching for and recording the responses. R. Werner at Vol. 13; Bolazina at Vol. 14; Hauser at Vol. 14; Eldridge at Vol. 15. The SSD also provides for community based programs, field trips, and extracurricular activities for the children in Phase III. Hauser at Vol. 14; Huskey at Vol. 14; Stip. 3.8.

The SSD employs three special strategies in their Phase III program.[44] First, the district has opted for departmentalization. Departmentalization exposes the children to more than one teacher, and, therefore, different teaching methods and ideas. The youngsters have the advantage of several teachers focusing their varied talents, skills, and experience on the youngster's developmental problems. Departmentalization also encourages the teachers to exchange ideas and concerns about the children. Emmons at Vol. 13; Bolazina at Vol. 14. Second, the SSD has instituted a voluntary program whereby high school and college students can work with the children

---

42. In 1981–82, 797 of the 2,007 youngsters served in Phase III programs were assigned to Phase I and Phase II classes. SD Exh. 16.

43. Janet E. Hauser is an Area Coordinator with the SSD, responsible for the Early Childhood Special Education Program. Hauser at Vol. 14; SLCSDD Exh. I.

44. The SSD also has two Skill Centers which serve a total of four hundred handicapped children. The program is included within the Phase III count. About two-thirds of the children are from Phase II programs and the rest from Phase III programs. The goal of the Skill Centers is to mesh work skills with necessary academic skills to provide each student with an employable skill. For example, in the shop area there is a mechanic and an academic teacher. There are eight similar work areas. The program is designed for youngsters 16 to 21. The Phase II students come to the program because they are having difficulty in Phase II, and the Phase III students come because they are ready for a more open environment. Some of the children go on to vo-tech school, to a Phase II class, or to a work environment.

The St. John's project is another vocational program maintained by the SSD. At the time of the trial fifteen Phase III students were doing custodial, food service, and laundry work for a hospital. A Phase III teacher accompanied them to teach them such job-related skills as ability to arrive on time, to interact properly, and to stay on task.

on a one-to-one basis and under the supervision of a teacher. The district screens the volunteers for maturity, and has not sought or accepted anyone under sixteen years of age. Although the volunteers express an interest in working with the profoundly handicapped, very seldom do they volunteer to work with the lowest functioning children. The advantage of the program is the extra attention it affords the youngsters. Bolazina at Vol. 14; Hauser at Vol. 14. Finally, the SSD has established a voluntary program for the parents. The parents may work directly with their child in class under the supervision of the teacher, take in-service training courses, and participate in the parent's organization.[45] Hauser at Vol. 14.

The DESE, through the Division of Special Education, works with each of the SSDs and monitors their compliance with federal and state laws. It reviews all compliance data submitted by both SSDs on an annual basis, and once every three years it makes an on-site inspection. The DESE last inspected the SSD of St. Louis County in March of 1983. The inspectors looked closely at the Phase system, the special education program, the vocational education program, and the financial structure of the SSD. The investigators concluded that the SSD had made improvements since 1980, and still offered the best special education program in the state. The DESE approved the SSD's compliance plan. P. Exh. 124; R. Werner at Vol. 13; Hauser at Vol. 14; Eldridge at Vol. 15; Hall at Vol. 17.

IV. *Local Programs*

Finally, some of Missouri's more profoundly handicapped children are served directly by local school districts in local programs. Little evidence was presented on these programs, yet both sides mention the local programs in their arguments. They will be discussed briefly before turning to the merits of the case.

In 1974, Missouri law for the first time allowed local school districts to provide special education programs for the severely or more profoundly handicapped. Seven local school districts started programs that year with twenty-six school districts sending their children to the programs. The availability of Education Act funds in 1978 further spurred the movement toward local programs. For the 1982–83 school year 101 local school districts sent their severely handicapped children to twenty-one local programs. Approximately 165 students were involved.[46] Heskett at Vol. 9; Stips 1.34 and 1.38.

---

**45.** The SSD also has a program for severely behavior disordered (SBD) youngsters in its Phase III schools. The SBD educational program is highly structured and maintained separately from the programs for the other students. The programs are kept separated because SBD children need a stimulus free environment in order to attend to their work. Also, because they can pose a danger to other children. The teachers and aides who work with these children are trained to handle negative behavior and to reinforce positive behavior. Hauser at Vol. 14.

According to Dr. George J. Yard, whose doctorate and area of expertise is in the field of behavior disorders, (BD), behavior disorder children make up two and one-half to three percent of the school age population. Twenty percent of the severely handicapped are behavior disordered. A BD child is one who can not interact with his peers, parents, or authorities because his behavior is so significantly disorganized for a significant period of time. They may be verbally abusive or physically abusive to themselves, others, or property. Autistic children as well as children with conduct disorders

such as hyperactivity or withdrawal fall within the BD category. Yard at Vol. 15.

**46.** The following is a list of the twenty-one programs, the number of districts served by each program, and the number of students served during the 1981–82 school year.

| District | No. of Districts | No. of Students |
|---|---|---|
| Bevier C–4 | 4 | 3 |
| Bolivar Co-op | 15 | 0 |
| Camden County R–II | 2 | 13 |
| Cameron R–I | 5 | 0 |
| Carrollton R–VII | 2 | 5 |
| Clark County R–I (Kahoka) | 6 | 6 |
| Clinton | 3 | 5 |
| Ecco Co-op (Marshfield) | 7 | 9 |
| Greenfield R–IV | 9 | 6 |
| Kirksville R–III | 5 | 18 |
| Lafayette County C–1 (Higginsville) | 6 | 9 |
| Lebanon R–III | 2 | 15 |
| Leeton R–X | 6 | 4 |
| Lewis County C–1 | 1 | 5 |
| Lutie R–VI | 3 | 10 |
| Moberly | 3 | 8 |
| Moniteau County R–1 | 8 | 13 |
| Monroe City R–1 | 5 | 9 |
| Montgomery County R–II | 4 | 20 |
| Tarkio R–I | 4 | 7 |
| Seymour | 1 | –* |

*Seymour began its program in 1982–83.

Each time a local program is established the state school program serving that district is phased out. The local school district must agree to serve all of the profoundly handicapped children in the area previously served by the State School and guarantee in good faith that it will provide a special educational program on par with the program provided by the State School. The DESE relinquishes direct educational responsibility, and the local district administers and staffs the program. The local districts and the DESE have both initiated takeovers of state school programs. The DESE is responsible for deciding whether a local school district is capable of assuming the educational duties and providing the necessary educational services. It does not approve a takeover by a local district just because the district requests it. The DESE reviews the proposed educational program, along with the amount of resources the local district commits to and the quality of its special education program for the mildly and moderately handicapped. If the resource commitment is not acceptable or the present special education program does not indicate a capability to serve the severely handicapped then the request is turned down. The DESE also approaches local school districts regarding the takeover of state school programs. In the past two years, for example, it has approached three school districts with strong special education programs for the mildly and moderately handicapped. Not all districts that are approached, however, consent to starting a program. Often after learning of the services it must provide to adequately serve the severely handicapped a district will conclude that it is not ready to accept the responsibility. The DESE, however, encourages the districts it believes are capable by working with them to fund the new program. The teaching and supervisory staff of the DESE also cooperate with the local district on the substantive portion of the program. Heskett at Vol. 9; John at Vol. 12; Hall at Vol. 17.

Financing is the foremost concern of the local authorities. They have not been willing to initiate a severely handicapped program when to do so would take money away from the educational programs of the other students they serve. The DESE has had to assure these local districts that the necessary money will be available. The local district has two sources of funds at the local level. One is the money it was paying the state to serve the district's severely handicapped children in a state program. *See* Mo.Rev.Stat. § 162.740. The other source is the money the participating districts, those districts sending their severely handicapped children to the local program, have agreed to pay for the educational services. *See* Mo.Rev.Stat. § 162.-705(1). At the state level, besides being able to count its own children for foundation formula purposes, the district would also be eligible for categorical aid to pay toward the salaries of teachers, teachers' aides, and ancillary staff. Categorical aid is paid out on a per class basis at the rate of $10,000, $2,000, and $4,000 respectively. Federal funds are available under Chapter One and the Education Act. A district may opt for either on a per child basis. Only two of the local programs have opted for Chapter One funds. On top of the entitlement money, a district may also apply to the state for discretionary funds under the Education Act. The DESE has used discretionary grants to provide the additional funds necessary to run the local programs.[47] The local districts have used the

Stips. 1.34 and 1.38. The same figures were not available for the 1982–83 year, but the numbers should not have differed significantly.

47. When a local district takes over a state school program the DESE is no longer responsible for administering, staffing or providing the direct educational and related services. The DESE does remain responsible for ensuring that the local programs provide an appropriate educational program in compliance with the law. The DESE has found, however, that often a local district will refuse to provide a necessary

component of an appropriate program if the money to pay for the component must come from within its existing budget. The district will sometimes threaten to abandon the entire program. The DESE uses discretionary grants to encourage the local districts to provide necessary services.

Under federal law the state may hold back up to twenty-five percent as discretionary funds from its Education Act allocation. 20 U.S.C. § 1411. The rest is to be passed directly to the local districts to supplement their special educa-

money to supplement salaries, purchase equipment or materials, and to buy or equip buses.

Complete information was not provided the Court concerning the staffing of the local programs. Information is available, however, concerning the teachers and aides serving seventeen of the local programs. In 1982–83 these particular local programs had twenty and one-half full time teachers and twenty-five full time aides on the staff serving approximately 143 students. No information is available concerning the number of support staff. The local districts contract for physical and occupational therapists. Other ancillary services are provided by professionals already within the district if they have the expertise or, if not, then the district may contract for the services. Typically, the program of the State School is continued by the local district, and the classes remain in one school, rather than being dispersed to an elementary, middle, and high school. Heskett at Vol. 9; John at Vol. 12; Hall at Vol. 17; Stips 1.35 and 1.36.

### Education of all Handicapped Children Act

The plaintiffs maintain that the State Schools, DMH educational programs, and the separate schools of the SSDs violate the education of All Handicapped Children

Act of 1975, 20 U.S.C. § 1401 *et seq.* (Education Act). Although they presented an elaborate argument, the plaintiffs basically assert three contentions: (1) the defendants do not treat the "severely handicapped" on an individual basis; (2) the defendants' placement of handicapped children in separate settings violates the least restrictive environment concept embodied in the Act; and (3) the defendants are inherently unable to provide appropriate educational programs to handicapped children in separate schools. These contentions tend to overlap, but the Court will attempt to address each separately.

The Education Act was passed in 1975 to assure that all handicapped children had access to a publicly funded education, and to assist the states financially in meeting this obligation.[48] Congress first expressed its desire that handicapped children be educated with nonhandicapped children in the Education Amendments of 1974. House Rep. 94–332 at 5; Sen.Rep. 94–168 at 8, U.S.Code Cong. & Admin.News 1975, p. 1425; 62 Ia.L.Rev. 1283, 1329 (1977). It was also the first time Congress explicitly recognized the right of all handicapped children to a publicly provided education. House Rep. 93–380, U.S.Code Cong. & Admin.News 1974 at 4093, 4146; 62 Ia.L.Rev.

tion programs for the mildly and moderately handicapped. As Missouri has withheld more money in discretionary funds to pay for these local programs for the profoundly handicapped, six percent in 1981–82, eight percent in 1982–83, and twelve percent in 1983–84, the result has been a decrease in the money available at the local level to supplement programs for the mildly and moderately handicapped. Heskett at Vol. 9; John at Vol. 12; Hall at Vol. 17.

**48.** The Education Act of 1975 refined previous attempts by Congress to ensure the education of the handicapped children of the nation. In 1966, Congress enacted the Elementary and Secondary Education Amendments, P.L. 89–750, which created a program of grants to assist states, a National Advisory Committee on Handicapped Children, and a Bureau of Education for the Handicapped within the Office of Education. This was known as Title VI. In the Elementary and Secondary Education Amendments of 1970, P.L. 91–230, Congress repealed Title VI and created the forerunner to the Education Act. The amendments continued to provide grants to the states, and maintained the Bureau and the National Advisory Committee.

In addition, Congress allocated grants for research, program development, personnel development, and curriculum development and dissemination. In 1974, Congress extended the provisions of the 1970 Amendments for three years in the Elementary and Secondary Education Amendments of 1974, P.L. 93–380. The 1974 Amendments increased the funding, and added due process procedures and privacy safeguards. The 1974 enactment also set a goal of free, full educational opportunities for all handicapped children, a priority for use of the funds, and required a plan from each state to show that the handicapped children were being served in regular schools whenever appropriate. H.R.Rep. No. 332; 94th Cong., 1st Sess. (1975) (House Rep. 94–332); S.Rep. No. 168, 94th Cong., 1st Sess. *reprinted* in U.S.Code & Adm. News 1425, 1429–1430 (1975) (Sen.Rep. 94–168). The Senate version of the Education Act was introduced to ensure that the provisions contained in the 1974 Amendments were expanded to benefit the handicapped. Sen.Rep. 94–168 at 1430.

at 1329. Historically, this country has recognized the usefulness of an education both to the individual and to the nation. *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954); H.R.Rep. No. 805, 93rd Cong., 2nd Sess. *reprinted* in U.S.Code Cong. & Admin.News 4093, 4151 (1974) (House Rep. 93–805).[49] To this end, the states enacted compulsory attendance laws. These laws typically, however, made an exception for handicapped children adjudged not to be able to benefit from public education.[50] Initially, if a handicapped child was to receive any educational services, the child was either placed in an institution for the more profoundly handicapped where he might receive some instruction, or if he was more mildly (less noticeably) handicapped, allowed to attend a regular class. The handicapped children in the regular classes received the same instruction as did their nonhandicapped peers, without the benefit of any special attention to compensate for their handicap. Not surprisingly, these children often failed to even minimally succeed in the regular school environment. As a result special classes and day schools began to be created for the handicapped. A conscious effort was made to separate handicapped children from non-

handicapped children for educational purposes. Throughout this century the emphasis has remained on separating the two groups. In the 1960's, these special schools and classes proliferated. Only in the last ten years has the emphasis begun to shift back to regular classroom placement. It was felt that if a child could function in a regular classroom with specialized assistance then that placement better prepared the child to function independently. 56 St. John's L.Rev. 81, 90–93 (1981); Miller & Miller, The Handicapped Child's Civil Right as it Relates to the "Least Restrictive Environment" and Appropriate Mainstreaming, 54 Ind.L.Jo. 1, 6–12 (1978); (Miller, 54 Ind.L.Jo.); 62 Ia.L. Rev. at 1293–9. This emphasis on mainstreaming handicapped children, when appropriate, did not result, however, in universal public education for the handicapped. In 1974, the House Committee on Education and Labor reported that two-thirds of the 5.5 million handicapped children were either "excluded from schools or, sitting idly in regular classrooms awaiting the day they would be old enough to drop out." House Rep. 93–805, U.S.Code Cong. & Admin.News 1974 at 4093, 4137–38. In 1975, Congress noted that of the eight million handicapped children more than half were not receiving appropriate educational services.[51] 20 U.S.C. § 1401,

**49.** The Supreme Court in *Brown* summed up the importance of an education in an oft quoted passage.

> Today education is the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is the principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Brown v. Board of Education*, 347 U.S. at 493, 74 S.Ct. at 691. *See Plyler v. Doe*, 457 U.S. 202, 221–22, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973). The House Report stressed

the historical nature of the concern. "An educated citizenry has been an objective of the Nation since the earliest thinkers began planning a government for what then were the colonies." House Rep. 93–805 at 4151.

**50.** Missouri first enacted a compulsory attendance law in 1919. The present law was enacted in 1977. Mo.Rev.Stat. § 167.031. The section still contains an exclusion for children whom the chief school officer of the district determines are physically or mentally incapacitated. Section 167.033, however, excludes from the exception all handicapped children who receive special educational services as provided by § 162.670 *et seq.* In particular, § 162.700(1) requires each local school district, not served by a SSD, to provide special educational services to the handicapped children within its boundaries.

**51.** Statistics from the U.S. Office of Education show that in 1948 only twelve percent of handicapped children received special education services, twenty-one percent in 1963, and thirty three percent in 1967. Miller, 54 Ind.L.Jo. at 11 n. 34; Sen.Rep. 94–168 at 1430.

note "Congressional Findings." *See also* Sen.Rep. 94–168 at 8, U.S.Code Cong. & Admin.News 1975, p. 1425; House Rep. 94–332 at 7. In the early 1970s, the courts began to redress the gap in educational services offered handicapped children. For example, in Pennsylvania where approximately 50,000 retarded children were being denied access to any public educational services, a federal district court approved a consent decree in which the state agreed to provide each retarded child between the ages of six and twenty-one access to a "free public program of education and training appropriate to his learning capacities ...." *Pennsylvania Assoc. for Retarded Children (PARC) v. Pennsylvania,* 334 F.Supp. 1257, 1258 (E.D.Penn.1971); *PARC v. Pennsylvania,* 343 F.Supp. 279, 296 n. 53 (E.D.Penn.1972) (cited the 50,000 figure referred to). A year later the right to a publicly funded education was extended to all handicapped children in *Mills v. Bd. of Ed. of the District of Columbia,* 348 F.Supp. 866, 873–75 (D.D.C.1972). What followed was an outpouring of cases, both federal and state, which challenged the educational services or lack thereof offered to handicapped children. Congress influenced by *PARC* and *Mills,* and recognizing that the states lacked resources sufficient to meet the educational burdens being placed on them, sought to aid the states and redress the gap in educational opportunities with the passage of the 1974 Amendments and later with the Education Act. House Rep. 94–332 at 3–7; Sen.Rep. 94–168 at 1429–33.

The Education Act contains various requirements a state must comply with to receive federal funds. A state must have a policy of providing an appropriate education at public expense to its handicapped children, and a detailed plan for carrying out the policy. 20 U.S.C. § 1412(1) and (2); § 1413. To ensure that each child receives an education tailored to his individual needs, the statute requires that an IEP be developed for each one and that it be re-viewed on, at least, an annual basis. *Id.* at 1412(4); 1414(a)(5). The Education Act also requires certain procedural safeguards. The state must have a due process procedure that provides the parent notice of any decision affecting his child's educational program, an opportunity to examine the materials upon which the decision was based, and an opportunity to challenge the decision and have an impartial hearing held on the challenge. *Id.* at 1412(5)(A) and 1415. The state must also have procedures to ensure that to the maximum extent appropriate handicapped children, with the use of supplemental aids and services, are educated with nonhandicapped children in regular public schools. *Id.* at 1412(5)(B). Finally, the Education Act requires the state to designate one of its state level agencies, usually the state entity responsible for overseeing the elementary and secondary public school system, the "State education agency." The entity so designated is responsible for developing the plan, passing on applications from school districts serving the handicapped, and ensuring general compliance with the Act. *Id.* at 1412(6) and 1401(7). The entity here is the State Board of Education through the DESE. The Secretary of Education[52] is responsible for reviewing and ruling on state plans. *Id.* at 1413(c). The Secretary also has the authority to withhold from a state funds for the entire state program or for a portion of the program not in compliance with the Education Act. *Id.* at 1416(a).

## I. Threshold Questions

Before reaching the contentions of the plaintiffs the Court will address a threshold jurisdictional issue raised by the defendants. The defendants maintain that the Court lacks jurisdiction to hear this case because the plaintiffs failed to exhaust the administrative remedies provided by the Act in Section 1415, and because the Act does not provide for a private right of

---

**52.** The Education Act speaks in terms of the Commissioner of Education. The responsibilities of the Commissioner, formerly within the Department of Health, Education, and Welfare, however, were transferred to the Secretary of Education with the passage of the Department of Education Organization Act, 20 U.S.C. § 3401 *et seq.,* in 1979.

action to raise a systemic challenge. Based on the purposes of the Education Act and the cases that have interpreted it, the Court finds that it has jurisdiction to determine systemic challenges by private parties. Furthermore, the failure of the plaintiffs to exhaust does not deprive the Court of jurisdiction.

■ Taking up the exhaustion argument first, the Court is well aware of the statutory basis the defendants are relying upon. Sections 1415 and 1416 bestow federal jurisdiction. Only Section 1415, however, mentions actions by private parties, and it clearly anticipates that the aggrieved party before bringing a federal action will have pursued the administrative remedies provided. The exhaustion requirement, however, is not absolute. Courts have not required exhaustion when recourse to the administrative procedures would be futile. *Jose P. v. Ambach*, 669 F.2d 865, 869 (2nd Cir.1982); *Monahan v. State of Nebraska*, 687 F.2d 1164, 1168 (8th Cir.1982). The defendants have previously raised this issue, and the Court found that exhaustion would be futile in these circumstances. *See* Memorandum and Order of June 16, 1981, pp. 4–9; Memorandum and Order of July 29, 1982. Having again considered the question, the Court finds no reason to change its earlier ruling.

The claim the plaintiffs raise, if correct, could not be resolved by resort to Missouri's administrative review process. The plaintiffs claim that the defendants automatically place in a separate school or facility any child who is determined to be severely handicapped without regard to whether the child could receive an appropriate education in a regular school. They point out that the IEP teams do not have the option of placing a severely handicapped child in a regular school because the placement continuums of the defendants do not include a program for the severely handicapped in those schools. The placement options for the severely handicapped are limited to separate schools or facilities according to the plaintiffs. If the plaintiff's view of the placement process is correct and since the plaintiffs do not challenge the evaluation determinations that

the individual plaintiffs have severe handicapping conditions, then review would be meaningless and exhaustion unnecessary. Under the placement system they describe, a child correctly evaluated as having a severe impairment will never be placed in a regular school. The Court will reach the merits of this claim below, but for exhaustion purposes these allegations are sufficient.

■ Similarly to their position on exhaustion, the defendants rely on Sections 1415 and 1416 in arguing that there is no cause of action for systemic challenges by private parties. The Court notes, however, that several cases have, at least implicitly, recognized the right of private parties to bring a systemic challenge. In a number of recent cases private parties have challenged their state's policy limiting the school year for handicapped children to the typical nine-month period. *See Georgia Assoc. of Retarded Citizens v. McDaniel*, 716 F.2d 1565 (11th Cir.1983); *Crawford v. Pittman*, 708 F.2d 1028 (5th Cir.1983); *Battle v. Pennsylvania*, 629 F.2d 269 (3rd Cir.1980); *Yaris v. Spec. Sch. Dist. of St. Louis Co.*, 558 F.Supp. 545 (E.D.Mo.1983). In each case the court found that the system-wide denial of a summer school program to handicapped children denied them the right to be treated and considered on an individual basis as provided by the Education Act. Other courts have also recognized systemic challenges by private parties. *See Brookhart v. Illinois St. Bd. of Ed.*, 697 F.2d 179, 182–83 (7th Cir.1983) (challenged denial of diplomas to handicapped children unable to pass the state's minimum competency test); *Gary B. v. Cronin*, 542 F.Supp. 102 (N.D.Ill.1980) (challenged state rule that excluded counseling and therapeutic services from special education or its related services). *Colin K. v. Schmidt*, 536 F.Supp. 1375 (D.R.I.1982), 715 F.2d 1 (1st Cir.1983) (challenged policy of placing all learning disabled children in regular public schools); *Riley v. Ambach*, 508 F.Supp. 1222 (E.D.N.Y.1980) rev'd on procedural grounds 668 F.2d 635 (2nd Cir. 1981) (challenged policies setting a fifty percent discrepancy level before a child is determined to be handicapped and remov-

ing all residential schools or learning disabled children from the list of approved schools); *Roncker v. Walter,* 700 F.2d 1058 (6th Cir.), *cert. denied* — U.S. ——, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).[53] Systemic challenges similar to those leveled by the plaintiffs here were raised in *Roncker.* Roncker advanced two claims. One, that the school district in question automatically referred all trainably mentally retarded (TMR) children to the separate county schools. The court found that if Roncker was correct then the district was violating the Education Act requirement of individual placement decisions. *Id.* at 1064. The plaintiff also claimed that the school district labeled children as TMR solely on their IQ scores. The court found this too to be a violation of the statute. *Id.* at 1064. The plaintiffs here have alleged that all severely handicapped children are automatically placed in separate schools without regard to their individual needs and have alluded to a belief that the defendants categorize the handicapped children solely by their IQ score.

This Court believes that the willingness of the aforementioned courts to hear these systemic claims is consistent with the purposes of the Education Act. As already mentioned Congress passed the Education Act in response to a perceived need to assure that handicapped children are afforded a publicly funded education. To further ensure that the education afforded is meaningful for each child, Congress mandated that each be treated on an individual basis and that the parents or guardian of the child be afforded the opportunity to participate in all phases of the process of formulating an educational program for their child. Moreover, Congress mandated

extensive due process, review procedures that a parent or guardian could utilize to challenge a decision that he felt was not in his child's best interest. It is this Court's belief that Congress afforded parents and guardians such extensive involvement opportunities and the right to challenge their child's educational treatment because Congress viewed parents and guardians as a necessary check to insure that handicapped children are provided appropriate educational opportunities. This Court does not believe that Congress created this role for parents and guardians while intending to withhold from them the ability to challenge a portion of their state's system that if left uncorrected would deprive their child of an appropriate education.[54]

The defendants argue that Congress did intend to so limit private party challenges. They maintain that systemic challenges and corrections are the exclusive province of the Secretary of Education. They imply that aggrieved private parties can petition the Secretary to take the action desired. The statute does not expressly provide for private party petitioning and the statute certainly does not require the Secretary to heed these petitions. Even if that avenue was open to private parties the sanctions available do not ensure adequate relief. Under Section 1416 the only sanction granted to the Secretary is the authority to withhold funds to the entire state program or to the offending portion of it. The withholding of federal funds does not guarantee the specific relief sought by a private party. In fact, it might result in the elimination of the segment of the educational program challenged, rather than lead to its reform. *Georgia Assoc. of Retarded Citizens v. McDaniel,* 716 F.2d at 1573. *See*

---

**53.** The cases this Court has found which have denied systemic challenges, have denied the challenges not because they were systemic, but because of their subject matter. As an example of these cases *see Fallis v. Ambach,* 710 F.2d 49 (2nd Cir.1983).

**54.** The defendants also maintain that the regulations accompanying the Education Act support a finding that private actions are limited to the educational services afforded an individual child. They call the Court's attention to the

comments following 34 C.F.R. § 300.552, in particular the admonition that "the overriding rule in this section is that placement decisions must be made on an individualized basis."

The Court does not find such a cause of action limitation in the regulations, 34 C.F.R. § 300. Furthermore, the phrase cited by the defendants goes only to the question of how placements are to be made. It does not speak to potential causes of action. If anything remedying a violation of this "overriding rule" would seem to support finding a cause of action.

also *New Mexico Assoc. for Retarded Citizens v. New Mexico,* 678 F.2d 847, 851 (10th Cir.1982) and *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1381 (10th Cir.1981) (termination of federal funds for violation of the Rehabilitation Act, Section 504, does not provide adequate relief for private claims against the educational system involved). When a systemic challenge goes to the question of whether a state policy interferes with the provision of an appropriate education on an individual basis, as it does here, then a parent or guardian has a cause of action which he may bring before a competent court.

## II. *Individualized Consideration*

The plaintiffs contend initially that the handicapped children attending the separate schools and facilities maintained by the defendants are not treated as individuals. They do not claim that these children were not treated on an individual basis by the diagnostic/evaluation team or by the IEP team in formulating the substance of their educational programs. The plaintiffs do claim, however, that the IEP team, acting on the evaluations, labels the more profoundly handicapped children as "severely handicapped." Consistent with their exhaustion argument they claim that once a child is labeled as "severely handicapped" the placement decision is automatic. All "severely handicapped" children are denied placement in a regular school setting, and placed in a separate school or facility without regard for their individual needs and capabilities.

■ Fundamental to the guarantee of a free appropriate public education is the requirement that each handicapped child be considered as an individual. Congress recognized, and there was total agreement amongst those who testified before this Court, that handicapped children are a heterogeneous population, each member having a unique condition and concommitant unique needs. *See* Sen.Conf.Rep. No. 94–

455, 94th Cong., 1st Sess. *reprinted* in U.S.Code Cong. & Admin.News 1480 (1975) (hereinafter Sen.Conf.Rep. 94–455); House Rep. 94–332 at 9; 20 U.S.C. § 1401 note. *See* Note, Denying Appropriate Education for the Handicapped: The *Rowley* Decision, 27 St. Louis U.L.J. 685, 689 (1983); Comment, Residential Placement of Handicapped Children: Altering the Scope of Public Education, 43 U.Pitt.L.Rev. 789, 795 (1982) (Residential Placement, 43 U.Pitt.L. Rev.). This congressional recognition carried over into the requirements of the Education Act. *See* 20 U.S.C. §§ 1401(16), (18), (19); 1414(a)(5); and 34 C.F.R. §§ 300.340—300.349.

■ Consistent with the Education Act, the Court finds that Missouri requires and that each handicapped child is treated on an individual basis. Missouri law requires each local or special school district to obtain "current, appropriate diagnostic reports for each handicapped child ...." Mo.Rev.Stat. § 162.700; State Plan 1984–86 at 69. Each child is also entitled to an IEP within thirty days of a determination that the child needs special educational services and annually thereafter. State Plan for 1984–86 at 45.[55] The law also requires that each child's IEP be implemented in an educational program designed to meet the needs of the child and to develop his full potential. *Id.* at 162.705(1), 162.725(2). The unchallenged testimony also substantiates the defendant's concern for the individual needs of each child. Witnesses from the DESE, the SSD of St. Louis County, and the St. Louis City School District all testified regarding the individual nature of the evaluation and IEP process. Friedebach at Vol. 10; McPheron at Vol. 11; Emmons at Vol. 13; Hauser at Vol. 14; Eldridge at Vol. 15; Kopp at Vol. 15; Wilkerson at Vol. 16; and Hall at Vol. 17. For example, the composition of each diagnostic team and IEP team varies according to the handicapping condition of the child. Friedebach at Vol. 10. The evidence also

---

**55.** The plan sets out compliance mechanisms. Each educational service provider must submit to the DESE a document indicating the development and maintenance of an IEP for each handicapped child served by it. The DESE may also request, at random, the IEPs and supporting documents of particular children to assess the adequacy of the programming and may make periodic, on-site visits. *Id.* at 48–49.

establishes that the IEPs vary according to the needs of each child. McPheron at Vol. 11; Emmons at Vol. 13; P.Exhs. 187, 189, 191–93, 195–200.

The defendants' evaluation, IEP, and placement process supports the conclusion that the placement decision is also made on an individual basis. The evidence establishes contrary to the suggestions of the plaintiffs, that the defendants, consistent with federal and state law, first determine through the evaluation and IEP process whether a child, given his peculiar handicaps and capabilities can benefit from placement in a local public school. If the IEP team believes that he can not so benefit then the child is referred to the DESE. The DESE does not automatically accept the child for placement in a state school. Rather, a DESE team reviews the entire record of the child and makes an independent determination as to whether placement in a state school is appropriate. Heskett at Vol. 9; Friedebach at Vol. 10; Kopp at Vol. 15; Hall at Vol. 17. Before a child is placed in a separate school his condition is reviewed and ruled upon by two separate and distinct teams. The label "severely handicapped" is only placed on the child after each team has concluded

that the child would not benefit from local school placement and that separate school placement would be appropriate.[56]

Some confusion on this point may have resulted from Missouri's statutory definitions. Mo.Rev.Stat. § 162.675(2) and (3). The statutory scheme distinguishes between handicapped and severely handicapped children.[57] Neither the definition of "severely handicapped children," however, nor any other portion of Missouri's law or policy requires that a child with particular handicapping conditions be placed in a separate school. The definition denotes merely as "severely handicapped" those handicapped children that have already been approved for placement in separate schools after a group of competent professionals has determined that the children, on an individual basis, could not benefit from or meaningfully participate in a regular school program for handicapped children. The key point here is that the placement decision is made first, and if the decision is to place the child in a separate school then the child is categorized as severely handicapped. As one witness put it, the "severely handicapped" label is used for reporting rather than for placement purposes. Eldridge at Vol. 15.[58]

56. The procedures used by DMH and the SSDs do not significantly differ from the one described in the text. The 1980 agreement between the two agencies makes the DESE responsible for the placement of children served by the DMH. As for the SSDs, an SSD team rather than a DESE team must approve a local district referral before a handicapped child is placed in a Phase III program. The differences do not alter the Court's decision

57. By law, "handicapped children" in Missouri are defined as

children under the age of twenty-one years who have not completed an approved high school program and who, because of mental, physical, emotional or learning problems, require special educational services in order to develop to their maximum capacity.

Mo.Rev.Stat. § 162.675(2). The law denotes as a subgroup of handicapped children, "severely handicapped children" which the law defines as handicapped children under the age of twenty-one years who, because of the extent of the handicapping condition or conditions, as determined by competent professional evaluation, are unable to benefit from or meaning-

fully participate in programs in the public schools for handicapped children. The term 'severely handicapped' is not confined to a separate and specific category but pertains to the degree of disability which permeates a variety of handicapping conditions and education programs.

58. The plaintiffs also claimed that the defendants determine whether to place a child in a separate setting based solely on the child's I.Q. score. The Education Act prohibits the states from relying on only one procedure or test in evaluating the needs of a child. 20 U.S.C. § 1412(5)(C); 34 C.F.R. § 300.532(d). The defendants are in compliance with the Act and the regulations. State Plan 1984–86 at 69–71; P. Exh. 124 at 79–83; Friedebach at Vol. 10. Friedebach and R. Werner both stressed that the placement decision does not hinge on the child's I.Q. score. Also considered by an IEP team, is the child's communications, adaptive behavior, gross and fine motor, and mental level, along with the child's health, social skills, and the necessary services to aid the child. Friedebach at Vol. 10; R. Werner at Vol. 13; Wilkerson at Vol. 16; Gitel at Vol. 17.

III. *Least Restrictive Environment*

■ The plaintiffs next contend that the children placed in the special schools and facilities are denied an education in the least restrictive environment. The focus of this portion of the plaintiffs' claim is on the defendants' continuum of alternative educational settings. The plaintiffs' maintain that the Education Act's least restrictive environment provision mandates that handicapped children be educated in either regular classrooms or separate classrooms in regular schools. They further maintain that the defendants' placement continuums which include special schools are not required by the Act, and inconsistent with the least restrictive provision.

1. The plaintiffs argue first that "[i]t is far from clear ... that the statute recognizes any continuum of placements." They point out that the statute itself does not contain a continuum provision and that the definition of "special education" in the statute, § 1401(16), mentions several educational settings, but not separate schools. In other words, the concept of "least restrictive environment" does not include separate schools. The Court finds such a conclusion contrary to the language of the Education Act, its legislative history, the accompanying regulations, and judicial interpretations of the Act.

Although the phrase "least restrictive environment" does not appear in the Education Act, those in the field of special education have adopted it as a shorthand denominator for the placement presumption contained in Section 1412(5)(B), of the Act. The section requires each state to have procedures to assure that its handicapped children are educated with nonhandicapped children to the maximum extent appropriate. The section further provides that a child is not to be removed from a regular educational environment unless the nature or the severity of the child's handicap prevents him from receiving a satisfactory education there, even with the use of supplemental aids and services.[59]

Neither Section 1412(5)(B) nor any other provision of the Education Act indicates a congressional intent to eliminate separate or other facilities for the handicapped children who need them to benefit educationally. The definition of "special education" calls for the delivery of publicly funded education services in a classroom, hospital, institutional setting, or at the child's home. 20 U.S.C. § 1401(16). The hospital, institution and home settings are all settings separated from nonhandicapped children in public schools. Moreover, the "classroom" setting is generic. It is not limited to local public school classrooms, but speaks of classroom settings without limitation. Furthermore, the placement provision, Section 1412(5)(B), recognizes the need for separate educational settings both explicitly and implicitly. The section acknowledges that some handicapped children will not be able to receive a satisfactory education in a "regular educational environment" and will need to be placed in "special classes, separate schooling" or otherwise removed from the regular school setting. Unless Congress intended to repeat itself, special classes and separate schooling must mean two distinct education placements.[60] Even

---

59. The full text of § 1412(5)(B) states:

  (5) The State has established

    *   *   *   *   *

  (B) procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplemental aids and services cannot be achieved satisfactorily.

60. Relying on Webster's dictionary, the plaintiffs maintain that schooling means "instruction in school," and, therefore, "separate schooling" as used in the Act means instruction in a regular public school, but not a regular classroom. The plaintiffs' definition, however, would result in Congress, having already listed special classes, repeating itself with the use of "separate schooling." They do not explain why Congress would recite the same alternative placement twice. The Court believes, irrespective of Webster, that the better definition of "schooling" within the statutory context is school.

if separate schooling does not mean separate schools, which this Court believes that it does, the phrase "other removal from the regular education environment" indicates a recognition of the appropriateness of separate settings for some children. After all, Section 1412(5)(B) does not mandate that all handicapped children be educated along side nonhandicapped children.[61] It only requires that educational agencies, to the "maximum extent appropriate," place handicapped children in regular classrooms. The implication is that some handicapped children will not be able to be educated in a regular school environment. Moreover, two other sections of the Education Act indicate that Congress did not intend to foreclose separate alternative educational settings. Section 1414(d) authorizes the state to provide direct educational services to handicapped children in settings separate from public schools in certain circumstances. Section 1401(22) defines an "intermediate educational unit" as any provider of public educational services on a regional basis, other than a local school district and indicates an acceptance of placements outside the regular schools. Furthermore, in recent amendments to the Education Act Congress explicitly recognized separate schools as an alternative placement option. *See* P.L. 98–199, § 681 (Dec. 2, 1983).

The legislative history of the Education Act further supports this conclusion. The House Committee did not foreclose separate educational settings. Rather, it understood that varying educational environments would be necessary to meet the education needs of the handicapped.

> The Committee understands the importance of providing educational services to each handicapped child according to his or her individual needs. These may entail instruction to be given in varying environments, i.e., hospital, home, school, or institution. The Committee urges that where possible and where most beneficial to the child, special education services be provided in a classroom situation. An optimal situation, of course, would be one in which the child is placed in a regular classroom. The Committee recognizes that this is not always the most beneficial place of instruction. No child should be denied an educational opportunity; therefore, H.R. 7217 expands special education services to be provided in hospitals, in the home, and in institutions.

House Rep. 94–332 at 9. Like the Education Act, the House Committee spoke in general terms when it mentioned a classroom setting. The Committee wrote that "where possible" and "where most beneficial" a child should be educated in a "classroom situation." The "optimal situation" is a "regular classroom." Those two sentences taken together indicate that the Committee foresaw classroom settings beyond or in addition to the traditional classroom. Likewise, the cases that provided the impetus for the Education Act, *PARC* and *Mills*, and whose principles were incorporated to a large extent in the Act, do not foreclose separate placements.[62] The con-

---

**61.** Commentators discussing the placement provision in Section 1412, have also viewed it as calling for a continuum of alternative placements to meet the varying needs of the children to be served. J. Shryban, Due Process in Special Education 17 (1982); (Shryban, Due Process); Colley, The Education for All Handicapped Children Act (EHA); A Statutory and Legal Analysis, 20 J. of L. & Ed. 137, 148 (1981); (Colley, 20 J. of L. & Ed.) Note, Education of Handicapped Children: The IEP Process and the Search for an Appropriate Education, 56 St. John L.Rev. 81, 112 (1981); (Note, 56 St. John L.Rev.); Enforcing the Right to an "Appropriate Education": The Education for All Handicapped Children Act of 1975. 92 Harv.L.Rev. 1103, 2220–21 (1979) (Note, 92 Harv.L.Rev.); 62 Ia.L. Rev. at 1419 n. 969, Miller, 54 Ind.L.J. at 3 n. 11,

6–7, 10–11; 62 Ia.L.Rev. at 1419 n. 969; Comment, the Handicapped Child Has a Right to an Appropriate Education, 55 Neb.L.Rev. 637, 672 n. 124 (1976) (Comment, 55 Neb.L.Rev.).

**62.** The Supreme Court in *Rowley* noted Congress' reliance on *PARC* and *Mills*.

> The fact that both *PARC* and *Mills* are discussed at length in the Legislative Reports suggests that the principles which they established are the principles which, to a significant extent, guided the drafters of the Act. Indeed, *immediately after discussing these cases the Senate Report describes the 1974 statute as having "incorporated the major principles of the right to education cases."* S.Rep. at 8. Those principles in turn became the basis of the Act, which itself was designed

sent agreement approved in *PARC* stated that "placement in a regular public school class is preferable to placement in a special public school class and placement in a special public school class is preferable to placement in any other type of program of education and training." *PARC v. Pennsylvania*, 334 F.Supp. at 1260. The *Mills* decision allowed the District of Columbia school system to deny a handicapped child placement in a regular public school if (1) the child was offered adequate, alternative educational service, (2) a hearing was held prior to the placement and (3) the placement and the child's progress were reviewed periodically. *Mills v. Bd. of Ed. of the District of Columbia*, 348 F.Supp. at 878. Both *PARC* and *Mills* stated a preference for public school placement, but neither went so far as to require or even to suggest the elimination of separate public educational settings.

The regulations accompanying the Education Act are consistent with this view. Beyond stating a presumption in favor of a regular classroom placement,[63] Congress left it to the Secretary to promulgate regulations to ensure that each child is appropriately placed. Crucial to the present issue, the regulations require that each state have a continuum of alternative placements available. The continuum must include the alternative placements listed in Section 300.13 of the regulations: regular classes,

special classes, special schools, home instruction, and instruction in hospitals and institutions.[64] 34 C.F.R. § 300.552(b). Section 300.552(b) further requires that the full continuum of settings be available for the placement of each child, in line with his unique needs. *See also* 34 C.F.R. §§ 300.360–361. The defendants each have a continuum of alternative educational settings that complies with the regulations. Mo.Rev.Stat. § 162.725(1); State Plan 1984–86 at A29; R. Werner at Vol. 13.

The regulations promulgated by the Secretary of Education, pursuant to 20 U.S.C. § 1417(b), are entitled to substantial deference by the Court. *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981); *International Nutrition, Inc. v. Department of Health and Human Services*, 676 F.2d 338, 342 (8th Cir.1982). In light of the foregoing, this Court believes that the regulations herein cited are not inconsistent with the statutory mandate or the policy underlying the Education Act. *FEC v. Democratic Senatorial Campaign Comm.* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). Furthermore, the Court has been unable to discern and the plaintiffs have not presented any compelling indications that the regulations are inappo-

---

to effectuate the purposes of the 1974 statute H.R.Rep. at 5.

*Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176 at 194, 102 S.Ct. 3034 at 3044, 73 L.Ed.2d 690.

**63.** It is not clear to what extent Congress intended to pursue the mainstreaming presumption. The Education Act shows that Congress preferred regular classroom placement. It is not as apparent that once beyond a regular classroom that Congress had a preference. Both *PARC* and *Mills* set up a heirarcy: regular classroom, special classroom, separate school. It is not clear from the Act that Congress also adopted this heirarchy. Section 1412 merely lumps special classes, separate schooling, and other settings together. At least one federal judge has posited that Section 1412, and the mainstreaming preference applies only to those children who can in some respect be satisfactorily educated in a regular classroom. If the child can not be placed in a regular classroom for even part of the school day then the local district

may determine, free of any mainstreaming restraints, where to locate the child's classroom. *Roncker v. Walter*, 700 F.2d at 1065–66 (dissenting, Kennedy, J.). Although the Court finds some merit to this position it is unnecessary to make such a finding to resolve the present issue.

**64.** The regulations also require each educational service provider to review annually the placement of each child, to base the placement on the child's IEP, and to place the child in the appropriate placement nearest the child's home. *Id.* at § 300.552(a). The State educational agency has the further responsibility of informing, training, and assisting the teachers and administrators who serve the handicapped to assure that they understand and comply with the placement provisions. *Id.* at 300.555. The State agency is responsible for monitoring the compliance of the other educational service providers. *Id.* at 300.556.

site. *Beal v. Doe*, 432 U.S. 438, 447, 97 S.Ct. 2366, 2372, 53 L.Ed.2d 464 (1976).

Federal case law further supports the conclusion that Congress did not intend to foreclose separate educational settings. Several cases have by now dealt with the question of appropriate placement and have found settings outside the regular school environment to be appropriate. One example is the case of *Colin K. v. Schmidt*, 536 F.Supp. 1375 (D.R.I.1982) aff'd, 715 F.2d 1 (1st Cir.1983). In *Colin K.* the court found that a self-contained classroom recommended by the local school authorities, was not the appropriate placement for two children with severe learning disabilities and accompanying emotional problems. The court directed continuation of their education in a residential facility, "at least an appropriate special education," until it can be determined whether the children can benefit from an "intensive non-resident placement," presumably a day school.[65] *Id.* at 1386–87. Another example is *Riley v. Ambach*, 508 F.Supp. 1222 (E.D.N.Y. 1980) *rev'd* 668 F.2d 635 (2nd Cir.1981). *Riley*, in part, involved a challenge to the decision of the New York Commissioner of Education to remove all residential schools serving the learning disabled from a list of approved schools. New York only paid for special educational services received at approved private schools. The Court ruled that New York must have residential schools available as an optional placement since all learning disabled children could not receive an adequate education in a regular school environment. *Id.* at 1244–45. The court concluded that the option of residential placement is consistent with the "mainstreaming principle." *Id.* at 1246. The Second Circuit reversed on other grounds. *Riley v. Ambach*, 668 F.2d at 642. The appeals panel did note, however, that each public educational agency must provide a continuum of educational placements that includes special schools and residential facilities. *Id.* at 638. In a final example closer to home, this court found that a state school offered the particular child in question an appropriate education in the least restrictive environment. *Cothern v. Mallory*, 565 F.Supp. 701, 701–08 (W.D.Mo.1983). *See Abrahamson v. Hershman*, 701 F.2d 223, 226 (1st Cir. 1983); *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 693 (3rd Cir.1981); *Christopher N. v. McDaniel* 569 F.Supp. 291, 293, 301 (N.D.Ga.1983); *Christopher T. v. San Francisco Unified School Dist.* 553 F.Supp. 1107, 1118 (N.D.Cal.1982); *Stacey G. v. Pasadena Indep. Sch. Dist.*, 547 F.Supp. 61, 78 (S.D.Tex.1982); *Parks v. Pavkovic*, 536 F.Supp. 296, 304 (N.D.Ill. 1982); *Norris v. Mass. Dept. of Ed.*, 529 F.Supp. 759, 767 (D.Mass.1981); *Grkman v. Scanlon*, 528 F.Supp. 1032, 1036–37 (W.D.Penn.1981), vacated and remanded in light of *Rowley*, 707 F.2d 1391 (3rd Cir. 1982); *Gladys S. v. Pearland Indep. Sch. Dist.* 520 F.Supp. 869, 879 (S.D.Tex.1981); *North v. Dist. of Col. Bd. of Ed.*, 471 F.Supp. 136, 140 (D.D.C.1979); *Lora v. Bd. of Ed. of Cty. of New York*, 456 F.Supp. 1211, 1269 (E.D.N.Y.1978), vacated, 623 F.2d 248 (1980).[66] *See also Doe v. Brookline Sch. Comm.*, 722 F.2d 910 (1st Cir. 1983); *Tilton v. Jefferson County Bd. of Ed.*, 705 F.2d 800 (6th Cir.1983); *Monahan v. Nebraska*, 687 F.2d 1164 (8th Cir.1982).

---

**65.** The court did not rule on what was the appropriate placement, citing the age of the evaluative information on the children. The court did explicitly find that placement in a self-contained classroom violated the children's right to a free appropriate public education. The services in the self-contained class were not sufficiently intensive, the instruction would not be sufficiently individualized, and the curriculum not sufficiently flexible so as to adjust to the children. The court also found the possibility of mainstreaming the children into nonacademic classes to be detrimental to their self-image. *Id.* at 1387.

**66.** At issue in *Lora* were the special day schools for the emotionally handicapped provided by the New York City Board of Education. The district court found special day schools to be an integral part of an acceptable continuum of alternative educational placements. *Id.* at 1164, 1169. The court pointed out that "mainstreaming" is a preference for regular school, regular class placement and not a mandate that all children be so placed. *Id.* at 1168–69. Mainstreaming does not require the elimination of all separate educational settings. *Id.* at 1167. The Second Circuit vacated the opinion on other grounds. *Lora v. Bd. of Ed. of City of New York*, 623 F.2d at 250–56.

Even those cases that have found the appropriate placement for a particular child to be in a regular school environment have recognized that placement in such an environment is not mandated by the Education Act. *Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983) ("The [Education] Act does not require mainstreaming in every case, but its requirement that mainstreaming be provided to the maximum extent appropriate indicates a very strong congressional preference."); *Springdale Sch. Dist. No. 50 of Washington County v. Grace,* 693 F.2d 41, 42–43 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1982). No case has come to the attention of this Court which has held or even stated in passing that a separate educational setting is *per se* inappropriate for the placement of any handicapped child due to its separation from public schools. The essence of current judicial opinion is that Section 1412(5)(B) does create a preference in favor of regular school placement, but that regular school placement can not provide an appropriate education in every instance. *See Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. at 181 n. 4, 102 S.Ct. at 3037 n. 4.

2. The plaintiffs next argue that even if the Education Act provides for a continuum with special schools, the defendants do not utilize their continuum consistently with the Act. A continuum may be valid, but its use invalid if the children are not placed in the least restrictive educational environment appropriate for them. According to the plaintiffs, the least restrictive educational environment for the "vast majority" of "severely handicapped" children currently attending separate schools is a self-contained classroom in a regular public school.

.The Court finds that the defendants are systemically committed to the concept of placing each handicapped child in the least restrictive educational environment.[67] The commitment begins with the State's educational laws. In enacting its present special education law in 1973, Missouri created a presumption in favor of local school placement similar to the one contained in Section 1412(5)(B). Mo.Rev.Stat. § 162.680(2).[68] Missouri law also requires that special aids and supplementary services be tried before a child is removed from a regular classroom. *Id.* The State Plan submitted by the DESE and the applications filed with the DESE by the SSD and the DMH indicate that the defendants have incorporated these statutory requirements in their policies and procedures. *See* State Plan 1984–86 at 63–65 and A29; SD Exh. 8, Teacher's Guide; SD Exh. 14a, DMH Policies.

The realities of the system also bear out this commitment to placement in the least restrictive educational environment. For the 1982–83 school year Missouri's public school census totalled 805,921 students,

---

**67.** In discussing this point the Court will focus on the DESE placements and to a lesser extent the placements by the St. Louis Co. SSD. The DMH follows the same procedures as the DESE. In fact, the latter is responsible for placing the children of the former in educational settings. The information available on the Pemiscot Co. SSD shows that it too follows a pattern similar to that of the DESE and the St. Louis Co. SSD.

**68.** Subsection two provides that:

To·the maximum extent practicable, handicapped and severely handicapped children shall be educated along with children who do not have handicaps and shall attend regular classes. Impediments to learning and to normal functioning of such children in the regular school environment shall be overcome whenever practicable by the provision of special aids and services rather than by separate schooling for the handicapped.

Read literally Missouri's use of the word "practicable" instead of "appropriate" might be cause for concern. Practicable which means reasonably possible or feasible, could be more limiting than appropriate, which means fitting or proper. To the extent that the defendants are considering only practicality, in a narrow sense, then they are violating the placement presumption of Section 1412(5)(B). The evidence related in the text indicates, however, that the defendants are not shunning their placement responsibilities by relying on a narrow usage of the word "practicable." Use of the word "practicable" is not so odd when it is remembered that Missouri enacted its present special education laws in 1974. At that same time the Elementary and Secondary Education Amendments of 1974, which first incorporated this presumption in favor of local, public school education, was just being enacted, and the Education Act was still a year from passage.

ages five to twenty-one. The DESE identified 136,996 of those children as handicapped and in need of special services. Of that number, 5,006 youngsters were placed in settings challenged by the plaintiffs: the DESE served 2451 in state schools, private agencies under contract with the DESE served 291, the DMH educationally served 225 in its facilities, the St. Louis County SSD served 2007 in the Phase III program, and the Pemiscot County SSD served 32. SD Exh. 16; SD Exh. 41; Stips 1.17 and 3.7, Hall at Vol. 17.it. The numbers indicate that relatively few children are actually placed in the separate settings contested in this suit. The 5,006 who are in contested settings, represent just over one-half of one percent (.0062) of the public school age population. Although neither the Education Act nor its regulations discusses the percentage of children that might or might not be appropriately served in a separate setting, the statistics do indicate, at the least, that Missouri is not warehousing children in separate schools and other separate settings in order to avoid regular school placement. The statistics lend credence to the testimony that the defendants only place in separate educational environments those children who can not benefit from local school placement.[69] Heskett at Vol. 8; Gitel at Vol. 17; Hall at Vol. 17.

Moreover, neither the DESE nor the SSD take assignment to a separate setting lightly. Before most children are recommended for separate school placement they have been placed and worked with in a special education program in a regular school. When it becomes apparent that a child is not going to benefit in the regular school even with the use of supplemental aids and services then he is referred to the DESE. Gitel at Vol. 17. The entire evaluation and IEP process works on the presumption that only those children that can not benefit from special education programs in the regular schools can be placed elsewhere. Both the DESE and the SSD have two teams review the file of every child recommended for placement in a separate setting. The initial team, the IEP team consists of the child's parents and professionals with knowledge of or experience in working with the child. It formulates the IEP and decides upon the appropriate placement. If the child can benefit from educational services in a regular school environment, either a regular class or a self-contained class, then the child is placed there. If the initial team decides that a regular school placement is inappropriate then the child's file is forwarded to an administrative review team to determine whether a separate placement is appropriate. If the review team determines that a separate setting is not appropriate then the child is referred back to the local school district for educational services. Friedebach at Vol. 10; Kopp at Vol. 15; Eldridge at Vol. 15; Wilkerson at Vol. 16; Hall at Vol. 17; SD Exh. 8, Teacher's Guide at 2.1a. The review committees perform a meaningful function

69. The plaintiffs point to the St. Louis Co. SSD to support their position that the children in separate schools are not appropriately placed. It is true that the Phase III schools educate a higher number of children than would be statistically expected. While the local public school districts of St. Louis County educate seventeen percent of the State's school children, the SSD's Phase III schools educate over forty percent of the State's children in separate schools.

The witnesses for the SSD provided several reasons for the size of the Phase III program. One, the county has a significant school age population that attends private and parochial schools, and, therefore, is not counted within the seventeen percent. Two, the SSD was one of the earliest school districts to deal specifically with handicapped children and has a reputation that causes people with severely handicapped children to settle in the county to take advantage of the programs. Three, the district serves children from a Juvenile Detention Center and the DDTC. Fourth, the students attending the skill centers, approximately 400 in number are also counted in the Phase III program. Fifth, even counting all 2,007 youngsters, that number still represents only sixteen percent of the handicapped children served by the SSD. R. Werner at Vol. 13; Hauser at Vol. 14; Huskey at Vol. 14; Eldridge at Vol. 15; Hall at Vol. 17.

The numbers presented on their face do not, when considered with the various explanations for them, establish that the SSD is systemically violating the least restrictive environment provision. As for whether particular children are misplaced, the Court leaves the resolution of that question to later cases with properly developed records and with their focus on the particular child.

in the placement process by serving as a check on placements outside the regular school environment. The record indicates that rather than serve as a mere rubber stamp for referrals from local IEP teams, the review committees reach an independent decision on whether separate placement is appropriate. SD Exh. 41.

In addition to the two-tiered placement decision, the defendants provide additional checks to ensure that the placement is and remains appropriate. The defendants train their professional staff and provide them with technical assistance to aid them in determining the least restrictive educational setting. State Plan 1984–86 at 65; Eldridge at Vol. 15.[70] The DESE also monitors the compliance of the DMH and the SSDs with the state and federal requirements. State Plan 1984–86 at 64; P.Exh. 166, DESE and DMH Agreement; Hall at Vol. 17. Once a child is placed additional safeguards come into play. The DESE requires after a child has been in a separate educational setting for thirty days that the IEP team meet and determine whether they still believe the IEP and the placement are appropriate. Beyond the thirty day meeting, the IEP team can be reconvened at any time by the child's parents or teacher if either one believes a change is warranted. Finally, the team must meet once a year to review and reformulate an IEP,

and reach a new placement determination. If the child is again recommended for a separate placement, then the state or SSD team again reviews the decision. R. Werner at Vol. 13; Hauser at Vol. 14; Eldridge at Vol. 15; Kopp at Vol. 15; SD Exh. 8, Teacher's Guide at 1.5e and 2.16; State Plan 1984–86 at A29.

These additional checks also result in children being referred back to regular school placements. Information available for the 1981–82 school year indicates that the SSD referred over thirty-three percent of the children in Phase III programs to Phase I and II programs. SD Exh. 16. Furthermore, Dr. Werner, Dr. Huskey, Ms. Hauser, and Ms. Eldridge all testified regarding incidents of moving children from Phase III programs to Phase II or vocational programs. If the IEP team determines that a child in a Phase III program no longer needs the intensity of services provided there, and could be more successful in a less restrictive environment, then the child is reassigned to a regular school setting. Testimony of R. Werner at Vol. 13. The record also indicates that placement in a state school is not a dead-end. Information available from the 1980 school year shows that the DESE referred 105 children back to their respective local school districts for placement the following year.[71] P. Exhs. 1–57, Report of Teacher

---

**70.** The DESE provides teachers and administrators serving the handicapped with the federal and state regulations concerning placement along with information on actions of the State Advisory Committee for Special Education Personnel Development. The state also conducts in-service training programs on the subject and the regional special education consultants are available to and do meet with the teachers and administrators.

The SSD of St. Louis County has developed an IEP manual that has been distributed to the professional staff of the district. The manual was designed to inform the staff regarding the applicable federal and state regulations concerning placement determinations. The manual provided a format to follow in making the determinations. The district was seeking to establish a consistent approach among the 1300 professional staff who could or have served on IEP committees.

**71.** Listed below is the number of children referred from each State School to a less restrictive setting as indicated in the year end reports of the State Schools. P. Exhs. 1–57.

| | State School No. | No. Referred |
|---|---|---|
| Green Valley | 1 | 11 (2 to St. Sch. for Blind) |
| Mapaville | 2 | 3 (1 to Div. of Voc. Rehab.) |
| Kirchner | 3 | 3 (2 to Div. of Voc. Rehab.) |
| Shady Grove | 4 | 1 |
| Lakeview Woods | 6 | 3 |
| Boonslick | 7 | 3 (2 to Div. of Voc. Rehab.) |
| Columbia | 8 | 3 |

in Charge—State Schools. Mr. Friedebach also testified that the DESE referred approximately 150–200 children in 1980–81, 200–275 in 1981–82, and 300 in 1982–83, back to the local school districts for placement. Ms. Wilkerson related that the St. Louis City Public School District was expecting to receive five children for the 1983–84 school year that had previously been assigned to Gateway School, State School No. 70. The record contains only sketchy information about the children served by private agencies. Mr. Kopp testified that the St. Louis City Public School District had about 100 children currently

| | State School No. | No. Referred | |
|---|---|---|---|
| Maple Valley | 9 | 6 | (4 to Div. of Voc. Rehab.) |
| Kennett | 10 | 0 | |
| Parkview | 11 | 4 | (1 to Div. of Voc. Rehab.) |
| Shepherd | 12 | 4 | (1 to St. Sch. for Blind) (3 to Div. of Voc. Rehab.) |
| Wheeler | 13 | 0 | |
| Bowling Green | 14 | 2 | (1 to Div. of Voc. Rehab.) |
| Flat River | 15 | 0 | |
| West Plains | 18 | 4 | (1 to Div. of Voc. Rehab.) |
| Cameron | 19 | 2 | (1 to Div. of Voc. Rehab.) |
| Chillicothe | 20 | 0 | |
| Thompson | 21 | 1 | (1 to Div. of Voc. Rehab.) |
| Neosho | 22 | 0 | |
| Robinson | 23 | 0. | |
| Citadel | 24 | 0 | |
| Ste. Genevieve | 25 | 4 | (2 to Sheltered Workshop) |
| Maryville | 26 | 2 | (1 to Div. of Voc. Rehab.) |
| Essex | 27 | 0 | |
| Mtn. Grove | 30 | 0 | |
| Davis | 32 | 6 | (4 to Div. of Voc. Rehab.) |
| Richmond | 33 | 1 | (to St. Sch. for Blind) |
| Monett | 34 | 3 | (1 to Div. of Voc. Rehab.) |
| Keytesville | 35 | 1 | (to Div. of Voc. Rehab.) |
| Hannibal | 36 | 7 | (2 to St. Sch. for Blind) |
| Passaic | 37 | 1 | |
| Union | 40 | 0 | |
| Lutesville | 41 | 1 | (to Div. of Voc. Rehab.) |
| Marshfield | 42 | 0 | |
| Fulton | 44 | 0 | |
| Harrisonville | 45 | 1 | |
| Warrensburg | 46 | 1 | (to Div. of Voc. Rehab.) |
| Joplin | 48 | 3 | |
| Siikeston | 49 | 0 | |
| Bolivar | 52 | 1 | |
| Boonville | 53 | 0 | |
| Eldon | 55 | 1 | |
| Marshall | 56 | 2 | |
| Louisburg | 57 | 2 | |
| Waynesville | 59 | 1 | |
| Coniphan | 60 | 1 | |
| Salem | 61 | 2 | |
| Anderson | 63 | 2 | (1 to Div. of Voc. Rehab.) |
| Linn | 65 | 1 | (to Div. of Voc. Rehab.) |
| Nevada | 66 | 1 | |
| Arcadia | 67 | 0 | |
| Piedmont | 68 | 0 | |
| Camdenton | 69 | 3 | |
| Gateway | 70 | 2 | |
| Mexico | 73 | 1 | |
| Dixon | 74 | 0 | |
| Kansas City | 75 | 4 | (to Div. of Voc. Rehab.) |

placed with private contractors. In the past couple of years approximately one-third of the children had returned to public school placements or to vocational schools.

Although, the number of children being referred back to local school districts and other non-contested educational settings may appear insignificant in comparison with the number of children who remain in separate settings, and though the numbers provided by Mr. Friedebach may be somewhat inflated (he was providing approximations without recourse to notes), the Court finds this evidence to be instructive. It indicates that once children are placed in a separate setting they are not forgotten. More importantly, it indicates that each child is considered on an individual basis, and that there is nothing inherent in either the DESE or SSD system that prevents a child, ready for a less restrictive educational environment, from being transferred back to his local school district for placement.

Another indicator of the commitment of the DESE to the concept of placement in the least restrictive educational environment is the evolutionary transformation of the special education program in Missouri. Missouri initiated its special education program in 1958. At that time the focus was on educating the mild to moderately mentally retarded. These programs were conducted in separate schools. Since then the system has evolved to the point that state law allows only handicapped children who can not benefit from local school placement to be assigned to separate schools. Mo. Rev.Stat. §§ 162.675(3), 162.680(2), 162.725. Moderately handicapped children are now in local public schools. The local districts are mandated by statute to provide special education programs for handicapped children. Mo.Rev.Stat. § 162.700. Eighty-five percent of the children served in separate schools are in special school buildings built with their education and service in mind.

Another evolutionary change has occurred in the referral process. In the early 1970's when Missouri was striving to include all of the state's handicapped children in a public education program the DESE accepted practically all of the children re-ferred to it by the local districts. The DESE did this for two reasons. It wanted to show the skeptics that the system would work, and that all handicapped children should be educated and would benefit therefrom. It also realized that most of the local districts were not prepared to nor capable of serving the children it was accepting for state school placement. By 1978, however, with the state system in place, and with the local districts better able to serve the less profoundly handicapped, the DESE began to reject referrals it would have accepted a couple of years earlier. Heskett at Vol. 8; Friedebach at Vol. 10; and Hall at Vol. 18. The statistics bear this out. Although, the DESE accepted more children for placement in separate settings in 1982–83, the overall number served in the contested separate settings continued to decline. In 1979–80, 3223 handicapped children were served by the state school system, in private agencies or at home. By 1980–81, the number declined to 3161. It further declined to 3094 by the 1981–82 school year, and in 1982–83, the total number was down to 2935. SD Exh. 41. The Court again stresses that the statistics, *per se*, are not what is important here. They merely lend substance to the testimony presented.

A final example of the evolution of the Missouri special education system is the development of programs at the local level for severely handicapped youngsters. The state school system for the severely handicapped was initially created to fill a perceived educational need. The DESE did not believe the local districts were capable of assuming or willing to assume the responsibility of providing educational services to the severely handicapped. By 1974, this view had changed, at least on an individual district basis, and the way was opened for local school districts to assume this responsibility. In 1974, seven local school districts had programs serving the "severely handicapped" youngsters of twenty-six school districts. By the time of trial there were 101 school districts sending their "severely handicapped" children to twenty-one local programs. The local programs function much like a special school

district for the severely handicapped. Also, the local district must agree to serve the multiple-district area formerly served by the State School. Also, the local district must show that it is capable of providing an educational program equivalent to that provided by the present state school. When a local school district volunteers to takeover a state school program the DESE reviews the proposed program, the resources the district currently commits to its special education program for its mild to moderately handicapped youngsters, and the quality of that program. If the DESE concludes that the district can provide a comparable program then the takeover is approved. If not, then the takeover is refused. Those districts that do establish local programs for the severely handicapped receive technical and financial assistance from the DESE. The DESE is interested in the orderly transfer of responsibility for the education of the severely handicapped to local school districts, but again only as the districts become capable of providing an appropriate education.[72] Heskett at Vol. 8; John at Vol. 11; Hall at Vol. 18.

This trend toward local district responsibility is instructive in a couple of regards. One, it refutes the notion that the DESE has some bureaucratic self-interest in maintaining a separate state school system. The willingness to close State Schools and to work closely with the local districts to help them develop an appropriate educational plan for each child supports this conclusion. Two, it highlights that the primary concern of the DESE is the educational services available to a child. The unchallenged evidence indicates that the DESE relies exclusively on educational program considerations when deciding whether to close a State School and shift the educational responsibility to a local school district. When a district is ready the transfer occurs. Otherwise a State School fills the educational services gap.[73]

72. Dr. Hall, Dr. Heskett, and Ms. John believed that not every district was ready to educate the severely handicapped. Ms. John noted the difficulty the local districts had in providing educational services to the mildly and moderately handicapped. The regular education administrators of the local districts have not fully embraced the concepts of parental involvement and due process. The local districts, without prodding from the DESE, do not expend much effort in including parents in the IEP process nor providing them with a due process mechanism for objecting to their child's program.

The concept of least restrictive environment has also been a difficult concept for the local districts, to accept and implement. When 94–142 became law and mildly and moderately handicapped children came under the auspices of the local districts, the districts faced space problems. They did not have a place to put the classrooms for this group. Many obtained mobile classrooms for the handicapped students. Many of the classes remain in the mobile units even with the best efforts of the DESE to get them moved into the regular buildings. Also, the local districts have often balked at accepting handicapped students back from the state program. The DESE has had to negotiate long and hard to get the local districts to accept the child. The DESE usually avoided a due process fight with the district only by providing the district with discretionary funds.

73. The Plaintiffs maintain that all of the state schools should be closed because some of them have already been closed. The children should become the responsibility of local school districts because then they would be placed in the least restrictive environment. Closing all of the state schools tomorrow would be inconsistent with the Education Act. First and foremost the Education Act is concerned that each handicapped child receive a free appropriate public education. Only secondarily does the least restrictive environment come in to play. Taken together, a child is entitled to be placed in the least restrictive environment where he can receive an appropriate education. The DESE has determined in twenty-one instances that a local district can provide an appropriate education. To speed up the transfer process on that basis, however, would result in the view of the DESE, in children being placed with districts either unable or unwilling to provide them with an appropriate education.

The Education Act recognizes that a local district will not always be the proper service provider. The Conference Committee on Bill S. 6 (The Education Act), added a definition of intermediate educational unit to the bill. The definition was added to include state created educational agencies that served handicapped students on a regional basis. Conference Rep. No. 94–664, 94th Cong., 1st Sess., 31 (1975); 20 U.S.C. § 1401 (22). The Education Act also provides for a state educational agency to provide educational services when a local school district is unable or unwilling to provide a free appropriate public education, or has one or more handicapped children who can be better served in a State or regional educational facility. 20

The plaintiffs stress that it would be feasible to transfer the handicapped children currently served in separate settings to regular school environments.[74]  Relying

U.S.C. § 1414(d).  The State education agency also has the authority under the Act to require local school districts to consolidate their programs on a regional basis to ensure adequate quality, size, and scope.  *Id.* at 1414(c) and (d); House Rep. 94–332 at 17.

Shifting the educational responsibility to a local district does not guarantee that the children affected will be moved into a regular public school.  Of the twenty-three local programs now serving severely handicapped youngsters only nine are currently located in a regular school building and two others are partially located in a regular school building.  Of the rest, the two split programs and one other remain in the old state school building, seven are in mobile units sitting on the school grounds, and four are in rented buildings away from the regular schools.  Supp. Stipulation 5.  The same holds true for the state schools.  Some are located on the campus or in the regular school buildings of local districts.  Dr. Heskett testified that the DESE, when it was first establishing a state school program, always contacted the local school district about renting space or buying land.  Testimony of Heskett at Vol. 8.  The evidence indicates that just because a severely handicapped child is educated by a local school district, and in a regular school building does not mean that the child also interacts with nonhandicapped children.  *Id.* at Vol. 9.  Finally, the Court notes that the DESE's approach of transferring responsibility to those local districts that actively seek it comports with the approach suggested and followed by Dr. Sailor, one of the plaintiffs' expert witnesses.  In deciding where to locate the handicapped classes in the San Francisco area he chose the public schools where the parents, teachers, and principal all were in favor of having the class.  The project did not force a handicapped class on a school that did not desire one.  Sailor at Vol. 1; Brown at Vol. 3 (another expert).

**74.**  The plaintiffs relied on a number of out-of-state witnesses connected in some way with special educational programs in their own areas.  Rather than mention each one's background as he or she is cited, they are listed here:

Richard Brinker is a research scientist with Education Testing Service (ETS).  He has a Doctorate Degree in Psychology and Human Development.  Before joining ETS he taught and worked with a program for the multiply handicapped at the University of Nebraska.  Brinker at Vol. 6;  P. Exh. 256.

Louis Brown is a professor at the University of Wisconsin, Madison, with a Doctorate Degree in Mental Retardation.  He teaches students who are preparing to teach the more severely handicapped.  Currently he is actively assisting the Madison public school system in their program to integrate the district's handicapped children into regular schools.  Brown at Vol. 13;  P. Exh. 257.

Phillippa Campbell is an adjunct professor at Kent State University and responsible for or involved in various programs designed to assist handicapped infants and young children at Children's Hospital in Akron, Ohio.  She has a Master's Degree in Special Education with an emphasis on learning disabilities.  Campbell at Vol. 4;  P. Exh. 258.

Sharon Freagon is a professor at Northern Illinois University in the Department of Learning Development and Special Education.  She has a Ph.D.  Dr. Freagon has worked with the parents and teachers of the more profoundly handicapped, teaches the latter group, and currently is working with the public school system of DeKalb, Illinois, on integrating severely handicapped children.  Freagon at Vol. 4;  P. Exh. 259.

H.D. Bud Fredericks works for the State of Oregon in its Teaching Research Division of the Department of Education.  His responsibilities focus on teaching methods for the severely handicapped.  He holds a doctorate degree in Education.  Fredericks at Vol. 7;  P.Exh. 260.

Warren Grund has a doctorate degree in Special Education Administration.  He is presently employed by the North Syracuse Central School District as the Director of Special Education.  Grund at Vol. 7;  P. Exh. 262.

Jane Nisbet was a teaching and research assistant at the University of Wisconsin, Madison at the time of trial.  She is now an assistant professor at Syracuse University.  Ms. Nisbet has a Master's Degree in Special Education and has worked as a PT and as a special education teacher in the Madison School District.  Nisbet at Vol. 3;  P. Exh. 263.

William M. Peters is the Executive Director of the DeKalb County Special Education Administration (DCSEA).  DCSEA is a special education cooperative composed of ten school districts and serving 2,000 students.  Mr. Peters has been the assistant or executive director since 1975.  He has a Master's Degree in Education Administration with emphasis on Special Education.  Peters at Vol. 5;  P. Exh. 264.

Wayne Sailor is a professor of Special Education at San Francisco State University.  He is in charge of area programs for the severely handicapped and is the project director of the California Research Institute on Integration of Children with Severe Disabilities.  He also was actively involved in the program to "integrate" the San Francisco Unified School District.  He has a Doctorate Degree in Psychology.  Sailor at Vol. 1;  P. Exh. 265.

John R. Schroeder is the Coordinator of Specialized Educational Services for the Madison School District.  His responsibilities include providing educational programs and related services for emotionally disturbed and multiply handicapped children.  He too has a Master's

in part on the testimony of some of the defendants' witnesses, the plaintiffs maintain that such a transfer would not face staffing shortages, lack of classroom space, create health or safety problems, or cost more, and it would result in lower transportation times for the children.[75] The defendants presented considerable evi-

Degree in Special Education. Schroeder at Vol. 5; P. Exh. 267A.

Martha Snell is an associate professor of Special Education at the University of Virginia. She teaches and supervises graduate students preparing to teach the severely handicapped. She has her Doctorate Degree. Snell at Vol. 2, P. Exh. 266.

Jane W. Toews is currently the Director of Classroom Services at Teaching Research in Oregon. She is responsible for the personnel budget, quality of programming, and the IEPs of profoundly handicapped children in five classes placed in Oregon's public schools. Ms. Toews has a Master's Degree in Special Education. Toews at Vol. 8; P. Exh. 267.

Besides the witnesses from the DESE and the St. Louis Co. SSD, most of whom have already been identified, the defendants also called in some experts of their own. They follow:

Thomas A. Burton is head of the Department of Special Education at the University of Georgia. He has a Doctorate Degree in Special Education with emphasis on mental retardation. He has taught the mentally retarded and has been an educational and program consultant for various projects and agencies. Burton at Vol. 11, SD Exh. 7.

Peter S. Fanning is the Executive Director of Special Education for the State of Colorado. He holds the same type of position as Dr. Hall holds in Missouri. He has worked as the Director of a special education program in a mid-sized city, as a professor at the University of Arizona, and as an intern with the Chief State School Officers helping to draft the Education Act. He has his Doctorate Degree in Educational Administration and Special Education. Fanning at Vol. 10; SD Exh. 46.

Jay Gottlieb is a professor of educational psychology at New York University. He has a Doctorate Degree in Pscycho-Educational Research in Mental Retardation. Dr. Gottlieb spent a total of seven years at the Research Institute for Educational Problems and on project PRIME studying mainstreaming and the effects of mainstreaming on handicapped children. Gottlieb at Vol. 16; SLCSSD Exh. HH.

James Newby is the Director of Special Education for the Davenport, Ia., Community School District. He is responsible for the overall administration and supervision of the program. He has a Doctorate Degree in Special Education Administration. Newby at Vol. 12; SD Exh. 47.

John M. Throne is a professor of Special Education at Kansas University and a senior scientist in the University's Bureau of Child Research. He has also worked as the executive director of a private school for the mentally retarded. He has a Doctorate Degree in Psychology with a minor in Special Education. Throne at Vol. 17; SLSD Exh. 20.

George L. Yard is an associate professor in the Behavioral Studies Department at the University of Missouri, St. Louis. He has taught special education courses, directed a special education school, and worked in the St. Louis Co. SSD. Dr. Yard, has a Ph.D. in Special Education, has also worked for the DMH and been a consultant to the DESE. Yard at Vol. 15; SLCSDD Exh. 66.

The Court found all of these witnesses to be qualified by experience and education to discuss the issues to which they testified. All were sincere in their beliefs as to what is educationally best for the more profoundly handicapped. They represent the two schools of thought on the education of the more severely handicapped.

**75.** Ms. Eldridge testified that the SSD received approximately two hundred teacher applications for one opening. Eldridge at Vol. 15. In addition, the local districts would have available to them the teachers employed in the challenged facilities. If the rural areas had difficulty finding a teacher the school district could hire a temporarily certified teacher and then use the State's program for funding the training of these teachers. John at Vol. 12. The plaintiffs maintain that sufficient therapists would also be available. The local districts could contract with the OTs and PTs currently under contract with the defendants and further utilize the therapists they currently employ. Nor will dispersing the classes into age appropriate public schools affect the intensity of the therapy services according to the plaintiffs. They maintain that the local districts can adopt an indirect service delivery model. In the indirect model the therapist does not work directly with the children but trains the teacher and aides to do it. Campbell at Vol. 4. Also, because of declining enrollments and the accessibility requirements of Section 504 of the Rehabilitation Act sufficient classroom space should be available. Fire safety concerns could be more easily dealt with because fewer severely handicapped children would be in any one building.

Funds exist to cover the transition. The money currently being used for separate facilities could be used by the local districts. Although the plaintiffs admit that there would be some short run transition costs, they say that over the long term costs would either remain constant or decline. They reason that any increases in staffing or equipment costs will be offset by swings in building and administration costs. The "severely handicapped" will no longer have their own building or administration costs. Rather, they will share these "overhead" costs with other public school children. Sailor at Vol. 1;

dence rebutting the feasibility of a whole-sale transfer.[76] The issue for resolution

here, however, is not whether it is feasible to transfer all the handicapped children in

Peters at Vol. 5; Schroeder at Vol. 6; Grund at Vol. 7.

The plaintiffs also claim that moving the severely handicapped into regular schools would also mean that they are closer to their homes with a resultant decrease in time spent on buses to and from school. Schroeder at Vol. 6: The plaintiffs asserted that thirty-one percent of the state school students have one way bus rides of over an hour and that one way bus rides in the St. Louis County SSD also average over an hour. PE 1A–57A; Moore depo. The average route time of the severely handicapped students in the California, Missouri School District's special education program is only one half hour. Fletcher depo. The plaintiffs say that the local districts can contract for transportation services, allow private carriers, and receive money from the state to cover the excess cost of transporting the severely handicapped.

76. The defendants claim that the educational programs and related services provided in the separate facilities can not be provided with the same efficiency or intensity if the classes are dispersed as desired by the plaintiffs. Dispersal of each separate school into at least three regular schools of appropriate age level will increase the costs of the program and result in other problems. However, The defendants admit that if only one child is considered or only a particular portion of an IEP is considered then often it is feasible to place the child or perform that portion of the IEP in a regular school environment. Heskett at Vol. 8; Emmons at Vol. 13. The focus, however, must be on the entire program and all the children served. Heskett at Vol. 8; Hall at Vol. 17. Not all programs can be as effectively provided in a regular school. One example is the feeding program. An effective feeding program for the "severely handicapped", in which they must be taught such things as lip closure and swallowing, requires a longer lunch period, and a less noisey and less crowded cafeteria than is available in a regular school environment. A crowded cafeteria also is not the most appropriate place to have to deal with rumination, spillage, and toileting accidents. These would be disruptive, if not repulsive, to the nonhandicapped. Burton at Vol. 11; Emmons at Vol. 13; Bolazina at Vol. 14. Another example is the toileting program. The schools in the major urban areas are typically older and multistoried. The elementary and middle schools have one rest room per sex, located in the basement of the building. The high schools may have more rest rooms, but not more than one per floor. To carry out the toileting program would require use of these "public" rest rooms. The instruction will be less effective because either the teacher will have to cope with nonhandicapped children coming in and out, or close the rest room to them, resulting in less instruction time. This situation has already posed a problem for the instruction of the mod-

erately handicapped. Kopp at Vol. 15; Wilkerson at Vol. 16; M. Werner at Vol. 16; Gitel at Vol. 17. Another example is the program for the behavioral disordered children. They require a highly structured environment without distractions and with a trained staff, to benefit educationally and to improve behaviorially. A regular school could not provide this environment and would not have a staff trained to deal with these children. Newby at Vol. 12; Hauser at Vol. 14; Yard at Vol. 15; Hall at Vol. 17.

Not only will the educational programs suffer if dispersal occurs, but so will the quality of the occupational and physical therapy services. As the severity of a child's handicapping condition increases so must the intensity of the services provided. A separate setting is the most efficient environment for providing services of sufficient intensity to the severely handicapped. Fanning at Vol. 10; Newby at Vol. 12; R. Werner at Vol. 13; Kopp at Vol. 15; Hall at Vol. 17. To match the intensity level of the services in the separate facilities, the local districts would have to hire more therapists. Werner at Vol. 13; Eldridge at Vol. 15. The present therapists will be spending time, previously spent providing services, traveling to the various schools to which the classes have been dispersed. Heskett at Vol. 8; Burton at Vol. 11; Eldridge at Vol. 15. The therapists currently serving the mild and moderately handicapped will not be able to fill the gaps because they already have full schedules themselves. Bolazine at Vol. 14. Furthermore, reliance on an indirect service model is not the answer because the indirect model is being used where appropriate now, and can not be used where the IEP does not call for it. Bolazine at Vol. 14; Eldridge at Vol. 15. The Madison School District had to double the number of physical and occupational therapists when it dispersed its separate schools, and had to create the new position of therapist assistant. Schroeder at Vol. 5. Dispersal will result either in a decrease in these services, or will require additional resources to be committed and additional therapists to be hired. This is at a time when both the DESE and the SSD are experiencing difficulties finding therapists to fill their positions and the money to pay them. Heskett at Vol. 8; John at Vol. 12; Eldridge at Vol. 15; Hall at Vol. 17.

The defendants claim that closing the separate schools would not necessarily lower the bus route times, but would increase the cost of transportation. The setting does not guarantee shorter bus routes. The route time depends on where each child lives in relation to the school he is assigned to attend. Nearly all the local districts currently have routes that exceed an hour. Fitzmaurice at Vol. 6 and 12. Even though fewer "severely handicapped" children would be attending any one school they would still be geographically dispersed. To hold down transportation costs and local districts will want

to modify a minimum number of buses to serve these children. Fitzmaurice at Vol. 6 and 12. Additional buses will be needed, however, just to serve the additional schools. Furthermore, to decrease the route times would require the use of additional buses. Buses are the major factor in transportation costs. Fitzmaurice at Vol. 12; Hall at Vol. 17. A new bus can cost between $14,500 and $21,500 before modifications for the handicapped. Additional buses also increase driver, aide, mileage, and maintenance costs. Fitzmaurice at Vol. 12; Hall at Vol. 17. Running their own buses though is cheaper for a school district than to contract for the service or to hire private carriers. Heskett at Vol. 8.

The additional therapists and the additional buses will increase the costs of educating the severely handicapped. Currently, none of the educational funds in Missouri are unencumbered. The state has relied on discretionary funds provided under the Education Act and state funds to cover the costs of the State School phase outs. The local districts have not had to contribute any additional monies to these programs. The discretionary funds would not cover a dispersal as envisioned by the plaintiffs.

The defendants maintain that additional obstacles stand in the way of dispersal. One is the need for classroom space. Even though public school enrollments are on the decline classroom space has become more scarce. In St. Louis, for example, as the enrollment has declined buildings have been sold or shut down. Also with the advent of desegregation the city school district has reduced its pupil-teacher ratio and thereby required more classrooms. At the same time the county school districts have sought additional classroom space to handle the influx of city students under desegregation. Already the classes for the mild and moderately handicapped are having difficulty finding classroom space. Currently, no excess classroom space exists in the county school districts or the city school district that could absorb the severely handicapped classes. Werner at Vol. 13; Harmon at Vol. 14; Kopp at Vol. 15; Wilkerson at Vol. 16; M. Werner at Vol. 16. The local districts will have to find classroom space to at least match the number of classes in the separate facilities. If no classrooms are available in the local districts then the districts will have to reopen buildings, find new buildings, or use the separate schools in some modified form. M. Werner at Vol. 16. Any cost savings from shutting down the separate schools would be offset to a significant degree. Furthermore if the DESE continues to maintain separate facilities for only the medically fragile and physically abusive then there may be no building related cost savings.

Another obstacle posed by the defendants are the attitudes of the regular education administrators and teachers. The administrators and staff do not understand the special needs of the severely handicapped. Wilkerson at Vol. 16; Hall at Vol. 17. They believe that the severely handicapped should fit the mold of a nonhandicapped child. For instance they believe that all children by the time they reach school age should be toilet trained. They do not understand when the handicapped do not possess this ability. Gitel at Vol. 17. Also the regular education teachers are typically unwilling to monitor, supervise, or interact with the handicapped children. They see the smaller class of handicapped children and believe that their teacher should be able to handle all of their problems. Wilkerson at Vol. 16. Due to the small increments of learning and the need for repetitive teaching methods the teachers need breaks during the teaching day. Bolazina at Vol. 14. The administrators are not receptive to severely handicapped classes because of the potential problems posed and the paper work. Kopp at Vol. 15. The severely handicapped unless handled properly by the entire staff can disrupt a regular education program and distract the nonhandicapped children. Burton at Vol. 11; Emmons at Vol. 13; Yard at Vol. 15; Throne at Vol. 17. The poor attitudes and serious insensitivity of the regular education personnel would have a deleterious effect on the teachers of the severely handicapped. Staff and administrative support is vital to forestall burn out among these teachers. The support present in a separate school with its entire focus on the needs of the severely handicapped would be missing from the regular school environment with its primary focus on the nonhandicapped. Newby at Vol. 12; Bolazina at Vol. 14; Hauser at Vol. 14; Gottlieb at Vol. 16.

Health and safety considerations also cause the defendants some concern. One, they are concerned with fire safety. Kopp at Vol. 15; Wilkerson at Vol. 16. The precautions taken by the regular schools in this regard were not formulated with the severely handicapped in mind, and would have to be adapted. M. Werner at Vol. 16. The separate schools are staffed with people trained in how to evacuate the severely handicapped, have audio and visual alarm systems, have two exits from each classroom, and in general, are newer buildings designed with the severely handicapped in mind. Heskett at Vol. 8; Kopp at Vol. 15; M. Werner at Vol. 16. Another concern is the day to day safety of the children. The severely handicapped do not have the ability to deal with problems they could encounter in a public school, nor the knowledge to seek help. Kopp at Vol. 15; Hall at Vol. 17. The schools do not have sufficient staff to monitor the severely handicapped at all times during the school day. Wilkerson at Vol. 16. The concerns range from being accidentally knocked down to being victimized. The moderately handicapped have been victims of extortion and sexual misconduct. Heskett at Vol. 8; Wilkerson at Vol. 16. The defendants also ques-

the separate schools to regular schools,[77] but whether the separate schools and facilities are an appropriate part of a special education system and whether systemically the defendants have procedures that seek to assign the children to the least restrictive educational setting appropriate. The answer to both queries is yes. If the Court did as the plaintiffs ask and ordered the wholesale transfer of all the children in separate schools to regular schools it would be committing the same wrong the plaintiffs alleged against the defendants earlier. The Court would not be treating each child as an unique individual.

This Court's determination that the defendants are systemically in compliance with the placement provisions of the Education Act should not be viewed as a ruling that each, individual child served in a separate setting is appropriately placed. Resolution of each individual case, however, is better left to the administrative review process, and, if necessary, to a court case focusing on the needs and abilities of the individual child. This is the challenge and review procedure Congress established. If a parent or guardian believes that his child has been inappropriately placed he may challenge the placement. If the DESE finds against the parent or guardian, then he has recourse to a court. 20 U.S.C. § 1415. This procedure is available in Missouri and has been utilized. *See Cothern v. Mallory,* 565 F.Supp. 701 (W.D.Mo.1983); *Vogel v. School Bd. of Montrose R–14 Sch. Dist.,* 491 F.Supp. 989 (W.D.Mo.1980); *Mallory v. Drake,* 616 S.W.2d 124 (Mo.App. 1981); *Moran v. Bd. of Directors, Sch. Dist. of Kansas City,* 584 S.W.2d 154 (Mo. App.1979). The Court's only ruling today is that separate schools are not *per se* in violation of the Education Act, and that the separate settings maintained by the defendants are consistent with the Act.

IV. *Appropriate Educational Program*

■ As a final challenge under the Education Act, the plaintiffs claim that the children in the separate schools and facilities do not receive an appropriate education. They maintain that it is inherently impossible to provide an appropriate educational facility to children attending a sepa-

---

tion the hygiene of the older schools. Many severely handicapped youngsters are highly susceptible to infections and suffer from allergies. They spend some time each day on mats on the floor. The defendants question whether the regular schools can be sufficiently cleaned and maintained so as not to endanger the health of the severely handicapped. Kopp at Vol. 15; Wilkerson at Vol. 16.

The defendants cited three other advantages to the separate settings: (1) The separate settings were designed solely with the needs of the severely handicapped in mind. The buildings have a dual alarm system, two exits from each class, extra-wide hallways for wheelchairs and other equipment, extra large classrooms for equipment, a home living area and a vocational area designed for the severely handicapped, rest rooms adjacent to each classroom, and a sink in each classroom. The regular schools do not have these facilities. Heskett at Vol. 8; Kopp at Vol. 15; M. Werner at Vol. 16. (2) The separate settings also allow the children to be grouped by functional level. Dispersal would make this impractical. Newby at Vol. 12. (3) A separate setting provides a better student teaching experience. The student can see how an entire program meshes together. This is more likely to weed out those potential teachers most susceptible to burn out. Newby at Vol. 12.

Finally, the defendants point out that the local school districts used as examples by the plaintiffs do not really represent the dispersal sought by the plaintiffs. All of the local districts that took over a State School program continue to keep all of the classes together rather than disperse them to age appropriate schools. Heskett at Vol. 8.

**77.** Feasibility should be a concern. In this day of limited public resources, each state must maximize the use of its educational dollar. The states should strive to ensure that each education dollar is effectively and efficiently spent. Money, that is spent on an educational program or service which is wasted in some way or not utilized to its fullest is money taken from the programs or services of other children. Feasibility, however, does not translate into appropriate. It can be feasible to place a child in a certain educational environment, but not appropriate for the sake of his education to do so. Besides, based on the record before the Court, grave doubts arise as to the feasibility of a wholesale transfer and dispersal of all but the medically fragile and physically abusive to regular schools. Where once one school served these children there would now be at least four schools: one regular elementary, middle and high school, and the separate facility for the exceptions noted.

rate educational environment. The plaintiffs posit that in a separate setting (1) educators can not provide the components necessary for an adequate educational program, (2) the children are denied sufficient opportunities to interact with nonhandicapped children, and (3) the quality of the teaching is inferior. The Court has reviewed all of the evidence presented on this challenge and finds that it is possible to provide an appropriate education to children in separate schools.

The Education Act requires each participating state to provide a free appropriate public education to the handicapped children of the state. A free appropriate public education is defined in the Act as the combination of special education and related services provided at public expense, under public supervision, and in conformity with each handicapped child's IEP. 20 U.S.C. § 1401(18). The Supreme Court in *Rowley* read the Act's goal of a free appropriate public education as calling for "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. at 188–89, 203, 102 S.Ct. at 3041–42, 3049. When confronted with the task of determining the appropriateness of an educational program, the Supreme Court has instructed the lower courts to concentrate on two inquiries: (1) whether the state is complying with the procedures contained in the Education Act and (2) whether the IEP is reasonably calculated to benefit the child. *Id.* at 206–07, 102 S.Ct. at 3050–51. In the discussions of the preceding claims the Court has already found that the defendants are complying procedurally with the Act on a systemic basis, answering inquiry number one. The posture of this case does not allow for a determination of whether the IEP of a particular child is reasonably designed to benefit that child. The actual question here is whether, on a systemic basis, any handicapped child can benefit from an educational program provided in a separate setting. The Court will take up

each of the plaintiffs' claims and the defendants' responses.

The plaintiffs argue first that the separate settings are inherently inadequate because an appropriate educational program can not be provided in separate schools. Both sides agree that handicapped children are slower to learn, do not learn as much, and can not as readily apply what they have learned to new situations. Witnesses for the plaintiffs testified that because of these learning deficiencies profoundly handicapped youngsters require an educational program that teaches age appropriate functional and social skills in an age appropriate manner, and which provides the children with sufficient opportunities to practice or generalize what they are learning. Sailor at Vol. 1; Snell at Vol. 2; Freagon at Vol. 4. Their witnesses further maintained that it is impossible to teach these skills or provide the needed generalization opportunities in a separate educational environment, and since these components of an education program are essential to the development of the severely handicapped no program in a separate setting will be adequate. Snell at Vol. 2; Nisbet at Vol. 3. The witnesses who toured the separate schools and facilities administered by the defendants did not find the educational programs offered to be exceptions to this view. Snell at Vol. 2; Brown at Vol. 3; Nisbet at Vol. 3; Freagon at Vol. 4.

The evidence presented by the defendants contradicts the plaintiffs' position on two points. First, all of the witnesses for the defendants maintained that a child in a separate facility can receive an appropriate educational program. Speaking specifically to the program components stressed by the plaintiffs' witnesses, Dr. Newby countered that functional and social skills can be taught, that the problem of generalization can be dealt with, and that chronological age appropriateness can be considered in a separate setting. Based on his experience he believed that these skills could not be taught and the problem of generalization could not be handled better, if as well, in a regular school. Newby at Vol. 12.

Several other witnesses from outside of Missouri reiterated this view. Fanning at Vol. 10; Gottlieb at Vol. 16; Throne at Vol. 17. Even the testimony of two of the plaintiffs' witnesses indicated that an educational program in a separate setting is not inherently foreclosed from containing these elements. Dr. Fredericks maintained that he would have found the programs he observed to be adequate if they had provided sufficient interaction opportunities. Fredericks at Vol. 7. Ms. Toews did find the curriculum, materials, and staff to be excellent, and the program age appropriate at the Phase III schools she observed. Toews at Vol. 8. Second, witnesses from the DESE and the SSD testified that the educational programs they provide contain the components highlighted by the plaintiffs. Heskett at Vol. 8; Werner at Vol. 13; Hall at Vol. 18. Dr. Heskett testified that the state school curriculum includes functional and social skills. The IEP teams are trained to formulate IEPs that call for instruction in the functional and social skills needed by each particular child. The importance of these skills is further stressed to the teachers through seminars, in-service training, and materials that are distributed to them. The home-living area and the vocational area are examples of functional training. Heskett at Vol. 8. Ms. McPheron and Ms. Emmons, each with experience in developing and applying IEPs, supported the testimony of Dr. Heskett. In particular, each reviewed the IEPs of the individual plaintiffs and pointed out the functional and social skills instruction contained in the IEPs. McPheron at Vol. 11; Emmons at Vol. 13. Other witnesses resubstantiated this point although in a more general context. Bolazina at Vol. 14; Hauser at Vol. 14. The actual curriculum of the State Schools and the IEPs in the record further support the testimony of the witnesses. Both show that the teaching of functional and social skills is part of the educational programs provided by the defendants. P.Exh. 153A, Self-Care Curriculum; P.Exh. 153C, Language and Communication Curriculum; P.Exh. 153D, Interpersonal Relationships Curriculum; P.Exhs. 183, 185, 187, 189, 191–19, 195–199.

The skills taught each child, however, are based on the child's present functional or developmental level rather than on the child's chronological age as stressed by the plaintiffs. Werner at Vol. 13; Hauser at Vol. 4; Hall at Vol. 18. Experts for the defendants, who testified to this point, supported the approach of focusing on developmental level rather than age. Fanning at Vol. 10; Newby at Vol. 12; Yard at Vol. 15. Dr. Heskett pointed out, however, that this did not mean that the concept of "age appropriate" is ignored. Rather, the importance of teaching a child in an age appropriate manner and with age appropriate materials is stressed to the professional staff in seminars, etc., and, furthermore, the DESE reviews all equipment and materials requests to determine if they are age appropriate. Heskett at Vol. 8. The skills taught, however, are gauged to the child's developmental level and not to his age. Sufficient generalization opportunities are also provided. The curriculum materials are diverse and allow the teachers to use different materials to teach the same point. The teacher rotation system or departmentalization allows the child the opportunity to be taught by teachers with different styles, perspectives, and expertise. Once the children have learned a skill they are taken into the community to practice the skill where they would be expected to use it. Heskett at Vol. 8; R. Werner at Vol. 13; Bolazina at Vol. 14. Dr. Hall maintained that the separate schools, and not the regular schools, could better provide an age appropriate functional and social skills curriculum with sufficient generalization opportunities for the more profoundly handicapped. Hall at Vol. 17. Ms. McPheron, Ms. Emmons, and Ms. Bolazina all testified that the IEPs of the individual plaintiffs indicated that they were benefitting from the programs they are receiving. Finally, the outside experts found the programs not only effective but at the forefront of current professional thought. Fanning at Vol. 10; Burton at Vol. 11; Gottlieb at Vol. 16–17.

The plaintiffs argue next that a separate setting is inadequate because it can not

provide sufficient interaction opportunities with nonhandicapped peers. Snell at Vol. 2; Brown at Vol. 3; Nisbet at Vol. 3; Fraegon at Vol. 4; Towes at Vol. 8. The witnesses explained that interacting with nonhandicapped peers would improve the social skills of the handicapped child, provide the child with appropriate models for dress and behavior, and create more learning and generalization opportunities. Sailor at Vol. 1; Snell at Vol. 2; Brown at Vol. 3; Freagon at Vol. 4; Fredericks at Vol. 7; Toews at Vol. 8. They also pointed out that interacting with nonhandicapped children in a school setting better prepares the handicapped child for the "real" world.[78]

A child who only interacts with other handicapped children will not be ready to deal with nonhandicapped people when he finishes school. Snell at Vol. 2. Finally, if the handicapped are "integrated" then nonhandicapped children can serve as peer tutors. A peer tutor is a nonhandicapped child who volunteers to work one-on-one with a handicapped child at a time when the latter's teacher is working with other students. Peer tutors not only provide structured interaction opportunities, but also increased instruction time.[79] Sailor at Vol. 1.

The defendants maintain that interactions between profoundly handicapped and

78. The plaintiffs presented two other unsubstantiated reasons why a regular school better prepares a child for the "real" world. First, Dr. Sailor claimed that a regular school provides more settings in which to teach a child a skill and thereby aid the child's generalization of that skill. He maintained that the tendency in a separate school is to keep the child in the same room the entire day. Sailor at Vol. 1. Second, Dr. Brown claimed that regular schools due to their proximity with the community provide the handicapped child greater opportunities to go into the community to practice a functional or social skill or go to a job site to learn a work skill.

As Dr. Heskett pointed out in responding to Dr. Sailor's claim a separate school has the same physical settings as does a regular school: classrooms, hallways, cafeterias, and restrooms. In addition the separate facilities have home living areas and vocational rooms designed especially to teach this population functional skills. The shops and home economic rooms in regular schools are not so designed. Moreover, students, that are ready assist in the cafeteria, the custodial people, or the grounds people. Heskett at Vol. 8. The evidence indicates that at times children are kept in the classroom for lunch rather than going to the cafeteria. Lunch, however, is not just free time, it is another learning situation. For some children the classroom is more conducive to learning eating and feeding skills, and therefore, they are kept in the classroom for instruction. The decision is based on educational need. Burton at Vol. 11; Emmons at Vol. 13; Bolazina at Vol. 14. The bathrooms are adjacent to the classrooms in the separate schools. This is to aid the teacher in toileting instruction and in cleaning up after the children. If the toileting instruction had to occur in the bathroom of a regular school, then to be successful the bathroom would need to be closed to nonhandicapped children. Kopp at Vol. 15, Wilkerson at Vol. 16; Gitel at Vol. 17.

The proximity claim of Dr. Brown is not persuasive. There is no evidence in the record regarding the location of Missouri's separate and regular schools in relation to businesses that might potentially hire the handicapped or to potential community outings. Location is not as important as the motivation of those in charge of the special education program to provide field trips and job placement, and the communication level between the school and the community. The plaintiffs have not presented any inherent reasons why the staff of a separate school can not be as competent as that of a regular school. Witnesses for the DESE and the SSD maintained that they take the children in separate schools on more community outings than are taken by the regular schools. Part of their educational method includes practicing the skills taught in school in community settings. They also have job placement programs. Heskett at Vol. 8; R. Werner at Vol. 13; Bolazina at Vol. 14; Huskey at Vol. 14. Even if a regular school happened to be closer to more job opportunities the opportunities could still be less for the profoundly handicapped. In a separate school the focus is on placing only a few handicapped students at any one time. Whereas in a regular school the focus is more broad, the nonhandicapped, and mild and moderately handicapped as well as the profoundly handicapped are would all be seeking employment.

79. The witnesses maintained that busing nonhandicapped children into separate schools is not as effective as integrating the handicapped children into regular schools. Busing lowers the number of interaction opportunities. Not only are there fewer nonhandicapped children around, but they are there for only segments of the day. When nonhandicapped children are bussed in they are in the separate school solely for the purpose of interacting thereby, losing the spontaneity and naturalness of regular school interactions. Also, busing is an additional cost. Sailor at Vol. 1; Snell at Vol. 2.

nonhandicapped children are not as easy or as beneficial as the witnesses for the plaintiffs claimed. Their witnesses testified that merely placing a severely handicapped child in a school with nonhandicapped children does not guarantee interaction. As the severity of a child's handicapping condition increases so does the tendency of nonhandicapped children to ignore the child. They do not want to interact with children unlike themselves. Moreover, if the profoundly handicapped are unaware of their environment, as many are, then irrespective of the school setting, interactions will not occur. Even if, however, interactions do occur there is no guarantee they will be beneficial to the handicapped child. Dr. Burton pointed out that to foster positive interactions requires the nonhandicapped children to have been trained in interacting and the handicapped child to possess the social skills necessary for interaction. Bolazina at Vol. 14; Burton at Vol. 11; Heskett at Vol. 8. No data exists to support the plaintiffs' view that mere placement in a regular school environment will lead to positive interactions. Heskett at Vol. 8; Burton at Vol. 11.[80] The witnesses further testified that interactions with nonhandi-

capped children are not necessary for the provision of an appropriate education anyway. Heskett at Vol. 8; Fanning at Vol. 10; Burton at Vol. 16; Newby at Vol. 12; Gottlieb at Vol. 16; Throne at Vol. 17; Hall at Vol. 18. Moreover, social skills are not learned incidentally by the severely handicapped as they are by the nonhandicapped. Dr. Fanning maintained that severely handicapped children only learn these skills through an intense program which can be best provided in a separate setting. Furthermore, modeling does not occur. Dr. Throne stated that that due to disparities in their mental development severely handicapped children can not mimic their nonhandicapped peers. The witnesses stressed, however, that the placement of a severely handicapped child in a regular school before he is ready will arrest his social and education development. One of the concerns expressed by the witnesses was the effect of rushed interactions on a handicapped child's self-esteem. Dr. Fanning and Ms. Eldridge maintained that when a profoundly handicapped child, aware of his environment, is placed in an environment with interaction opportunities

**80.** The defendants stressed throughout the trial the lack of empirical data to support the benefits of interaction claimed by the plaintiffs. *See* Fanning at Vol. 10; Burton at Vol. 22; Gottlieb at Vol. 16; Throne at Vol. 17; Hall at Vol. 18. Many of the plaintiffs' witnesses admitted that no research data existed to support their position. Sailor at Vol. 1; Nisbet at Vol. 3; Freagon at Vol. 5; Schroeder at Vol. 6; Frederick at Vol. 7; Brown depo. Dr. Fredericks testified there is no data that all things being equal an education in a regular school with nonhandicapped children will achieve better results.

Mr. Brinker testified regarding a study he made. He concluded that severely handicapped children are more likely to interact with nonhandicapped children than with other handicapped children. The study compared the number of interactions between handicapped and nonhandicapped children when the latter are brought into the former's classroom with the number of interactions between handicapped children when the nonhandicapped children are not in the classroom. Brinker at Vol. 6. The study also showed that as teacher involvement (instruction) increased interactions among the handicapped students declined. Dr. Gootlieb for the defendants retorted that the study did not show that interactions increase when non-

handicapped children are in the school environment. He claimed that the study only showed that handicapped children have a greater tendency to interact with nonhandicapped children when they are put together for that purpose, than to interact with each other when the teacher is presenting a lesson. He maintained that it is only logical to expect time set aside for interacting to produce more interactions than time allotted for lessons. Gottlieb at Vol. 16.

The only actual data appears to concern the effect of interactions on the attitudes of the nonhandicapped toward the handicapped. The studies conclude that the nonhandicapped will have a positive attitude toward the handicapped if the former are properly trained to interact and not just thrown together with the handicapped, the interactions are highly structured, and if the handicapped child is developmentally able and ready to interact. If any one of these factors is absent, then the nonhandicapped child will probably come away with a negative attitude. Also, the studies indicate that if the training of the nonhandicapped children stops then the number of interactions decreases. Although the actual studies were not presented to the Court, they are referred to now as part of the basis for the opinions of Drs. Heskett, Burton, and Fanning.

before he can cope, the frustrations that arise therefrom will lower his self-esteem. As his self-esteem declines so will his capabilities. This result is compounded by the fact that the child will also have forfeited the gains he could have made in an appropriate environment. Eldridge at Vol. 15; Heskett at Vol. 8; Fanning at Vol. 10; Gottlieb at Vol. 16; Throne at Vol. 17; Hall at Vol. 18.

The witnesses pointed out that the severely handicapped have the opportunity to and do interact with their handicapped peers, their teacher and with volunteers. Both the DESE and the St. Louis Co. SSD have volunteer programs. The SSD selects and trains mature high school and college students to work one-on-one with their Phase III students. The DESE trains people from the community who volunteer. Both also have a program for parents. The goal of each program is not to provide nonhandicapped peers, but rather to provide the children with more attention. The attention rather than the age of the attendee is what is important. The attendee does not need to be a peer. Dr. Sailor admitted that he was unaware of any research on the benefits of peer-tutoring. Heskett at Vol. 8; Burton at Vol. 11; Fanning at Vol. 10; Bolazina at Vol. 14; Hauser at Vol. 14; Gottlieb at Vol. 16; Hall at Vol. 18. The witnesses further stress that peer tutors and other volunteers should not be viewed as teacher replacements. They can attend the profoundly handicapped, but they lack the expertise to teach them or to recognize the subtle signs of improvement. The more severely handicapped learn in very small increments which requires the teacher to note the smallest details of the child's action. Heskett at Vol. 8; Fanning at Vol. 10; Burton at Vol. 11.

Third, the plaintiffs claim that the quality of instruction is not as good in a separate school. Their witnesses attributed this to the fact that nonhandicapped children and regular education teachers are not present. They maintained that teachers in separate schools do not expect as much of their students and, therefore, do not push them to accomplish as much as they could because the teachers only have other handicapped students with which to compare them. If the teachers were in an environment with nonhandicapped students then their expectations would increase. The witnesses also maintain that the teachers in separate schools do not use age appropriate teaching methods. They believe that if the same teachers were in a regular school the pressure of having nonhandicapped children and regular education teachers around would prevent a special education teacher from decorating the classroom, treating the child, or using instructional materials in a manner more suitable for a younger child. Finally, the witnesses maintained that due to the lack of nonhandicapped children special education teachers have a greater tendency to become frustrated with the work and "burn-out" on teaching. Snell at Vol. 2; Brown at Vol. 3; Toews at Vol. 8.

The defendants maintain that the presence of nonhandicapped children and regular education teachers does not have an effect on the expectations or teaching methods of special education teachers. The Court has already discussed evidence that indicates that age appropriate materials and methods are used by the defendants. The witnesses admitted that burnout can pose a problem, but they attributed it to higher expectations, refuting the plaintiffs' claim that these teachers have lower expectations for their students. As Dr. Fanning put it, teachers who burnout have higher expectations, higher levels of professionalism, and a higher intensity level. Defendants' witnesses claimed that burnout, however, was more likely for a teacher of the more profoundly handicapped in a regular school and better combated in a separate school.

Burnout arises from the repetitive nature of the instruction and the incremental pace of the learning. To cope with this the DESE and the SSD have a rotation or departmentalization program which allows each teacher to spend some time each day away from his or her own class. These programs would not be possible in a regular school if there were not enough teachers certified to teach the more severely handicapped. The concentration of teach-

ers all with the same interests, problems, frustrations, etc., also serves as a support mechanism. The teachers are able to share their problems or experiences with the others while at the same time receiving solutions or insight from the others. Regular education teachers and teachers of the mild and moderately handicapped do not share the same experiences and do not have the same understanding of the problems faced by these teachers. Often regular education teachers view the handicapped classes and teachers as separate and distinct, and expect those teachers to handle their own problems. The administration in the separate schools are also supportive. They are familiar with and recognize the problems facing the teachers. They are not distracted by the needs of a nonhandicapped majority. For example, at one special school, the principal/coordinator meets formally with the teachers once a week and informally on a daily basis. She views one of her primary responsibilities as preventing and overcoming staff burnout. Heskett at Vol. 8; Fanning at Vol. 10; John at Vol. 11; Newby at Vol. 12; Bolazina at Vol. 14; Hauser at Vol. 14; Gottlieb at Vol. 16.

Both sides presented a considerable amount of evidence, only briefly summarized above, on the issue of an appropriate education. After reviewing the evidence in its entirety, the Court concludes that the defendants have shown that it is possible to provide an appropriate education in a special school or facility. None of the claims made by the plaintiffs justify a finding that educational programs in separate schools are inherently inadequate. One, the evidence indicates and the Court finds that it is possible and that the defendants are striving to teach each child functional and social skills in an age appropriate manner, and that generalization opportunities are incorporated into the program. The testimony of the witnesses from the DESE and the SSD was supported by the testimony of the outside experts of the defendants, the curriculum and IEPs in the record, and by portions of the testimony of two of the plaintiffs' witnesses. Two, the Court further finds, that interacting with nonhandicapped peers in a regular school environment is not a universal prerequisite to an adequate education. The evidence indicates that profoundly handicapped children can learn social skills in a separate setting without nonhandicapped age peers. Moreover, merely placing the profoundly handicapped in a regular school does not guarantee meaningful interactions. The nonhandicapped must be trained and the profoundly handicapped must be developmentally ready. If the handicapped child is not psychologically or developmentally ready then the regular school setting and the "interactions" can actually be harmful to the child's development. The defendants train volunteers to work with and provide attention to the profoundly handicapped children who can benefit. Three, the Court finds the evidence does not support the plaintiffs' claim that the teachers in separate schools have lower expectations, use inappropriate methods, and burn out more easily. The testimony of the defendants' witnesses, in general, and of the two teachers in particular, Ms. Emmons and Ms. Bolazina, along with the Court's impression of the two teachers supports an opposite conclusion.

This portion of the case comes down to choosing between the conflicting opinions of the experts who testified for both sides. The Court accepted the opinions of the defendants' experts for several reasons. First, the witnesses from the DESE and the SSD showed themselves to be sincere professionals dedicated to the educational advancement of the children they serve. Each witness who testified seemed to be more concerned with what would most benefit or be in the best interest of the child than with the child's educational setting. They appeared delighted and counted it as a success when a child in a separate setting was able to move to a less restrictive environment.[81] This Court's view of the sincer-

81. Granted the defendants' witnesses from the DESE and the SSD had some stake in the status quo, the stake for many would not be very significant. No one really stood to lose their job over this case. The administrators who testified would still be needed to oversee the special education program of the DESE statewide, and the SSD administration would not be

ity and dedication of the DESE and SSD witnesses is bolstered by the previous findings that both are procedurally complying with the Education Act.

Second, the independent approach taken by the outside experts who testified for the defendants led the Court to accept their opinions. Only Dr. Yard had more than minimal ties to the Missouri special education system. Drs. Burton and Gottlieb both made their testimony for the defendants' contingent on their perceptions of the system after viewing it. This is in contrast to the approach taken by plaintiffs' witnesses. All but one admitted that they already believed it was impossible to provide an appropriate education in a separate setting before they even viewed any of the defendants' programs.

Third, the generalizations the plaintiffs make are questionable. The witnesses for the plaintiffs maintained that their views of the benefits of integrating the profoundly handicapped were based on their experience with integrated programs. The programs, however, were all local in scope and voluntary in nature. None were or had been involved in a statewide program of court ordered integration. Dr. Fanning stressed that the localized experience could not be generalized to a state system. Fanning at Vol. 10. Moreover, existing alongside the integration projects of the plaintiffs' experts were separate schools. In each of the state's, and even in each community, profoundly handicapped children remained outside the regular schools. Dr. Gottlieb, who toured both the DeKalb County, Illinois, and the Madison, Wisconsin programs found that the children he observed in the integrated programs were less severely impaired than the children served by the defendants.[82]

Fourth, credibility is not a question of numbers or place in the academic hierarchy. Rather it concerns who is in the better position to know what is being testified to by the competing witnesses. The Court believes that the witnesses for the defendants were in the better position. Their witnesses were administrators and teachers who had evaluated the progress of the children over time and who had worked with the children on a daily basis. As is the nature of such suits, the plaintiffs' witnesses were less familiar with the children at issue. They typically spent only a day or less at each school they visited. They usually concentrated on two to four children at a school, observing the children directly, reviewing their files, and speaking with their teachers. Yet, based on this minimal familiarity they testified that they did not see any children, even the ones they only saw in passing, that could not benefit from a regular school placement. Although the evidence was more general and theoretical, than specific, and the Court is not making any determinations with regard to specific children, two examples regarding individual children make the point here. The teacher of two of the children the plaintiffs' witnesses maintained should be in a regular school testified to the contrary. She maintained that one child is totally unaware of her environment. The child has no body control and must be repositioned, can not differentiate between people, does not know when things in her environment change, and her only communication occurs through unpredictable vocalizing. The other child can sit up but lacks head control and the ability to track objects. She, too, can not differentiate between people and has little environmental awareness.

Fifth, the Court gives the educational theories of the State's educators the deference required by law. This case comes down to a clash between two schools of educational thought on the question of whether interactions with nonhandicapped youngsters in a regular school environment are necessary for an adequate education.

---

affected. The teachers, with experience with these children, would probably be welcomed by the local school districts, and there is some evidence that they would be better paid by the local districts.

**82.** The court by this ruling does not intend to denigrate the integrity of the plaintiffs' witnesses. They are highly motivated and dedicated individuals, committed in good faith, to advancing their theory and belief of what is educationally best for handicapped children.

The Supreme Court in *Rowley* counseled the courts against substituting their own educational theories for those held by the state and local educational agencies. *Hendrick Hudson Central School District v. Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050. Congress placed the primary responsibility for formulating educational policy on the state and local authorities, and it did not intend the courts to strike down an appropriate educational theory. *Id.* at 207–08, 102 S.Ct. at 3051–52. The debate over the need for interaction falls within this category. To rule for the plaintiffs would in essence require the Court to substitute, contrary to congressional intent and to the admonition in *Rowley*, one education theory for another. To overturn an educational theory held and applied in good faith by a state's educational authorities would require a showing that the theory is completely out of step with present educational thought and with no likelihood of benefitting the children served. Such evidence is not before the Court. To the contrary the evidence shows that Missouri is in the mainstream of special education. At present most severely handicapped youngsters continue to be educated in separate schools. Only Hawaii has fully integrated its handicapped children into its regular schools. Hawaii, however, only has one school district and its IEP teams still refer children to private schools or other nonregular school placements. All other states continue to educate more than just the medically fragile or physically abusive in separate schools. This Court is the first to recognize that the necessity of being the first to do something new or different is not a valid reason for not doing it. Neither, though, is change for its own sake a valid reason to change.

Here, the defendants are complying with the procedural requirements of the Education Act and are committed to an educational theory which is not inconsistent with the Act. The defendants' goal is to prepare each child to live as independently as the child's capabilities will allow. They theorize that to reach that goal they must have a system of alternative educational settings, a mechanism to place each child in the setting best suited to develop the child's skills, and a procedure to move the child to less restrictive settings as his skills develop. This is consistent with the Education Act and its regulations. This Court, therefore, will not interfere with and disrupt the state and local control of the special education program by ordering the defendants to change their program to comply with the theory espoused by the plaintiffs.

Again, as a postscript the Court points out that its ruling is limited to a finding that it is possible to provide an adequate education in a separate educational setting. The Court has not ruled and does not take a position on the particular educational programs provided to individual students. If a parent believes that his child's program is inappropriate he is free to pursue relief through the administrative review process and a court challenge.

Rehabilitation Act

The plaintiffs next turn to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as a basis for challenging the validity of the separate facilities maintained by the defendants. Section 504 of the Rehabilitation Act prohibits any handicapped person from being excluded from, denied the benefits of, or discriminated against with respect to any program receiving federal funds.[83] The plaintiffs argue that by plac-

---

**83.** Section 504 reads, in pertinent part that:
No otherwise qualified handicapped individual in the United States, as defined in Section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving federal financial assistance ....
29 U.S.C. § 794 (1978). Section 706(7) provides that

... the term "handicapped individual" means, for purposes of subchapters IV and V of this chapter, any person who (i) has a physical or mental impairment which substantially limits one or more of such person's life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.
20 U.S.C. § 706(7) (1978). Section 504 falls within Subchapter V.

ing the profoundly handicapped in separate schools the defendants exclude them from, deny them the benefits of, and discriminate against them with regard to a regular school placement in violation of Section 504. They claim that the Section and its accompanying regulations mandate the inclusion of these children into educational programs in the regular schools. The Court finds that the defendants maintenance of separate schools does not violate Section 504. Contrary to the assertion of the plaintiffs, Section 504 like the Education Act, does not mandate the education of all handicapped children in regular schools. The defendants' compliance with the requirements of the Education Act establishes compliance with Section 504.

The defendants argue first that Congress preempted the application of Section 504 to the area of elementary and secondary education with the passage of the Education Act. Five circuits, including this circuit, have ruled that the Education Act and Section 504 provide independent causes of action. *Timms v. Metro Sch. Dist. of Wabash Co., Ind.,* 722 F.2d 1310 (7th Cir. 1983); *Georgia Ass'n of Retarded Citizens v. McDaniel,* 716 F.2d 1565 (11th Cir.1983); *Marvin H. v. Austin Indep. Sch. Dist.,* 714 F.2d 1348 (5th Cir.1983); *Smith v. Cumberland Sch. Comm.* 703 F.2d 4 (1st Cir. 1983); *Monahan v. Nebraska,* 687 F.2d 1164 (8th Cir.1983). Two recent Supreme Court cases, though, lend considerable credence to the position of the defendants and cast doubt on the decisions of the five circuits. *Smith v. Robinson,* —— U.S. ——, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Irving Indep. Sch. Dist. v. Tatro,* —— U.S. ——, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984). Each case discussed the reach of the Education Act with reference to the payment of attorney's fees. The Education Act does not provide for attorney's fees. The plaintiffs in *Smith* were trying to obtain them under Section 504 and Section 1983, and the plaintiffs in *Tatro* under Section 504. The Court concluded that Congress did not intend to allow parties to "circumvent the requirements or supplement the remedies of the EHA [Education Act] by resort to the general antidiscrim-

ination provision of Section 504." *Smith v. Robinson,* —— U.S. at ——, 104 S.Ct. at 3473. The Court in *Smith* reached the same conclusion with respect to equal protection claims under Section 1983, but did not rule on the due process claims.

The plaintiffs maintain that *Smith* and *Tatro* stand only for the proposition that if a party succeeds on its Education Act claim then it can not pursue a remedy under either Section 504 or Section 1983, but if the party fails under the Education Act then it still has the potential of alternative claims under Sections 504 and 1983. This Court's reading of *Smith* and *Tatro* is broader than that of the plaintiffs. If a party's claim concerns some aspect of his educational program cognizable under the Education Act the Education Act is the exclusive remedy for the party. The decisions in *Smith* and *Tatro* were handed down as this opinion neared completion, and since the extent of their application has not been discussed by this or any other circuit, the Court in the interest of efficiency and a final resolution of this case will proceed to discuss the merits of the plaintiff's Section 504 and Section 1983 claims.

The Eighth Circuit recently applied Section 504 to claims of discrimination in the education of handicapped children. *Monahan v. Nebraska,* 687 F.2d 1164 (8th Cir. 1983). The relevant issue in *Monahan* concerned whether damages for an improper educational placement were recoverable under Section 504. The appellate court viewed the reference to discrimination in Section 504 as indicating that a violation of the section required a different showing than did a violation of the Education Act. For the latter Act, the showing of an improper placement, educational program, or evaluation would be sufficient to constitute a violation. *Id.* at 1170. Relying on its belief that Section 504 did not create general tort liability and giving heed to the Supreme Court's admonition in *Rowley* that courts were not to substitute their judgment for that of the state and local educational authorities, the Eighth Circuit held that "either bad faith or gross misjudgment should be shown before a Section 504 violation can be made out, at least in the

context of education of handicapped children." The Court explained that it could "not believe that Congress intended to create liability under Section 504 ... as long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals ...." *Id.* at 1171.

Applying the *Monahan* analysis, this Court concludes that the defendants have not violated Section 504. The Court has already found that the witnesses who administer or work for the defendants are sincere, knowledgeable and dedicated educators with the best interests of the children they serve foremost in their minds. The plaintiffs' have not provided any evidence of bad faith or gross misjudgment on the part of the defendants. The plaintiffs do maintain that the defendants' refusal to transfer the severely handicapped to regular schools despite the advances in the education of the handicapped rises to the level of an unreasonable refusal to modify a program. *Southeastern Community College v. Davis,* 442 U.S. 397, 412–13, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979).[84] The defendants' programs have been evolving with the advances in education. For example, Missouri once educated moderately handicapped students in separate schools. They are now placed in regular schools. Another example is the effort that has been made by both the DESE and the SSD to intensify the standards for placement outside the regular school environment. Other examples have been previously cited, but these two suffice to show that the educational systems under attack have not been static. The Court recognizes that there is an ongoing debate on the proper educational placement for the profoundly handicapped. The Court's function, however, is not to decide the debate nor interfere with the decision of Missouri's educators unless they have substantially departed from "acceptable professional judgment, practice or standards." *Monahan v. Nebraska,* 687 F.2d at 1171. The Court finds that Missouri's system of educating the severely handicapped is in the mainstream of acceptable professional thought. Nor have the defendants exercised their professional judgment in such a manner as to grossly depart from the accepted professional standards. Supportive of this finding are: (1) Forty-nine states currently educate some children in separate schools, and the other state, Hawaii, will still determine on occasion that other placement is more appropriate. *See Dept. of Ed., State of Hawaii v. Katherine D.,* 727 F.2d 809 (9th Cir.1983); (2) Missouri provides for local districts to take over separate programs on a voluntary basis; (3) The defendants provide a continuum of placements and services that is fluid and allows each child to progress to less restrictive environments as he is ready; (4) To date the Secretary of Education has approved the compliance plans submitted by the State of Missouri;

---

**84.** *Davis* presented the Supreme Court with its first opportunity to interpret Section 504. The case concerned the exclusion of a hearing impaired individual from a college nursing program. Based on evidence that the hearing impairment would prevent Davis from participating in the entire program and could pose a safety problem for patients assigned to her the Court upheld the denial of admission. The Court stressed that Section 504 did not preclude the college from considering Davis'. handicap and excluding her from the program if her handicap prevented her from meeting all of the requirements of the program. *Id.* at 405–06, 99 S.Ct. at 2366–67. Section 504 prohibits only discrimination based on a handicap. A handicapped individual who is otherwise qualified to participate in a program can not be denied the opportunity to participate solely because she is handicapped. *Id.* at 406, 99 S.Ct. at 2367.

Davis argued that with certain modifications of the training program she could learn some of the functions of a registered nurse and at the same time not endanger any patients. *Id.* at 408, 99 S.Ct. at 2368. The Court answered that Section 504 did not require affirmative action to modify a program. A program needed only to be modified to the extent necessary to eliminate discrimination. *Id.* at 410, 99 S.Ct. at 2369. The Court added, however, that the line between unnecessary affirmative modifications and necessary modifications to eliminate discrimination was not always clear. It pointed out that situations may arise, due to changes in circumstances or innovations, where a refusal to modify a program would constitute discrimination. *Id.* at 412–13, 99 S.Ct. at 2370. The plaintiffs now rely on this caveat.

(5) The experts who testified on behalf of the defendants maintained that the Missouri state school system is on the cutting edge of the field. Fanning at Vol. 10; Burton at Vol. 11. Dr. Hall stated that the SSD provides the best educational program for the handicapped in the state.

Normally, a conclusion that the defendants have satisfied the requirements of or are acting consistently with the case law of the circuit would end the inquiry. The Court, however, hesitates to stop at this point today. At least one other circuit, the Seventh, has questioned the bad faith or gross misconduct standard enunciated in *Monahan,* and none of the other circuits have applied it. The Seventh Circuit's concern arises over the application of Title VI cases to Section 504. Originally intended as an amendment to the Civil Rights Act of 1964, Section 504 is patterned after Title VI of the Civil Rights Act, which prohibits race discrimination.[85] In 1981 the Rehabilitation Act was amended to provide that the remedies set out in Title VI would also apply to Section 504 actions. 29 U.S.C. § 794a(a)(2). The Seventh Circuit Court believed that these two factors weaken the *Monahan* standard because Title VI has been interpreted as not requiring proof of intentional discrimination unless compensatory relief is sought. *Timms v. Metro Sch. Dist. of Wabash Co., Ind.,* 722 F.2d at 1318 n. 4, citing *Guardian Ass'n v. Civil Service Comm.,* — U.S. —, 103 S.Ct. 3221, 3235 n. 27, 77 L.Ed.2d 866 (1983).[86] Whether the Eighth Circuit Court intended the standard announced in *Monahan* to be ap-

plied in all Section 504 cases dealing with the education of the handicapped is not clear. The language used in *Monahan* does not hint of any limitations on the application of the standard. If that is the case, then the undersigned Court has already found the defendants in compliance with Section 504. It may be, however, that despite the broad language, the Circuit Court intended the standard posited in *Monahan* to apply only to cases where compensatory damages are sought. *Monahan,* after all, was such a case. If so, then the Court must further address the plaintiffs' Section 504 claim. The plaintiffs do not seek compensatory damages.

Section 504 prohibits discrimination against the handicapped in any program which receives federal assistance. The plaintiffs view education in a regular school environment as the program in question. They argue that the defendants are violating Section 504 by excluding the severely handicapped they serve from an educational program in a regular school and concomitantly from its benefits.

▌ The plaintiffs focus on a regular school education as the federally funded program in question is misplaced. As with the Education Act, the congressional concern underlying Section 504 and its regulations is broader. The concern is that handicapped children not be excluded, denied, or discriminated with regard to a free appropriate public education.[87] 34 C.F.R. § 104.-33(a). There is no evidence in the record that the defendants have excluded any child in Missouri from receiving a publicly

**85.** Title VI reads in pertinent part:
No person in the United States shall on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**86.** At least one court has questioned the application of race case principles to cases dealing with discrimination of the handicapped. *Garrity v. Gallen,* 522 F.Supp. 171, 206 (D.N.H.1981). The *Garrity* court cited two reasons why courts should not analogize "race" to "handicap." First, unlike race there are no readily apparent divisions among the handicapped. Second, whereas race is not a precursor of ability, hand-

icap and ability are inextricably intertwined. *Id.* at 206. Also, the *Timms* court concluded that it was unclear whether Title VI principles applied to Section 504. *Timms v. Metro Sch. Dist.,* 722 F.2d at 1318 n. 4.

**87.** Where a child is placed is only a component of an appropriate education. *Id.* at § 104.33(b). The Section 504 regulations do express a preference for educating the handicapped with non-handicapped children, but the regulations do not mandate it. A child, who a placement team finds can not receive a satisfactory education in a regular school with the use of supplemental aids and services may be educated elsewhere. 34 C.F.R. § 104.35(c).

paid for education nor denied any child the opportunity to enjoy the benefits of a public education. This Court has already found, under the Education Act, that the defendants, on a systemic basis, are providing a free appropriate public eduation to the children they serve. The defendants are complying with the placement requirements and the regular school preference. Their compliance with the Education Act is sufficient, in this situation, to satisfy Section 504 and its underlying Congressional

intent. This Court is convinced that when a Section 504 claim is based on some facet of the Education Act, such as the plaintiffs claim here, compliance. with the requirements of the Education Act also establishes compliance with Section 504 even assuming, as urged by the plaintiffs, that the two Acts do provide independent causes of action. In the realm of elementary and secondary education for the handicapped Section 504 does not require anything beyond that required by the Education Act.[88]

**88.** The plaintiffs set out five benefits that they claim are available to children attending regular schools. (1) the opportunity to interact with nonhandicapped children, (2) a more motivated, highly qualified staff, (3) a greater range of available activities, (4) a locally elected school board, and (5) a six hour school day. In essence, they claim that the children attending the separate schools are being denied these benefits, solely because they are handicapped. Section 504 requires modification of programs necessary to eliminate discrimination, which they claim in this instance entails transferring the severely handicapped to regular schools.

Even assuming a local educational program is the appropriate program to focus upon for this inquiry, the same conclusion is reached for two reasons. First, Section 504 requires that the handicapped seeking participation in or the benefits of a federally assisted program must be qualified despite their handicap to participate in the program. The Court has already found that on a systemic basis the defendants have procedures in place to ensure that the proper placement decisions are made. A decision that a child should be placed in a separate school is also a decision that the child is not qualified for a regular school program.

Second, the benefits claimed would either not be beneficial to this group of children or are not inherent to a regular school setting. The first two benefits, interaction opportunities and teacher quality, have been discussed. The evidence established that for handicapped children who are not ready to interact, interaction opportunities will not be used and the exposure will often prove harmful to the child's further development. Similarly, there is no resulting benefit in teacher quality by placing the children in regular schools. The teachers in the separate schools must be certified to teach the severely handicapped. No evidence has been presented to the effect that teachers employed by the defendants are less competent. Witnesses for the plaintiffs who observed in the separate schools found the teachers competent, and witnesses for the defendants testified that they are highly motivated. The Court's impression of the two teachers who testified for the defendants supports this testimony. Also, the evidence indi-

cated that teachers in the separate schools are better able to combat burn out, the primary concern of the plaintiffs.

The plaintiffs' third claim is that a regular school environment provides a variety of extracurricular activities, has a library, and has personnel not available in the separate schools. They did not, however, show how many handicapped children now participate in these activities. Nor did they show what activities are offered to the handicapped by the local school districts that have taken over state school programs. Similar to the interaction opportunities the availability of numerous activities is meaningless unless the child is able to actually participate. The evidence indicates that most, if not all, of the handicapped children in the separate schools have either severe speech and communication impairments, motoric limitations, environmental awareness deficiencies, significant mental handicaps, or a combination thereof. The availability of organized sports, cheerleading, student council, the math club, national honor society, etc., is not beneficial to a child that can not hold its head up, or is not aware of his environment, or can not communicate, or can not even do rudimentary academic exercises. Likewise, access to a library is not beneficial to a child that has not developed the mental or physical capacity to read. No evidence was presented to indicate that students who might possess basic reading skills are not furnished sufficient reading materials. The evidence indicates that counselors and social workers are made available when a child's IEP calls for them. The benefit of having certified art and music teachers is not clear. Section 504 does not require equality for its own sake. Resources are too scarce to provide the handicapped with activities or personnel from which they can not benefit.

The fourth benefit, like the interaction opportunities, is tied to a regular school environment as the system is now set up. The state schools do not have a "local" school board as do the regular schools, and the special school districts. The plaintiffs claim that parents of children in separate schools are denied the opportunity to petition a local school board responsive to community needs to redress their grievances. Al-

A comparison of Section 504 with the Education Act further supports this conclusion. Both Section 504 and its accompanying regulations, at subpart D, 34 C.F.R. § 104.31–39, and the Education Act and its regulations are directed toward ensuring a free appropriate education to each handicapped child. Section 504, passed with the Rehabilitation Act in 1973, is a general provision directed at combating discrimination of the handicapped in connection with any program receiving federal assistance. It does not require a recipient of federal funds to do any more than eliminate discrimination and ensure equal treatment of the handicapped in the federally assisted program. Affirmative action is not required. *Southeastern Community College v. Davis*, 422 U.S. at 410–11. The Education Act, on the other hand, passed after the Rehabilitation Act is in direct response to the issue posed here: what type of public elementary and secondary education must a state which receives federal funding under the Act provide to the handicapped. It provides that the state must assure equal access to a free appropriate public education for each handicapped child. *Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. at 200, 102 S.Ct. at 3047. Congress, however, when dealing specifically with the public education of the handicapped through the Education Act did not require "strict equality of opportunity and services." It recognized that the handicapped, to receive a meaningful educational opportunity would require extra help in the form of special aids and services generally not afforded to the nonhandicapped. *Id.* at 198–99, 102 S.Ct. at 3046–47. Unlike Section 504, which does not require affirmative action on the part of federal recipients, the Education Act requires the states that participate to take affirmative steps to ensure the provision of an appropriate education to each handicapped child. *See id.* at 183, 102 S.Ct. at 3039; *Southeastern Community College v. Davis*, 442 U.S. at 411, 99 S.Ct. at 2369; *Timms v. Metro Sch. Dist.*, 722

though, the state schools do not have a "local" school board, parents have sufficient outlets for expression of their concerns and redress of their grievances. They have the opportunity to participate in the formulation of their child's educational program, something not available to the parents of nonhandicapped children. They are also guaranteed notice of any change in their child's program and may institute at any time a challenge to the child's identification, evaluation, educational program, placement, or review through established administrative review procedures. Federal law requires public hearings and consultation with individuals involved in or concerned with the education of the handicapped. 20 U.S.C. § 1412(7). Missouri provides for public hearings and for the Commissioner of Education to establish an advisory committee to review services and consider problems. Mo.Rev.Stat. § 162.685; § 162.690. Missouri has at least one advisory committee. The committee consists of parents, educators, university people, private vendors, and therapy service providers. Eldridge at Vol. 15. Dr. Hall testified that he spends half of each working day dealing with parents, and holds at least one forum per month. Hall at Vol. 17.

The final benefit claimed does cause the Court some concern. The plaintiffs claim that the children in separate schools are denied a full school day. By law, the regular public schools must provide a six hour school day. Mo.Rev. Stat. § 160.041. The state schools, however, do not fall within § 160.041. They provide a five hour school day. The Court notes first that the length of the school day is not a product of the setting. Both Special School Districts have school days of longer duration than six hours. The St. Louis State School and Hospital has a six hour school day. Defs. ans. to Interrogatories #7. Nevertheless, the Court is concerned, about the five hour school days in the state schools and the DMH facilities. The defendants did not put on any evidence to indicate why they have shorter days. At trial they objected to the plaintiffs offering of this evidence; they claimed that the length of the school day had not been pled, and, therefore, was not an issue in the case. It may be that some handicapped children would not benefit from an additional hour, but that is a determination that must be made on an individual basis. If the DESE has limited the school day for all of these children solely because they are handicapped, then it would be in violation of Section 504. The Court, however, does not reach this question because the plaintiffs at trial informed the Court that "[t]he length of the school day we are offering as evidence on the issues of Section 504 violations and equal protection violations, and we don't mean to make this an issue as such that we are seeking specific relief from." Transcript Vol. 6, lines 14–18. Since the length of the school day is not a product of the school environment this does not warrant a change in the placements. The State should review its five hour school day provisions in the light of this opinion and particularly this footnote.

F.2d at 1317; *Monahan v. Nebraska,* 687 F.2d at 1170. For example, under the Education Act each participating state must identify the eligible children in the state, diagnose their educational needs, develop an individualized educational program to meet the needs of each one, place each one in the least restrictive educational environment in which the child can receive a satisfactory education, and provide their parents with a mechanism whereby they can challenge and change the results of any of the above. 20 U.S.C. § 1412. No federal statute affords this specialized treatment and these benefits to the general, nonhandicapped population.[89] In light of the comprehensive detail and specific nature of the Education Act, the undersigned Court will not assume that Congress intended Section 504 to create compliance requirements in the area of the education of the handicapped beyond those set out in the Education Act. *See Smith v. Cumberland Sch. Comm.,* 703 F.2d 4, 10 (1st Cir.1983); *Darlene L. v. Ill. St. Bd. of Ed.,* 568 F.Supp. 1340, 1346–47 (N.D.Ill.1983).

The regulations in subpart D that accompany Section 504 also lend credence to the view that compliance with the Education Act is, at the least, sufficient to satisfy Section 504. First, the regulations, although not as extensive, mirror the major requirements of the Education Act. A recipient that operates a public elementary or secondary school must identify, 34 C.F.R. § 104.32(a); evaluate, § 104.35(a) and (b); provide a free appropriate educational program designed to meet the unique needs of § 104.33(a) and (b); place in the least restrictive educational environment which can provide a satisfactory education to, § 104.34(a); § 104.35(c); and reevaluate, § 104.35(d); each child within the recipient's jurisdiction. The recipient must also provide a review process. *Id.* at § 104.36. If a party has satisfied the more comprehensive requirements under the Education Act, then it has satisfied the procedural

requirements of Section 504. *Smith v. Cumberland Sch. Comm.,* 703 F.2d 4, 9 (1st Cir.1983). Second, the regulations themselves point out that one way to establish compliance with Section 504 is by implementing "an individualized educational program developed in accordance with the Education of the Handicapped Act ...." 34 C.F.R. § 104.33(2). Third, the reach of these regulations has been called into question by the Supreme Court. On both the occasions that the Court has written on Section 504 with regard to education it has pointed out that the regulations can not require any changes beyond what is necessary to eliminate discrimination. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 399, 101 S.Ct. 1830, 1836, 68 L.Ed.2d 175 (1981) (Burger, J. concurring); *Southeastern Community College v. Davis,* 422 U.S. at 410, 99 S.Ct. at 2369. Each time the Court has emphasized the limited nature of what Section 504 requires of federal recipients. This concern with the scope of the post-secondary education regulations has been recognized as extending to the regulations concerning elementary and secondary education. *New Mexico Ass'n of Retarded Citizens v. New Mexico,* 678 F.2d 847, 852 (10th Cir.1982). Although neither the Supreme Court nor any other federal court, to this Court's knowledge, has held that the regulations go too far and are invalid, the regulations themselves and the reservations stated by the Supreme Court both serve to indicate that the compliance requirements of Section 504 do not extend beyond the requirements of the Education Act.

Finally the Court notes that several cases confronted with claims under both the Education Act and Section 504 have reached the same conclusion: The Education Act sets the outer limits on what is required of a state in the area of educating the handicapped. *See Timms v. Metro Sch. Dist.,* 722 F.2d at 1317–18; *Colin K.*

---

**89.** Another example of the difference in the reach of the two statutes is the consideration given the finances of the school system. Under the Education Act a lack of funds is not a defense to noncompliance. *Roncker v. Walter,*

700 F.2d at 1063. In comparison under Section 504, modifications to accommodate the handicapped are limited so as not to cause any undue financial hardship. *New Mexico Ass'n of Retarded Citizens v. New Mexico,* 678 F.2d at 854.

*v. Schmidt,* 715 F.2d at 9; *Smith v. Cumberland Sch. Comm.,* 703 F.2d at 9 n. 5 and 10; *Darlene L. v. Ill. St. Bd. of Ed.,* 568 F.Supp. at 1346–47. *Stacey G. v. Pasadena Indep. Sch. Dist.,* 547 F.Supp. 61, 75 n. 8 (S.D.Tex.1982). *See also S–1 v. Turlington,* 635 F.2d 342 (5th Cir.1981) (analyzed claims under both statutes together). The Tenth Circuit in analyzing a challenge to New Mexico's educational system for the handicapped based solely on Section 504 intimated that the requirements under the Education Act are broader and extend farther than does Section 504. *New Mexico Ass'n of Retarded Citizens v. New Mexico,* 678 F.2d at 853. New Mexico does not participate in the Education Act program. No opinion has come to this Court's attention which has held the other way.

The Court is not suggesting that to satisfy Section 504 a federal fund recipient must always comply with the requirements of the Education Act. To the contrary, this Court is of the opinion, based on the foregoing, that compliance with Section 504 is less demanding than is compliance with the Education Act. That being the case, the Court is holding only that when the Section 504 claim concerns a facet of the education of handicapped children covered by the Education Act, such as the educational program or placement, a showing of compliance with the latter satisfies the former. The defendants are complying with the Education Act. The Court, therefore, finds that the defendants also are not violating Section 504.

Constitutional Challenges

■ The plaintiffs raise two constitutional challenges to the separate facilities; one is based on the equal protection clause and the other on the due process clause of the fourteenth amendment to the United States Constitution. With regard to the equal protection claim, the plaintiffs argue that the handicapped children placed in separate schools pursuant to Missouri law, Mo.Rev. Stat. § 162.675(3), are denied access to an adequate education in a regular school afforded other children. They maintain that the classification established by the section does not further any state interest in providing an education to these children and can not withstand any level of scrutiny under the equal protection clause.

Ordinarily upon finding that a state classification exists, and it is uncontested here that Section 162.675(3) sets out a classification, the next question is which level of scrutiny should be used to determine the validity of the classification. The Court does not need to reach that question, however, since it finds that the classification contained in Section 162.675 satisfies the most stringent level of review, strict scrutiny. The Court cautions that it is not finding, nor does it mean to imply that strict scrutiny is the appropriate standard; only that even assuming strict scrutiny to be applicable Section 162.675 survives the equal protection challenge.[90]

**90.** It is the Court's view that strict scrutiny is not the appropriate standard. Strict scrutiny applies when the classification affects a fundamental interest or a suspect class. Public education is not a right created by the Constitution, and, therefore, is not a fundamental interest. *Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973). Nor have the handicapped been recognized as a suspect class. To date the Supreme Court has recognized only race and national origin as suspect classes. It has not addressed the question with regard to handicapped individuals. At least two Circuits have taken up that question and have rejected handicapped status as creating a suspect class. *Brown v. Sibley,* 650 F.2d 760 (5th Cir.1981); *Doe v. Colautti,* 592 F.2d 704, 711 (3rd Cir.1979). *See also Dopico v. Goldschmidt,* 518 F.Supp. 1161 (S.D.N.Y.1981); *Sherer v. Waier,* 457 F.Supp. 1039 (W.D.Mo.1977). Only one case has been brought to this Court's attention that has held that handicapped persons are members of a suspect class. *In re G.H.,* 218 N.W.2d 441 (N.D.1974). A suspect class must be readily ascertainable and have been subject to a history of unequal treatment and political powerlessness. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1294. The handicapped do not fit the traditional notions of a suspect class. First, the handicapped are not as readily ascertainable as are the traditional suspect classes of race and national origin. This is even more true when one seeks to subdivide the handicapped into classes. Several different definitions of "severely handicapped" were held by the various witnesses that testified. Second, unlike race or national origin, a handicapping condition does have an effect on the individual's abilities. *See Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Finally, the passage of

Section 162.675(3), the challenged statute, defines "severely handicapped children" as those children whom professionals have determined, after evaluating their handicapping conditions, can not benefit from or meaningfully participate in regular school programs for handicapped children. Under strict scrutiny analysis this classification must be "precisely tailored to serve a compelling state interest." *Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982). The defendants maintain, and the plaintiffs concede that the state's interest is in providing an adequate education to all children, handicapped and nonhandicapped, within the state. The Court finds that provision of a public education is a compelling state interest. The importance of an education to the individual and to society has long been recognized. An education allows the individual to be more self-sufficient and a more productive member of the community. It also aids him in participating in the social and political institutions that undergird this nation. *Plyler v. Doe*, 457 U.S. at 211, 102 S.Ct. at 2392; *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. at 30, 93 S.Ct. at 1295; *Brown v. Bd. of Ed.*, 347 U.S. at 493, 74 S.Ct. at 691. The framers, however, did not create, explicitly or implicitly a direct constitutionally based right to an educa-

the Rehabilitation and the Education Acts detracts from the political powerlessness concern.

Whether a rational basis or the intermediate level of scrutiny is the more appropriate standard is more difficult to determine. Although the Supreme Court has not dealt with an equal protection claim involving a handicapped class, two equal protection cases involving public elementary and secondary education provide some insight into the problem. In *Plyler*, the more recent of the cases, the Court applied the intermediate tier of scrutiny and found that a Texas law which denied state education money to local school districts to educate undocumented, alien children violated the equal protection clause. Two points argue against application of *Plyler*. In *Plyler* the Court stressed that the states did not have authority in the realm of classifying aliens, and therefore, the special deference afforded the Congress in that area did not also apply to the states. *Id.* 457 U.S. at 225, 102 S.Ct. at 2399. The primary responsibility for public education, however, has traditionally been left to the states and localities. *Brown v. Bd. of Ed.*, 347 U.S. at 493, 74 S.Ct. at 691. Also, *Plyler* points out that the middle level of scrutiny allows the Court to apply a heightened level of review when absolute and enduring constitutional principles are involved. *Plyler v. Doe*, 457 U.S. at 218 n. 16, 102 S.Ct. at 2395 n. 16 (citations omitted). There is debate as to the proper method for educating the more severely handicapped. The testimony evidenced strongly held opinions by well regarded professionals on both sides of the separate school—regular school issue. The concern at issue lacks the absolute and enduring nature spoken of by the Court.

The other case is *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 37, 93 S.Ct. 1299. The Supreme Court in that case applied a rational basis standard and determined that Texas' system of distributing state tax money to local school districts did not violate the equal process clause even though it still resulted in the poorer districts having less money to spend on educa-

tion. Furthermore, the Court expressed reluctance to intercede in an area left primarily to the states.

In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels. Education, perhaps even more than welfare assistance, presents a myriad of "intractable economic, social, and even philosophical problems." The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them" and that, within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect.

\* \* \* \* \* \*

The ultimate wisdom as to these and related problems of education is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.

*Id.* at 55, 93 S.Ct. at 1308. These statements apply equally as well to the review of educational policies and theory with regard to the handicapped, and were reflected in the Court's opinion in *Rowley*, where it cautioned courts against substituting their judgment for that of the state and local educational authorities. *Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. at 207–08, 102 S.Ct. at 3051–52.

tion. *Plyler v. Doe*, 457 U.S. at 221, 102 S.Ct. at 2397; *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. at 35, 93 S.Ct. at 1297. Rather, the provision of a public education has fallen to the states. In light of the significance of an education, its provision is seen as one of the state's most important functions. *Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. at 207–08, 102 S.Ct. at 3051–52; *Plyler v. Doe*, 457 U.S. at 221, 102 S.Ct. at 2397; *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. at 30, 93 S.Ct. at 1295; *Brown v. Bd. of Ed.*, 347 U.S. at 493, 74 S.Ct. at 691. Missouri, in unison with the other forty-nine states, has undertaken to provide a public education to all children residing within the state. Mo. Const. Art. 9 § 1(a); Mo.Rev.Stat. § 160.051. The Court also finds that the classification in Section 162.675(3) is precisely tailored to serve the State's interest in providing an adequate education. The section allows only those children who can not benefit from or meaningfully participate in a regular school program for the handicapped to be placed elsewhere. The only criteria contained in the section "benefit" and "meaningful participation" are directly connected with the quality of the educational opportunity in the regular school. If a child, like his handicapped and nonhandicapped counterparts attending regular schools, can benefit from an educational program there, then the section requires that he also attend a regular school. If, however, the child unlike his counterparts would not benefit, then the section requires that he be placed in an educational setting where he will benefit. To require that all children, even those who can not benefit or meaningfully participate, be placed in a regular school would itself constitute an equal protection violation. This subgroup of school age children would be denied the opportunity to receive an adequate education.

The plaintiffs also challenge the classification as applied. They claim that handicapped children who could benefit from attending a regular school and interacting with nonhandicapped peers are denied that opportunity under Section 162.675(3). In other words, the classification as applied is overinclusive. The Court finds that not only is the statute precisely drawn, but it is also applied in a manner consistent with the equal protection clause. Section 162.-675(3) is consistent with Congress' recognition in the Education Act, 20 U.S.C. § 1412(5)(B), that not all handicapped children can receive a satisfactory education in a regular school. In order to assure that each handicapped child is placed in the appropriate setting Congress in the Act, and the regulations, established set procedures to follow in making placement decisions. The Court has already found the defendants to be in compliance with these procedures. Each child is evaluated on an individual basis by a number of professionals across a range of physical and mental modalities. The results are then reviewed by an IEP team. The team develops an IEP for the child and determines the appropriate placement to implement the IEP. The placement decision is based on educational need and not some criteria extraneous to the section. Also, the Court has already found the defendants in compliance with the provisions requiring a continuum of placements, and review of each IEP and of each placement on at least an annual basis. Moreover, the DESE has been keeping pace with the changes in the field of educating the handicapped. Pertinent to this issue, the evidence indicates that as educational theory and methods have improved allowing more children to receive an adequate education in regular schools the DESE has been making the requirements for separate school placement more and more stringent.

Aside from the traditional equal protection analysis, the Court also concludes that Section 162.675(3)'s consistency with the requirements of the Education Act establishes that it is valid under the equal protection clause. This Court shares the conviction of the Tenth Circuit that the Education Act is grounded, at least in part, on the fifth section of the fourteenth amendment, which gives Congress the power to enact laws to implement or enforce the amendment. *Crawford v. Pittman*, 708 F.2d 1028, 1036 (10th Cir.1983). Neither

the Act nor its legislative history actually acknowledges any reliance on the enacting power created in section five. Congress does not have to recite "section five" or "fourteenth amendment" as a source of power, however, in order for a Court to find that Congress has exercised that power. *E.E.O.C. v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983). All that is necessary is that the legislative purpose or history indicate its exercise. *Ibid.* Here, the legislative history of the Education Act indicates that Congress was concerned with ensuring that handicapped children received the equal protection of the laws with respect to public education.[91] See Conf.Rep. 94–664; House Rep. 94–332; Sen.Rep. 94–168; 20 U.S.C. § 1400(b)(9). With the passage of the Education Act, Congress intended to provide handicapped children equal access to educational opportunities at public expense. *Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. at 200, 102 S.Ct. at 3047. It preferred that each handicapped child be placed in a regular school alongside nonhandicapped peers, but realized that for some handicapped children to have an opportunity for a satisfactory education would require placing them outside the regular classroom and even the regular school. 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.551. Section 162.675(3) of Missouri law along with Section 162.680(2), Missouri's least restrictive environment provision, satisfies this acknowledgment by Congress that certain handicapped students will need to attend a nonregular school to ensure that they receive an equal educational op-

portunity. When a state classification is challenged on equal protection grounds and the classification is consistent with and in response to a federal statute enacted to assure implementation of the fourteenth amendment's equal protection clause then the reviewing court is hard pressed to find the state classification invalid, especially where there is no challenge to the underlying federal act. Here, the Court finds the classification established by Section 162.675(3) consistent with the equal protection clause.

■ The plaintiffs also raise a substantive due process challenge to the separate schools. They assert that severely handicapped children have an interest in receiving an education in a regular school with nonhandicapped children that is substantively protected by the due process clause. They argue, therefore, that placing handicapped children in separate schools substantially violates the due process clause. The gist of the arguments raised by the plaintiffs in support of this claim are no different from those raised in support of their equal protection and statutory challenges, and no more persuasive. The Court doubts very much whether the interest urged by the plaintiffs is protected, but even if it is, the Court concludes that the defendants have acted in a reasonable manner in placing the more profoundly and severely handicapped in separate schools.

■ The first step in analyzing a substantive due process claim is to determine whether there is a protected liberty inter-

---

91. Both Houses stated views that the Education Act was designed to implement the equal protection clause. The House Committee stated that it believed the "State laws and court orders must be implemented and that Congress has the responsibility to assure equal protection of the laws and thus to take action to assure that handicapped children have available to them appropriate educational services." House Rep. 94–332 at 19. The Senate Committee wrote that it believed that "Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity." Sen.Rep. 94–168 at 9, U.S.Code Cong. & Admin.News 1975, p. 1433. See also *Id.* at 22. Furthermore in the Conference Report,

the Conference Committee wrote: "The Senate Bill and not the House Amendments state that it is in the national interest that the Federal Government assist state and local efforts in order to assure equal protection of the law. The House recedes." Conf.Rep. 94–664 at 28–29. The same basic statement is also found in the first section of the Act. "[I]t is in the national interest that the Federal Government assist state and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law. 20 U.S.C. § 1400(b)(9). Several commentators have also mentioned the equal protection concerns of the Act. *See Colley, supra,* at 142; Miller, Ind.L.Rev. at 17 n. 56; Puget Sound L.Rev. at 185.

est.[92] No court, to this Court's knowledge, has found the interest urged by the plaintiffs, the interest of a severely handicapped child in being educated in a school attended by nonhandicapped children, to be a protected interest. The Court does not deny that there is some support for the view that receipt of an education, *per se* may be a protected interest. The Supreme Court has found a liberty interest in teaching and learning a foreign language, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922) (the concept of liberty encompasses the right "to acquire useful knowledge"); in sending one's child to private school, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1962); and in Blacks being educated with Whites, *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (due process clause of the Fifth Amendment.) In *Griswold* the Court cited *Meyer* and *Pierce* for the proposition that a state can not "contract the spectrum of available knowledge." *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). None of these cases go as far as the plaintiffs now urge. What the plaintiffs really seek here is the constitutional recognition of a particular theory on how best to educate the more profoundly and severely handicapped. Furthermore, this theory of education, which is currently the subject of much debate and controversy, is not the type of interest to be constitutionalized.[93] A ruling in the plaintiffs' favor would eliminate the flexibility and experimentation ongoing in this ever changing field.

▆▆▆ Assuming, however, that the parents of the plaintiffs have a liberty interest in having their children educated in a regular school under *Pierce* or that the severely handicapped may have a protected interest in associating with the nonhandicapped under *Bolling* or *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); or even that a liberty interest akin to that urged by the plaintiffs does exist, the Court finds that the defendants have acted in a manner consistent with the due process clause. Finding a recognized liberty interest does not end the inquiry. Liberty interests are not sacrosanct. *Youngberg v. Romeo*, 457 U.S. 307, 320, 102 S.Ct. 2452, 3460, 73 L.Ed.2d 28 (1982); *Roe v. Wade*, 410 U.S. 113, 153–54, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973). Substantive due process does not act as a barrier shielding protected interests from all governmental constraints. So long as a state acts rationally and not arbitrarily, and imposes a restraint reasonably related to a legitimate government end then the due process clause, for substantive purposes, is satisfied. *Youngberg v. Romeo*, 457 U.S. at 321, 102 S.Ct. at 2461; *Kelley v. Johnson*, 425 U.S. 238, 248, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976). To determine whether a restraint is arbitrary or reasonable, the liberty interests of the individual(s) are balanced against the interests of the state. *Youngberg v. Romeo*, 457 U.S. at 320–21, 102 S.Ct. at 2460–61; *Roe v. Wade*, 410 U.S. at 154, 93 S.Ct. at 727. Here, the interest of the state is in providing each child, handicapped and nonhandicapped alike, with a beneficial educational opportunity. Mo.Rev.Stat. § 162.675(3). The professionals administering Missouri's system of public education have concluded that for some handicapped children to have a beneficial educational experience they need to have access to separate schools. The State's interest in providing an adequate education outweighs the plaintiffs' interest in attending a particular type of school or in associating with nonhandi-

92. The plaintiffs argue that based on the least restrictive environment provisions of the Education Act and Missouri law the handicapped have a protected property interest in being educated in an environment with nonhandicapped peers. Undoubtedly the Education Act and Missouri law create an entitlement recognized for purposes of procedural due process. State and federal statutes, however, do not of themselves create substantive due process rights. Substan-

tively protected rights must flow either directly from the Constitution or be peripheral to those explicitly set out. *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). Education is not such a right. *See* n. 98.

93. Substantive due process applies only to liberty interests recognized as emanating from the Constitution. See n. 90.

capped children, and the State's method of only placing in a separate school those children who could not receive a beneficial education in a regular school is reasonably connected to this end. The plaintiffs argue that the separate school placements are not reasonably related to the provision of an adequate education because handicapped children can not receive an adequate education in a separate school and because the separate placement will stigmatize them. The Court has previously found that the separate schools can and do provide adequate educational opportunities, and that some handicapped children can not benefit from a regular school environment. The evidence also indicates that the "stigma" attaches to the handicapped status rather than to attendance at a particular school. Mild and moderately handicapped children in regular schools are subject to teasing and verbal harassment due to their handicaps. Moreover, for the children who are only, at best, minimally aware of their environment stigma is not an important concern. Placing each child in an educational setting suited to allow the child to develop fundamental life and social skills is more important than placing a child in a regular school where he would not benefit just to avoid a possible stigma. *Parham v. J.R.,* 442 U.S. 584, 600–01, 99 S.Ct. 2493, 2503–04, 61 L.Ed.2d 101 (1979) (failure to treat a mental disorder may create more of a stigma than the knowledge that one is being treated for the disorder).

Recent Supreme Court decisions support the conclusion that the defendants have not substantively violated the due process clause. The Court, in *Youngberg* when faced with a substantive due process claim by a mentally retarded individual challenging the training he was receiving in the state institution in which he had been placed, stated that due deference should be given to the decisions made by the professionals working in the institution when balancing the respective interests. *Youngberg v. Romeo,* 457 U.S. at 322, 102 S.Ct. at 2461. The Court reasoned that courts were no better qualified to make these types of decisions and that deference would limit the judiciary's interference into the internal operations of the state institutions. *Id.* at 322–23, 102 S.Ct. at 2461–62. The Court concluded that the "decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462. The Court believes that this same reasoning applies equally as well to decisions made by professionals concerning the education of the handicapped. *Rowley* admonished courts not to become enmeshed in educational theory and policy squabbles. Such decisions were better left to state and local educators. *Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. at 207–08, 102 S.Ct. at 3051–52. In an earlier case presenting a substantive due process claim, the Court warned against judicial intrusion into academic decision making. *Bd. of Curators, Univ. of Missouri v. Horowitz,* 435 U.S. 78, 92, 98 S.Ct. 948, 956, 55 L.Ed.2d 124 (1978) (without deciding whether medical student had a substantive due process claim to challenge her dismissal from school for academic reasons, ruled that her dismissal did not violate the clause). The evidence cited earlier in this opinion establishes that the professional educators for the defendants have acted reasonably and within the recognized area of professional judgment, practice, and methods in deciding to provide separate schools for the handicapped children who would not benefit from a regular school setting.[94]

---

**94.** The plaintiffs maintain that the professionals who make the placement decisions are not able to exercise their independent judgment because there is no regular school placement option for them to choose.

The defendants' continuums do not inhibit the IEP teams professional judgment. The defendants do not label a group of children as "severely handicapped" and then automatically place them in separate schools. Rather each IEP team reviews the unique characteristics of each child and determines where in the continuum of placements, which includes placements in a regular classroom and in a separate classroom in a regular school, the child would be placed appro-

The defendants have not violated the due process clause in this regard.[95]

Conclusion

Based on the foregoing discussion, this Court concludes that the special educational programs and the separate facilities of the defendants, considered systemically, do not violate the statutory or constitutional provisions relied upon by the plaintiffs. The undersigned Court, therefore, finds plaintiffs' claims to be without merit. As noted in the opinion above, the Court finds the issues in favor of defendants and against plaintiffs. The injunctive and declaratory relief sought by the plaintiffs is denied.

priately. The full continuum is available to all of the handicapped children.

**95.** The plaintiffs raise two additional challenges, one under 42 U.S.C. § 1983 and the other based on Missouri law. Each requires only limited comment.

Based on this Court's earlier findings that the defendants are in compliance with the Education Act and the Rehabilitation Act and have not violated the equal protection or due process clauses of the Fourteenth Amendment, the plaintiffs do not have a claim to assert under Section 1983. Section 1983 does not provide any substantive rights of its own. It is procedural in nature, designed to assure that an aggrieved individual has a vehicle by which to redress constitutional violations or the violation of certain federal statutes. *Middlesex County Sewage Auth. v. National Sea Clammers Assoc.,* 453 U.S. 1, 19–20, 101 S.Ct. 2615, 2625–2626, 69 L.Ed.2d 435 (1981); *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 27–30, 101 S.Ct. 1531, 1545–1546, 67 L.Ed.2d 694 (1981); *Chapman v. Houston Welfare Rights Organ.,* 411 U.S. 600, 606, 617–18, 99 S.Ct. 1905, 1910, 1915–1916, 60 L.Ed.2d 508 (1979); *Miener v. Missouri,* 673 F.2d 969, 976 n. 6 (8th Cir.1982). Without the finding of an applicable statutory violation or a constitutional violation Section 1983 does not create a right of action.

As for the state law claim, the Court believes that it is precluded from reaching the merits of the claim by the Supreme Court's most recent *Pennhurst* decision. *Pennhurst State Sch. & Hosp. v. Halderman,* — U.S. —, ———————, 104 S.Ct. 900, 910–911, 79 L.Ed.2d 67, 81–82 (1984). The Supreme Court analyzed the competing interests in federal supremacy and in

state sovereignty as recognized in the *Young* and *Edelman* line of cases. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (can not recover retroactive monetary relief in suit against state official for violation of federal law); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (a suit against a state official alleging conduct in violation of the Constitution is not a suit against a state, and, therefore, not barred by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman,* — U.S. at ———————, 104 S.Ct. at 908–910, 79 L.Ed.2d at 79–81. It ruled that the overriding need to promote federal supremacy when a federal statute or the Constitution is involved is not present where the concern is whether state officials are complying with state law. *Id.* at ——, 104 S.Ct. at 911, 79 L.Ed.2d at 82. In such a situation no federal interest is present, yet "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlies the Eleventh Amendment." *Id.* at ——, 104 S.Ct. at 911, 79 L.Ed.2d at 82. The principles recognized and applied in *Pennhurst* also apply here where the plaintiffs ask the Court to determine whether state education officials are complying with state law.

The Court notes in passing that even if *Pennhurst* did not apply, it would rule for the defendants on the merits. The aforementioned evidence indicates that the defendants are complying with state law.

Also, see *Wilson v. Marana Unified School Dist. of Pima County* (9th Cir.1984), 735 F.2d 1178 at 1183.